## STATE BAR OF NEVADA, Petitioner, *v.* HARRY EUGENE CLAIBORNE, Respondent.

No. 17294

May 18, 1988

756 P.2d 464

*John Howe,* Nevada State Bar Counsel, Las Vegas, for Petitioner.

*Oscar B. Goodman, David Goldwater,* Las Vegas; *John S. Drendel,* Reno, for Respondent.

# OPINION

By the Court, STEFFEN, J.:

On November 25, 1987, this court entered a preliminary order in this matter indicating that from our review of the pertinent legal authorities and the facts reflected in the record before us, we were "not persuaded that further discipline should be imposed upon respondent." *See* Docket No. 17294, order filed November 25, 1987. Our order indicated that a full and formal opinion setting forth in detail the grounds for our decision would be forthcoming. Accordingly, this opinion constitutes our formal and final resolution of the issues presented in this disciplinary proceeding.

The unique history and extensive interest permeating this proceeding demand a protracted and detailed analysis of the complex of factors that culminated in this court's determination not to impose further discipline on the respondent Harry Eugene Claiborne. The extent to which the judicial assets of this court have been allocated to the fair and just resolution of this matter reflect a predominate concern and sensitivity to the preservation of public confidence in the integrity of the state bar and, by extension, the judicial system of this state. We especially invite those who are and have been content to judge the integrity and rightness of our preliminary decision by result alone to travel forthrightly and objectively with us over the expansive terrain that follows. There can be little understanding or appreciation for the destination reached by this court without surveying the path it followed.

TABLE OF CONTENTS

PAGE

I. PROCEDURAL HISTORY................................................ 118

II. PRELIMINARY NOTE................................................. 129

III. THE FACTUAL HISTORY OF RESPONDENT'S
CONVICTION AND EVENTUAL REMOVAL
FROM OFFICE.......................................................... 129

   A. THE TENSION BETWEEN FEDERAL
AGENTS AND THE NEVADA FEDERAL
DISTRICT COURT JUDGES................................. 131

   B. ALLEGATIONS OF INVESTIGATORY
MISCONDUCT....................................................... 135

   C. THE FEDERAL GOVERNMENT'S BARGAIN
WITH JOSEPH CONFORTE................................. 139

   D. THE GRAND JURY INDICTMENT..................... 153

   E. RESPONDENT'S FIRST TRIAL............................ 153

   F. THE SECOND TRIAL AND SUBSEQUENT
APPELLATE AND CONGRESSIONAL
PROCEEDINGS........................................................ 169

      1. CONCERNS AND CONSEQUENCES OF
THE GRAND JURY INDICTMENT............. 172

      2. EVIDENCE OF RESPONDENT'S
"WILLFUL AND KNOWING" CON-
DUCT.................................................................. 176

        a. THE 1979 RETURN............................... 177

        b. THE 1980 RETURN............................... 183

      3. THE JUDICIAL AND CONGRESSIONAL
PROCEEDINGS.................................................. 194

IV. RESPONDENT'S PROFESSIONAL BACK-
GROUND................................................................... 205

V. DISCUSSION............................................................... 210

VI. CONCLUSION............................................................. 230

## I. PROCEDURAL HISTORY

Initially, for the benefit of the public and the bar, we will set forth in detail the procedural history of this matter in order to clarify the circumstances under which this case came before this court, as well as the process we employed in resolving the legal issues presented.

The Board of Governors of the State Bar of Nevada (the Board) first acted upon this matter in May of 1986, at their annual meeting in San Diego, California. Following that meeting, on May 27, 1986, former Bar Counsel transmitted to this court a certified copy of respondent's judgment of conviction. Additionally, Bar Counsel filed a motion, referring to SCR 111, requesting that this court temporarily "suspend" respondent from the practice of law in this state and refer the matter to the Southern Nevada Disciplinary Board of the State Bar for the sole purpose of assessing the extent of the discipline to be imposed by reason of respondent's conviction.[1] On July 9, 1986, respondent's counsel opposed the motion for temporary suspension, contending, among other things, that the State Bar had no jurisdiction to proceed against respondent Claiborne under SCR 111 because of respondent's official status at that time as a member of the federal judiciary.[2]

At the time former Bar Counsel filed the aforementioned

---

[1]SCR 111 provides in pertinent part:

(1) Upon the filing with the supreme court of a certificate of conviction demonstrating that an attorney has been convicted of a serious crime, as defined by this rule . . . the court shall enter an order suspending the attorney . . . pending final disposition of a disciplinary proceeding, which shall be commenced by the appropriate disciplinary board upon notice of conviction. For good cause, the court may set aside its order suspending the attorney from the practice of law.

[2]Interestingly, the former President of the State Bar and other members of the Board advised this court, through its current Chief Justice, that at the above-noted San Diego meeting Bar Counsel succeeded in bringing the instant disciplinary matter before the Board without the customary notice, and that Bar Counsel acted in excess of the Board's consensus by moving to suspend respondent. Specifically, the Chief Justice was advised that it was the consensus of the Board that Bar Counsel should merely notify this court of respondent's conviction without assuming an adversarial stance in the matter.

Bar Counsel, Michael Barr, subsequently resigned his position as counsel for the State Bar and presently serves as an assistant United States Attorney in Las Vegas. Although the minutes of the Board's meeting in San Diego in May of 1986 have never been submitted to this court as part of the formal record in these proceedings, the State Bar has never clarified or contradicted our recital of the Board's actions at that meeting. In particular, we note that we made reference to these facts in the memorandum and order directed to the Board on January 26, 1987. In light of the fact that the State Bar has never availed itself of the opportunity to submit any clarifications or corrections pertaining to our understanding of the Board's consensus at its May,

motion with this court, respondent officially occupied the office of United States District Judge for the District of Nevada. Respondent was not actively engaged in the practice of law in this state and in fact was precluded from such practice by federal law because he was a sitting federal judge. *See* 28 U.S.C. § 454 (1982); *cf.* SCR 98. The policy underlying SCR 111 is to afford protection to the public while disciplinary proceedings are pending against active, practicing members of the bar who have been convicted of criminal offenses reflecting upon their fitness to practice law. SCR 111 relates to proceedings against *attorneys* who are convicted of serious crimes, and does not by its terms apply to state or federal judicial officers, whose conduct in office is subject to different regulatory measures. *See, e.g.,* Nev. Const. art. 6, § 21 and art. 7, § 3; Nev. Code of Jud. Conduct, Canons 1 through 7; U.S. Const. art. II, § 4; 28 U.S.C. § 372 (1982). Based upon an extensive body of legal authority, this court concluded, therefore, in an order filed on July 22, 1986, that the State Bar lacked jurisdiction to conduct disciplinary proceedings against respondent pursuant to SCR 111 while he officially retained the position of United States District Judge.[3] Additionally, we noted that, arguably, this court also lacked jurisdiction to proceed against a sitting federal judge. We nevertheless considered it prudent to undertake a preliminary investigation that would facilitate a fair and reasonable resolution of the matter in the event that the jurisdictional impediment was removed. We accordingly specified in our order that:

> Judge Claiborne's conviction justifies this court in deferring a final decision as to our own jurisdiction and in pursuing further inquiry. Moreover, this court believes that, although the State Bar of Nevada lacks jurisdiction over Judge

---

1986 meeting, we have no reason to doubt the accuracy of the representations made to the Chief Justice in this regard by the former President of the State Bar and other members of the Board.

[3]Specifically, in our order of July 22, 1986, we relied upon the following authorities: In re Watson, 71 Nev. 227, 286 P.2d 254 (1955); Alabama State Bar ex rel. Steiner v. Aderholt, 218 So.2d 149 (Ala. 1969) (state bar cannot remove or discipline a state court judge where the constitution provides the exclusive method of removal); State Bar v. Superior Court, 278 P. 432 (Cal. 1929) (judge of court of record was not, during continuance in office, subject to jurisdiction, control, and processes conferred on state bar association); Petition of Colorado Bar Association, 325 P.2d 932 (Colo. 1958); In re Meraux, 12 So.2d 798 (La. 1943) (judges are inactive members of the bar and hence are not subject to disciplinary authority of the state bar association); In re Strahl, 195 N.Y.S. 385 (App. Div. 1922) (court dismissed petition by the bar association to discipline as an attorney a state court judge reasoning that "the right to practice law by one holding such a judicial office as the respondent is suspended during his incumbency"); Chambers v. Central Committee, 224 P.2d 583 (Okla. 1950).

> Claiborne, *[Bar Counsel] should be permitted to aid our inquiry by presenting any pertinent evidence he may possess concerning Judge Claiborne's contentions that proceedings against him in federal court have not been conducted fairly, in accord with due process, and in a manner entitling them to credit in disciplinary action by this court.* (Emphasis added.)

Thereafter, on August 4, 1986, former Bar Counsel responded to our order and acknowledged that the State Bar possessed "no evidence concerning [respondent's] contentions." In our view, his response indicated, among other things, that he had filed his petition seeking respondent's temporary suspension without any substantial preliminary legal or factual research. Consequently, based on our review of the preliminary documents and materials filed by respondent's counsel, this court determined that respondent's contentions could not be summarily dismissed. *See* Docket No. 17294, order filed September 16, 1986; *see also* In re Hallinan, 307 P.2d 1 (Cal. 1957); In re Hallinan, 272 P.2d 768 (Cal. 1954) (court refused to proceed summarily against an attorney solely on the basis of judgment of conviction for "wilfully and knowingly filing false and fraudulent federal income tax returns" without first inquiring into whether facts and circumstances surrounding the commission of the offense involved moral turpitude or other misconduct warranting disbarment or suspension). Accordingly, on September 16, 1986, we issued an order directing respondent to transmit to this court an extensive supplemental record of the federal proceedings against him which would fully apprise this court of matters essential to our complete understanding of the pending issues, and from which the federal government's position and the evidence against respondent could be accurately discerned.[4]

---

[4]Specifically, this court placed upon respondent's counsel the burden of transmitting:

1. The transcripts of both of respondent's trials in federal court;
2. All briefs filed by the United States and respondent in the United States Court of Appeals for the Ninth Circuit;
3. The United States' opposition to respondent's petition for a rehearing filed in the Ninth Circuit;
4. File-stamped copies of all pretrial and post-trial motions to dismiss, motions for a judgment of acquittal or new trial, opposition thereto, and orders resolving those motions, pertinent to the second trial;
5. File-stamped copies of all motions for judicial recusal, opposition thereto, and any pleadings or other documents relevant to the issue of whether the federal district court judge conducted the trials in a biased or prejudicial manner;
6. Any other relevant documentation tendered or filed in the criminal proceedings addressing the issue of misconduct of government agents and prosecutorial abuse prior to and during trial; and
7. Transcripts of the hearings conducted on the motions described above.

On October 21, 1986, respondent's counsel complied with our directive and transmitted the requested record.[5] Subsequently, respondent's counsel further supplemented the record before us with a multi-volume set of the "Report of the Senate Impeachment Trial Committee" containing, *inter alia,* the transcripts of all testimony elicited during the United States Senate proceedings conducted pursuant to the articles of impeachment returned by the House of Representatives. Upon receipt of these materials, this court directed its Central Legal Staff to review the voluminous record and to prepare a detailed memorandum summarizing and evaluating its contents.

On January 26, 1987, upon completion of our staff's review, in an effort to insure the accuracy and completeness of our staff's factual analysis, this court issued an order affording the Board an opportunity to review, evaluate, and comment upon our staff's initial, extensive memorandum.[6] We requested the Board to evaluate carefully and objectively our staff's analysis "in the light of the record, so that the truth may be as fully determined as possible, to the end that we may perform our judgmental function."[7]

On February 13, 1987, the Board submitted a response to our

---

[5]The record in this proceeding is divided into four parts. Part I is comprised of the pleadings filed in the United States District Court for the District of Nevada. Parts II and III consist of the transcript of respondent's first trial and the transcript of his second trial, respectively. Part IV contains the pleadings filed in the United States Court of Appeals for the Ninth Circuit and in the United States Supreme Court. References to the record are hereinafter referred to as "Rec. Pt. ......, Vol. ...... at ......."

[6]We note in this regard that the extensive record in this matter has been readily available for review by the State Bar throughout a major part of these proceedings. Present Bar Counsel, John Howe, acknowledged at the hearing of November 24, 1987, that respondent's counsel, Oscar Goodman, had supplied the State Bar, through service upon Mr. Howe's predecessor, with a copy of the complete record which Mr. Goodman transmitted to this court. Further, at the hearing of November 24, 1987, Mr. Howe indicated that he had received no instructions from the Board directing him to review that record, and that he was, quite understandably, not familiar with the underlying charges and proceedings resulting in respondent's conviction.

[7]Specifically, we requested the Board to file a memorandum advising this court:

(1) Whether the facts stated in the memorandum prepared by this Court's Central Legal Staff . . . are perceived to be inaccurate or incomplete in any material particulars which might reasonably affect this Court's judgment herein; and

(2) If so, what further facts in the record should be considered, or what further evidence should be received, relating to the questions of whether, and to what extent, further disciplinary action is warranted as to Harry E. Claiborne.

*See* Docket No. 17294, order filed January 26, 1987.

request stating in part that the Board "respectfully decline[d] to review the Claiborne record or comment on the Central Legal Staff's analysis of it." Instead, the Board suggested that it "would support retaining an independent attorney to do so, perhaps an academic from a recognized law school who would have student assistance available to carry out the enormous task the evaluation would be." The Board also expressed its belief that disciplinary proceedings against respondent should be conducted pursuant to SCR 111 because respondent was at that time no longer a member of the judiciary. In addition, the Board stated that, in its opinion, the Bar Governors' review of the record or of our staff's memorandum "would not . . . establish facts by which full faith and credit could be denied to [respondent's] federal judgment of conviction," and that the Board lacked the investigative and administrative support necessary to conduct a full hearing.[8] Nonetheless, the Board also expressed its support of those who, "at the time of Respondent's impeachment trial, called for an inquiry into the circumstances of his investigation, indictment, prosecution and conviction." Thus, the Board's response seemed to express divergent and, from our perspective, internally inconsistent viewpoints respecting our request for assistance.

In any event, the Board's equivocation finely focused the concerns and alternatives besetting our court. We could have followed the Board's suggestion and sought assistance outside the bar and the court in accomplishing the "enormous task" of further evaluation of the results of the extensive efforts of our own central legal staff. We elected not to pursue this alternative because of our confidence in the quality and objectivity of our staff's analysis of the voluminous record coupled with our dissatisfaction with the portents of delay and inefficiency inherent in obtaining a review by an academic while concomitantly referring the matter to a disciplinary board. Moreover, we were less than enthused by the Board's apparent lack of commitment to a task that could have been accomplished with paid assistance at comparatively small expense to the Bar's substantial surplus funds.

We found equally unreasonable the Board's request to invoke the machinery and pendent sanction of SCR 111. Given the exhaustive review of the Claiborne history by this court, and the disavowal of resources available to the Board to undertake the

---

[8]We note that the inquiry before this court does not include a question of "full faith and credit" as suggested by the Board. *See* U.S. Const. art. IV, § 1. Instead, the question before this court is whether, based on all the circumstances, professional discipline should be imposed. *See* Sloan v. State Bar, 102 Nev. 436, 440, 726 P.2d 330, 333 (1986); In re Kristovich, 556 P.2d 771, 773 (Cal. 1976) (court may look at the whole course of attorney's conduct which reflects on his fitness to practice law).

enormous task of reviewing the record and our staff analysis thereof, there was little expectancy for timely and effective review by busy lawyers sitting as an extension of the Board in the form of a disciplinary board. Although respondent was disentitled to favored treatment by the bench and bar of this state, basic fairness would not permit us to ignore the tortured history of Claiborne's prosecution, conviction, impeachment, and incarceration combined with the prospect of protracted disciplinary proceedings that could, by virtue of delay alone, expand the degree of punishment well beyond the bounds of human decency and objective judicial discretion.

In our approach to SCR 111, as with any other rule of court, we are enjoined to give the rule a liberal construction ''to promote and facilitate the administration of justice by the court.'' SCR 5. Moreover, it is beyond cavil that the inherent rule-making powers of this court also include the power to suspend or relax any court rule in order to promote individual justice. *See* Ashley v. Superior Court in and for Pierce County, 521 P.2d 711, 715 (Wash. 1974); 21 C.J.S. *Courts* § 178 (1940); 20 Am.Jur.2d *Courts* §§ 79, 85 (1965). *See also* State v. Lemme, 244 A.2d 585, 589 (R.I. 1968); Norton v. Standard Coosa-Thatcher Company, 315 S.W.2d 245, 249 (Tenn. 1958) (on rehearing). Based upon the foregoing principles, we determined that efficiency and justice would be served by suspending the operation of SCR 111, insofar as it required the court to order the suspension of respondent upon receipt of the certificate of his conviction, and to refer the matter to a disciplinary board of the state bar.

In respect of our decision not to suspend respondent upon receipt of the certificate of his conviction, we reiterate that, at that time, such suspension was arguably beyond our jurisdiction and unnecessary in any event because Claiborne was still a federal judge. At the point of respondent's impeachment and removal from office, he was incarcerated and therefore unable to practice law. Finally, as respondent's counsel observed at our hearing of November 24, 1987, respondent had voluntarily refrained from the practice of law pending this court's resolution of the question of his fitness to remain a licensed member of the bar.[9]

---

[9]State Bar v. Claiborne, Docket No. 17294, Reporter's Transcript of Hearing of November 24, 1987, at 105-06. We note in this regard that in July of 1986, respondent's counsel asserted that proceedings before a disciplinary panel of the state bar during the period of respondent's incarceration would deprive respondent of due process of law. *See* Respondent's Points and Authorities, Docket No. 17294, filed July 9, 1986, at 22-26. In particular, his counsel argued that respondent's right to be heard would be significantly

More important, however, was the concern to protect the public from an unfit practitioner, the underlying purpose for the automatic suspension provision of SCR 111. In this case, the purpose was satisfied by respondent's status as federal judge, incarcerated former judge and voluntary nonparticipant in the practice of law, respectively. Of equal persuasion on the issue of public safety was respondent's lengthy, exemplary record as a trial lawyer prior to his appointment to the federal bench and his subsequent felony conviction. More will be said on that subject later in this opinion. Simply stated, because the policy concern behind the suspension provision of SCR 111 was mooted, the need to suspend under the peculiar facts of this case did not exist. The danger to the public that SCR 111 attempts to foreclose was not present in this instance.[10]

There were also compelling reasons for this court not to refer the issue of Claiborne's discipline to the Southern Nevada Disciplinary Board as provided under SCR 111. As previously noted, this court had commenced reviewing respondent's situation well before his removal as a federal judge on October 9, 1986. And, pursuant to our order of September 16, 1986, respondent's counsel, on October 21 and 22, 1986, provided this court and the State Bar with a complete record of the entire federal court proceedings both at the trial and appellate levels. At no time between the date of October 21, 1986, and our order of January 26, 1987, requesting evaluative assistance from the Board concerning the accuracy

endangered because, due to his incarceration, respondent would be unable personally to attend such a hearing and to articulate his own defense.

This court has previously observed:
The Supreme Court has emphasized that "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). To determine appropriate procedure, we must consider: (1) the private interest affected; (2) the risk of erroneous deprivation by the procedures used; and (3) the government interest to be protected in light of the fiscal and administrative burdens imposed by additional procedural safeguards. Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

See Burleigh v. State Bar of Nevada, 98 Nev. 140, 145, 643 P.2d 1201, 1204 (1982). Unquestionably, respondent's right to practice law is a valuable property right and private interest that cannot be deprived without due process of law. Id. Because respondent was either unable to practice or voluntarily refrained from the private practice of law prior to our order of November 25, 1987, there existed minimal danger to the public interest.

[10]In a somewhat analogous context, this court has previously expressed the policy that it will exercise its inherent authority over matters concerning the bar to provide relief from a rule where the rule operates arbitrarily and effects a result unrelated to its essential purpose. See In re Nort, 96 Nev. 85, 96, 605 P.2d 627, 635 (1980); see also Bennett v. State Bar, 103 Nev. 519, 746 P.2d 143 (1987).

and completeness of our staff analysis of the record, did the Board ask this court, by formal motion or otherwise, to refer the Claiborne matter to the bar disciplinary board. Our January 26, 1987, order should have allayed any fears that this court intended to favor Claiborne with unilateral review. On the other hand, it made no sense for the court to employ an academic to research the extensive Claiborne record and our staff analysis thereof while concomitantly referring the matter to a disciplinary adjunct of the Board which, in the final analysis, could do no more than issue a non-binding recommendation to this court concerning the issue of respondent's discipline. *See* In re Kenick, 100 Nev. 273, 275-76, 680 P.2d 972, 974 (1984); Haviland v. Foley et al., 55 Nev. 455, 457, 39 P.2d 198 (1935); In re Scott, 53 Nev. 24, 38, 292 P. 291, 295 (1930). The Board had declined to review the record on grounds of inadequate resources, and it was apparent that the Southern Nevada Disciplinary Board would have even less capacity to undertake the task. Thus, we were constrained to accept the Board's evident determination that its review of the record and the facts underlying respondent's judgment of conviction was too onerous a task to undertake, notwithstanding the precedents of this court holding that the circumstances underlying the conviction must be considered in a disciplinary proceeding. *See* Sloan v. State Bar, 102 Nev. 436, 440, 726 P.2d 330, 333 (1986); In re Cochrane, 92 Nev. 253, 549 P.2d 328 (1976). Furthermore, as previously observed, the Board's February 13, 1987, response to our order of January 26 of the same year revealed either a misapprehension or lack of commitment to the task with which this court would have to struggle. We were hardly concerned with an exhaustive analysis of the Claiborne record as a possible predicate to a judicially improper denial of full faith and credit to the federal judgment of conviction. Our concerns dealt with the entire complex of circumstances underlying respondent's conviction and its impact, if any, on the nature and extent of any further discipline imposed on respondent by this court. The Board may have viewed such an undertaking as unduly onerous and futile, but we considered the effort necessary to a just disposition of respondent's future as a Nevada lawyer and citizen.

Tragically, the hallmark of Claiborne's prosecution, conviction, appellate review, and eventual removal from the bench has been an apparent unwillingness to consider all pieces of the puzzle. However imperfectly, we have forthrightly sought to assimilate and express a more complete picture of the Claiborne episode. A less thorough review by a disciplinary board would have, for respondent, merely perpetuated, as prologue, an abbreviated formula for the final blow by this court; for us it would have constituted an effort meaningless at best and prejudicial to a

full public understanding and acceptance at worst. We acknowledge that our premise assumes a less thorough review by an ephemeral disciplinary board, but our keen appreciation of the extensive assets invested in our own review provides reason to the assumption. A similar investment by a small group of practicing attorneys and one or more laypersons whose attention to the task could only be intermittent would have required an entirely unacceptable length of delay. In short, our elected course was in no sense a denigration of the character, integrity, and wisdom of bar and lay members sitting on a board of discipline. Rather, it was a recognition of the necessity for a substantial, consistent and prolonged effort that a temporary board is simply unequipped to handle. If, in the final analysis, due process was to have any true meaning to the 70-year-old respondent, protracted delay had to be avoided.

A familiar biblical passage insightfully declares that "the letter killeth, but the spirit giveth life."[11] We suspended the letter of SCR 111 in order to give meaning to its spirit in both the general and specific administration of justice concerning this highly complex and inordinate matter.

Finally, it is well established that, in discharging its inherent authority to discipline the bar, this court has the obligation to conduct an independent and *de novo* review of any record compiled in a disciplinary proceeding in order to determine whether discipline in any particular instance is warranted. See SCR 39; SCR 99(1); In re Kenick, 100 Nev. 273, 680 P.2d 972 (1984); In re Miller, 87 Nev. 65, 482 P.2d 326 (1971); In re Wright, 68 Nev. 324, 232 P.2d 398 (1951); In re Scott, 53 Nev. 24, 292 P. 291 (1930); *accord* McCray v. State Bar of California, 696 P.2d 83 (Cal. 1985); Matter of Nelson, 549 P.2d 21 (Wash. 1976). Thus, regardless of whatever preliminary procedures are utilized, the ultimate responsibility for arriving at the truth in disciplinary matters lies with this court. Because this court had already reviewed an extensive record in order to ascertain the existence of any facts bearing on the subject of disciplinary sanctions, and because the State Bar expressly declined to review that record, disciplinary proceedings before a fact-finding panel of the State Bar in accordance with SCR 111 would have entailed, in our view, substantial delay and a needless waste of resources which in any event the Board indicated it did not possess.[12]

---

[11]2 *Corinthians* 3:6 (King James).

[12]We note that at the hearing of November 24, 1987, Bar Counsel articulated his position that if this court had enough information to decide whether discipline is warranted, he would not quarrel with a deviation from the strict dictates of SCR 111. Specifically, we cite the following exchange from the transcript of that hearing:

JUSTICE STEFFEN: Mr. Howe, so it remains your position that this

After this court had thoroughly familiarized itself with the factual record, we undertook to utilize such resources as were available to us to define and to proceed with the prompt resolution of the legal issues confronting us. Accordingly, on September 18, 1987, we directed Bar Counsel, Mr. Howe, as a fiduciary to this court, "to provide his objective assessment of the legal principles which should control" our review of the record. *See* Docket No. 17294, order filed September 18, 1987.[13] On October 5, 1987,

---

matter should continue to be protracted and that there should be a discipline commission hearing?

In spite of all that's been known on this matter over these months and years, you feel that there would be something to be gained by involving the discipline committee procedure to hear the matter further?

MR. HOWE: Well, certainly, I can understand the problem involved in protracting it and extending it, and certainly that is something that is a disadvantage. And if this court decides that that's its decision, that it has enough information and can decide the issue, then I wouldn't quarrel with that.

But I do think --

CHIEF JUSTICE GUNDERSON: You would not quarrel with that?

MR. HOWE: I would not quarrel with that. But I do think, and the reason why I'm advocating following the system and referring it to the disciplinary board, is that I think the integrity of our system is important. And I think it's important that this case be handled as any other case would be handled which, under the rules, would be to refer it to the disciplinary board and get their findings and recommendations before the court considers it.

Now, it may be that there's special circumstances that the court, you know, feels because of the protracted nature that you want to dispense with that.

As I said, I wouldn't quarrel with that, but that's the reason for my recommendation that that's the way the matter should be handled.

State Bar v. Claiborne, Docket No. 17294, Reporter's Transcript of Hearing of November 24, 1987, at 95-96. *See also* 95 Reports of American Bar Association 783, 826-34 (1971) (Report of the Special Committee on Evaluation of Disciplinary Enforcement, addressing the importance of the prompt disposition of disciplinary proceedings).

[13]Our order indicated that Bar Counsel's discussion should focus on, but need not be limited to, the following questions regarding bar disciplinary proceedings which appeared to bear on respondent's position:

1. Under established Nevada practice, what are the goals of bar disciplinary proceedings?

2. In determining whether further disciplinary sanctions should be imposed by this Court following conviction for a criminal offense, is it appropriate for this Court under established Nevada practice to look beyond the fact of the conviction to determine whether the underlying circumstances of such conviction warrant further discipline?

3. In determining whether the imposition of further discipline is justified, is it appropriate under Nevada practice for this Court to consider whether the alleged conduct that resulted in the conviction is isolated or atypical in character, as well as to consider evidence of the attorney's good character, reputation, contributions to the legal profes-

Bar Counsel submitted his response to our order, indicating that his position respecting the legal principles that should control our review of the record was substantially congruent with the position espoused by respondent. We subsequently determined, however, that the parties should be afforded an opportunity to present to this court any further argument or evidence defining their positions herein and reflecting upon respondent's fitness to resume the active practice of law in this state. Accordingly, this court scheduled a hearing on this matter for November 24, 1987, to be held in Las Vegas, Nevada.[14]

[Headnote 3]

On November 20, 1987, Bar Counsel petitioned this court to open the entire record in this case to the public, including all prior confidential orders of this court, memoranda and responses thereto. Bar Counsel observed that there was substantial public interest in the case and that there had been public disclosure of portions of the record by unknown persons in violation of the established rule that bar disciplinary proceedings are confidential. *See* SCR 121. Accordingly, as the first order of business at the hearing of November 24, 1987, and with respondent's concurrence, the Chief Justice directed that this court's pleading file and the evidentiary records in this matter henceforth be open to public scrutiny.

We are confident that a conscientious review of the now public

---

sion, and professional standing in the legal community over the course of his or her career?

4. In determining whether the imposition of further discipline is justified, is it appropriate for this Court under Nevada practice to consider the retribution already exacted from the attorney as a result of his or her conviction?

[14]Since 1976, the constitution of this state has vested this court with the authority to conduct proceedings anywhere within the State of Nevada. *See* Nev. Const. art. 6, § 7. This court has frequently availed itself of the opportunity to do so in an effort to afford the citizens of Southern Nevada fair and convenient access to the appellate process. Numerous factors convinced us that the Las Vegas area was the most appropriate venue for this proceeding. Specifically, these proceedings primarily related to an individual from Southern Nevada, who was seeking to affirm his right to practice law primarily in that area of the state. Bar Counsel lives and maintains his office in Las Vegas. The most intense public interest in this matter appeared to be focused in Southern Nevada, where respondent has been a prominent member of the community since 1945. Respondent's two counsel live and work in Las Vegas, and we had been informed that a majority of the individuals who might appear before us also maintain their residences and offices in Southern Nevada. Several of these individuals are elder members of the bar and one in particular, who has since passed away, was 90 years old at the time of the hearing. Thus, taking into account the public's right to know, the convenience of the parties, the court, and those who might appear before us, this court determined that Las Vegas was the most appropriate setting for the hearing.

record of the procedural history of this unique matter will indicate that this court endeavored to conduct these proceedings in a manner consistent with the primary and well-established goals and procedures of bar disciplinary action. Further, in light of the Board's evident determination that it should take a nonadversarial stance in this matter, we endeavored to solicit, compile and review a comprehensive factual record from which respondent's position, as well as any contrary positions, could be accurately ascertained and verified. In so doing, extensive resources of this court have been expended in an effort to sift through the complex and unprecedented factual history of this matter to arrive at an equitable result not only consistent with the truth, but also with the public's right to a bar comprised of attorneys possessing the highest standards of integrity and professionalism.

## II.  PRELIMINARY NOTE

In our preliminary decision dated November 25, 1987, we observed that the authorities cited to us by both the State Bar and respondent establish that:

(1) the paramount objective of bar disciplinary proceedings is not additional punishment of the attorney, but rather to protect the public from persons unfit to serve as attorneys and to maintain public confidence in the bar as a whole;

(2) in a disciplinary proceeding, it is the duty of this court to look beyond the label given to a conviction in order to determine whether the underlying circumstances of the conviction warrant discipline;

(3) this court must also consider the isolated nature of an attorney's conduct as well as his prior, exemplary professional standing; and

(4) this court should examine the retribution and punishment already exacted in determining whether further discipline is warranted. Furthermore, humanitarian concerns such as age, ill health, or other disability warrant consideration in disciplinary proceedings.

(Citations omitted.)

We have reviewed the factual record of this matter in light of these fundamental principles. Thus, as set forth below, our review has necessarily entailed a detailed factual analysis of the circumstances surrounding Claiborne's prosecution, indictment, conviction, removal from judicial office, and personal history.

## III.  THE FACTUAL HISTORY OF RESPONDENT'S CONVICTION AND EVENTUAL REMOVAL FROM OFFICE

As fully discussed below, respondent was eventually indicted

in 1983 by a federal grand jury in Reno, Nevada, following an extensive investigation of his activities by four separate grand juries. As Judge Reinhardt of the Ninth Circuit Court of Appeals observed:

> Throughout these proceedings, Judge Claiborne has claimed that his investigation and prosecution constituted a part of an effort by the Department of Justice's Organized Crime Strike Force and the F.B.I. to discredit him personally and bring about his removal from the bench. Prior to his appointment in 1978, Judge Claiborne had been a prominent trial lawyer and had defended numerous individuals accused of committing criminal offenses. He contends that after his appointment the government launched a vendetta against him as a result of his issuance of a number of significant rulings adverse to the Department of Justice in criminal cases.

*See* United States v. Claiborne, 781 F.2d 1327, 1328 (9th Cir. 1986) (Reinhardt, J., dissenting). To date, however, in both the federal criminal proceedings and in the Senate impeachment proceedings, respondent's attempts to obtain evidentiary hearings respecting many of his allegations relating to the investigation, the four grand jury proceedings leading to his indictment, and prosecution of the criminal charges against him, have been denied.[15]

From our perspective, respondent's inability to obtain evidentiary hearings on many of his allegations in this regard is regrettable. It is not the function of this court in the instant disciplinary proceeding, however, to sit in review of the federal proceedings resulting in respondent's conviction. Nonetheless, this court is obligated to look beyond the mere fact of respondent's conviction in order to ascertain to what extent respondent's conduct, and the underlying circumstances of his conviction, mandate the imposition of disciplinary sanctions. *See* Sloan v. State Bar, 102 Nev. 436, 726 P.2d 330 (1986); In re Gross, 659 P.2d 1137 (Cal. 1983); In re Hallinan, 272 P.2d 768 (Cal. 1954); In re Walker, 364 N.E.2d 76 (Ill. 1977). Further, we have concluded that many of the facts underlying respondent's allegations are relevant to our deliberations and are appropriately considered as factors in

---

[15]Rec. Pt. I, Vol. III, Pleading Nos. 26, 27 at 314-15; Rec. Pt. I, Vol. IV, Pleading No. 28 (transcripts of hearings on pretrial motions); Rec. Pt. I, Vol. IV, Pleading No. 37 (orders respecting pretrial motions); Report of the Senate Impeachment Trial Comm.: Hearings Before the Senate Impeachment Trial Comm. on the Impeachment of Harry E. Claiborne, Judge of the U.S. Dist. Ct. for the Dist. of Nevada, of High Crimes and Misdemeanors, 99th Cong., 2nd Sess. 812, Pt. 1 at 108, 690, 876, 1181 (1986) (rulings of Chairman Mathias respecting scope of the impeachment committee's inquiry) [hereinafter cited as Senate Hearings].

mitigation of respondent's conduct. *See* Sloan v. State Bar, *supra;* In re Cochrane, *supra; see also* Murray v. State Bar of California, 709 P.2d 480 (Cal. 1985); In re Kristovich, 556 P.2d 771 (Cal. 1976); Carter v. Cianci, 482 A.2d 1201 (R.I. 1984).

Significantly, in an analogous context, SCR 114(3) expressly provides that a disciplinary judgment of another jurisdiction against an attorney licensed to practice in this state does *not automatically* require that this court impose the identical discipline. SCR 114(3) provides in part that:

> [T]his court shall impose the identical discipline unless the attorney demonstrates, or this court finds, that on the face of the record upon which the discipline is predicated it clearly appears:
>
> (a) That the procedure in the other jurisdiction was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process; or
>
> (b) That there was such an infirmity of proof establishing the misconduct as to give rise to the clear conviction that the court could not, consistent with its duty, accept the decision of the other jurisdiction as fairly reached; or
>
> (c) That the misconduct established warrants substantially different discipline in this state.
>
> If the court determines that any of the preceding factors exist, it shall enter an appropriate order.

This provision of our rules is derived from the United States Supreme Court's decision in Selling v. Radford, 243 U.S. 46, 50-51 (1917). In *Selling,* the Court articulated the well-established principle that where an attorney's right to practice in federal court is in issue, the natural consequences of a judgment in a state bar disciplinary proceeding should not take effect where an intrinsic consideration of the state court record reveals either a want of notice or opportunity to be heard, an infirmity of proof establishing a lack of fair private and professional character, or other grave reasons demonstrating unfairness or injustice. *Id.* Accordingly, we have endeavored to set forth below all the facts disclosed by our review of the record which are relevant to the issue of the nature and extent of discipline applicable to respondent in this state proceeding.

## A. THE TENSION BETWEEN FEDERAL AGENTS AND THE NEVADA FEDERAL DISTRICT COURT JUDGES

When respondent first assumed the federal bench in September of 1978, he initially was assigned to the Reno area, where he remained until late fall of 1979.[16] During his tenure on the bench

---

[16]Rec. Pt. II, Vol. XIII at 3036-37, 3091.

in Reno, and upon his return to Las Vegas, several events transpired which respondent claims ultimately motivated some federal officials to abuse their authority in the overzealous pursuit of his criminal prosecution.

First, in 1980, Joseph Yablonsky arrived in Las Vegas, Nevada, as the Special-Agent-in-Charge of the Las Vegas office of the FBI.[17] Upon his arrival in Nevada, Yablonsky reportedly proclaimed that his mission in Las Vegas was to plant "the American flag in the Nevada desert."[18] In testimony presented to the Senate Impeachment Trial Committee, Hank Greenspun, the publisher and editor of the Las Vegas Sun, stated that he visited Yablonsky's office the "second day" that Yablonsky arrived in Las Vegas. Greenspun recalled that Yablonsky had decorated his office walls with pictures and newspaper articles recounting Yablonsky's exploits in previous FBI criminal investigations. According to Greenspun, Yablonsky indicated, at that time, that a large vacant spot on his office wall had been specifically reserved for Judge Claiborne because he was "going to hang Claiborne up there."[19] Gerald Swanson, the former IRS District Director for Nevada, indicated that Yablonsky made similar comments when Swanson visited Yablonsky's office in December of 1981.[20]

Second, when respondent Claiborne returned to the Las Vegas area in 1979, an atmosphere of animosity and hostility had arisen between the federal district judges in Nevada and certain attorneys in the Justice Department's Strike Force which was investigating organized crime in Nevada.[21] For example, in 1979, then Chief Judge Roger Foley apparently suspected that Geoffrey Anderson, the chief prosecutor for the federal strike force in Las Vegas, had leaked information to the news media from sealed affidavits in a case pending in federal court. Judge Foley's criticism of strike force tactics apparently motivated Anderson to seek Judge Foley's disqualification from at least one case prosecuted by strike force attorneys.[22] In December of 1979, for example,

---

[17]Nomination of William H. Webster: Hearings Before the Sen. Select Comm. on Intelligence on the Nomination of William H. Webster, to be Director of Central Intelligence, 100th Cong., 1st Sess. 276, 93 (1987) (testimony of W. H. Webster) [hereinafter cited as Webster Nomination].

[18]Senate Hearings, *supra* note 15, Pt. 1 at 930 (testimony of H. E. Claiborne).

[19]Senate Hearings, *supra* note 15, Pt. 1 at 843-44 (testimony of H. M. Greenspun).

[20]Rec. Pt. I, Vol. IV, Pleading 33, Ex. B at 10.

[21]*Id.;* Senate Hearings, *supra* note 15, Pt. 4 at 2307-16 (series of newspaper articles respecting strike force).

[22]Senate Hearings, *supra* note 15, Pt. 1 at 930-31 (testimony of H.E. Claiborne); Respondent's "Synopsis of Acts of Governmental Misconduct," at 1 (filed in this court on August 29, 1986); Rec. Pt. I, Vol. I, Pleading No. 6 at 6.

Federal District Judge Thompson denied an attempt by Anderson to have Judge Foley disqualified from presiding over a case prosecuted by the strike force because of actual bias. In denying Anderson's motion, Judge Thompson apparently indicated that Anderson's attitude toward the sensitive problem of judicial disqualification was unbecoming an attorney for the government.[23]

The tension between the federal district court judges in Nevada and the strike force is further evidenced by events which transpired in April of 1980. Chief Judge Foley learned that insulting materials and caricatures were prominently displayed on a bulletin board in the offices of the strike force.[24] Oscar Goodman claimed the derisive items on the bulletin board were in full view of, and had an intimidating and prejudicial effect upon, members of the grand jury, as well as potential grand jury witnesses. These materials consisted of a mock man-on-the-street interview with numerous individuals including former Clark County Sheriff John McCarthy, Judge Claiborne, Judge Foley, defense counsel Goodman, and other individuals, some of whom were reputedly connected with organized crime in Nevada.[25] Sardonic responses to the question, "[d]oes organized crime really run the casinos and the State of Nevada??" appeared beneath the photographs of those depicted. In the space reserved for Judge Claiborne's photograph appeared the notation "no pictures please." Judge Foley, on the other hand, was depicted as a clown dressed in circus regalia. We do not deem it appropriate to set forth the statements attributed to those ridiculed in the item in question. We observe, however, that although the unknown author of this sarcasm ostensibly compiled it in jest, the fact that it was displayed within the confines of the United States Department of Justice, and apparently within the purview of members and witnesses of the grand jury, demonstrated an appalling arrogance, contemptuousness, and lack of decorum. On April 4, 1980, Judge Foley ordered United States Marshals to remove these items.[26] Thereafter, the problems between the strike force attorneys and the federal district judges became so acute as to attract the attention of Nevada's

---

[23]Senate Hearings, *supra* note 15, Pt. 1 at 930-31 (testimony of H.E. Claiborne); Respondent's "Synopsis of Acts of Governmental Misconduct," at 1, Docket No. 17294, filed August 29, 1986. *See also* Rec. Pt. I, Vol. I, Pleading No. 6 at 35.

[24]Senate Hearings, *supra* note 15, Pt. 1 at 931 (testimony of H.E. Claiborne).

[25]Photocopies of this material appear in Rec. Pt. I, Vol. I, Pleading No. 6 at 30-31; Senate Hearings, *supra* note 15, Pt. 1 at 931; *see also* United States v. Claiborne, 781 F.2d 1327, 1328 (9th Cir. 1986) (Reinhardt, J., dissenting).

[26]*See* United States v. Claiborne, 781 F.2d at 1328.

congressional delegation, the highest officials in the Justice Department, and the Clark County Bar Association.[27]

Judge Foley subsequently concluded in light of this atmosphere that he should no longer preside over cases involving the strike force. Further, respondent Claiborne was scheduled to assume Judge Foley's administrative duties as Chief Judge for the District of Nevada in May of 1980. Respondent claims that these facts, in addition to the fact that he had ruled adversely to the government's position and had criticized strike force tactics in several cases which had come before him, eventually motivated some within the strike force and the FBI to view him as an obstacle in their path, and to seek his removal from office.[28]

The difficulties between the strike force and respondent Claiborne were further exacerbated in April of 1980, when the news media began reporting that Judge Claiborne was himself a target of a grand jury investigation spearheaded by the strike force and the FBI.[29] In particular, the media reported that a grand jury was investigating allegations that Judge Claiborne, prior to his appointment to the bench, had hired a Las Vegas detective, Eddie LaRue, to conduct illegal electronic surveillance in the course of a defense investigation. The Public Integrity Section of the United States Department of Justice dispatched an attorney to Las Vegas to pursue these allegations.[30] Upon learning of the grand jury activity, on April 10, 1980, Judge Claiborne publicly stated that he had been cleared of these same charges prior to his appointment to office. Additionally, he publicly denounced the strike force, called for disbandment of the grand jury, and suggested that the grand jury had been tainted by the improper tactics of some strike force agents and attorneys. Specifically, the Las Vegas Sun, in an article entitled, *Judge Says Strike Force Must Go,* quoted Judge Claiborne as follows:

---

[27]Rec. Pt. I, Vol. I, Pleading No. 6 at 23, 34, 44 and 57.

[28]United States v. Claiborne, 781 F.2d 1327 (9th Cir. 1986) (Reinhardt, J., dissenting); Senate Hearings, *supra* note 15, Pt. 1 at 930 (Claiborne testimony). Respondent's testimony in explanation of some of his rulings adverse to the government is set forth in the Senate Hearings, *supra* note 15, Pt. 1 at 966-69. Respondent explained, for example, that in one such case he directed the acquittal of a coin-wrapper employed by a local casino, who was indicted by a grand jury, following a strike force investigation, for making false statements on his income tax return respecting the sale of his automobile. Respondent explained that he felt the only reason the individual was prosecuted was to justify the expenditure of strike force resources in an otherwise fruitless investigation of a casino.

[29]Rec. Pt. I, Vol. I, Pleading No. 6 at 6, 7.

[30]Rec. Pt. I, Vol. I, Pleading No. 6 at 23; Senate Hearings, *supra* note 15, Pt. 1 at 887-88 (testimony of R. Jesinger).

Charging they were a "bunch of crooks," U.S. District Judge Harry E. Claiborne said Wednesday Las Vegas Strike Force attorneys should be thrown out of Nevada and their Special Federal Grand Jury disbanded.

"I think they have outlived their usefulness, and they should be removed from this community," Claiborne said. "The grand jury has become tainted and should be disbanded."

Claiborne said the strike force, which he believes is responsible for 25-30 illegal wiretaps, also conducts illegal arrests and other such far-reaching illegal activity.

"They're a bunch of crooks, and they know I know it," Claiborne angrily said. "I'm not going to let them ride roughshod over this community. I'm going to stop them."[31]

We note, however, that in May of 1980, Judge Claiborne voluntarily removed himself from presiding over any further strike force cases.[32] It was in this setting, then, that federal law enforcement officials pursued the first of four grand jury investigations of Judge Claiborne conducted in Las Vegas, Portland, Oregon and Reno, respectively.

## B. Allegations of Investigatory Misconduct

In the course of its investigation into the allegations that respondent and LaRue conducted illegal electronic surveillance, the Las Vegas federal grand jury subpoenaed Charles Lee in April of 1980.[33] Lee was then employed by the Las Vegas Metropolitan Police Department as a homicide investigator and polygraph operator. His testimony before the grand jury concerned a

---

[31]Rec. Pt. I, Vol. I, Pleading No. 6 at 6; Senate Hearings, *supra* note 15, Pt. 1 at 1139-40 (in response to a question from Senator Heflin, respondent stated that the newspaper's report of his remarks was "absolutely correct" and "absolutely true"). Throughout this opinion, we will from time to time refer to media accounts respecting the many facets of this case. We consider the extensive media attention devoted to this matter over the last ten years to be relevant to our consideration and review in several respects. In particular, it is relevant to the public's perception of Mr. Claiborne, his reputation, his professional standing, and the obloquy and scorn to which he has been subjected as a result of the proceedings in which he has been involved. We wish to make it clear, however, that no factual findings or references of this court have been based upon media coverage of these events. Unless otherwise indicated, any factual recitations appearing in the media accounts cited herein have been verified by our independent research and review of the record in this matter.

[32]Rec. Pt. I, Vol. I, Pleading No. 6 at 37, 39; Senate Hearings, *supra* note 15, Pt. 1 at 931.

[33]Rec. Pt. I, Vol. VIII, Pleading No. 81 (affidavit of Charles Lee).

polygraph examination he had administered to respondent in 1977. Lee told the grand jury that, in his expert opinion, respondent had truthfully denied any participation in activities involving the illegal electronic surveillance into which the grand jury was inquiring.[34]

In an affidavit submitted to the federal court, Lee averred that following his appearance before the grand jury, he was summoned to the office of his superior, Sheriff John McCarthy. McCarthy informed Lee that he "had been visited by two Federal Strike Force agents sent by [FBI, Special-Agent-In-Charge Joseph] Yablonsky." According to Lee, McCarthy further stated that as a result of Lee's exculpatory grand jury testimony, Yablonsky considered Lee to be an "uncooperative witness" and that Yablonsky was going to "come down on [Lee] like a ton of bricks."[35]

Lee's attorney, Michael Stuhff, also has attested to the fact that information subsequently released to Lee pursuant to requests under the Freedom of Information Act and the Privacy Act, "confirms that Lee was targeted [for investigation] by Yablonsky because of Lee's refusal to join in or cooperate with Yablonsky's vendetta against Judge Harry E. Claiborne."[36] Lee and his attorney maintain that, as a result of Lee's testimony before the grand jury, and at the direction of Yablonsky, Lee was demoted and reassigned to a desk job answering telephones, and was further subjected to an intensive three-year investigation. The investigation into Lee's activities involved extensive covert and electronic surveillance of Lee by the FBI. Ultimately, however, the investigation was terminated having disclosed no wrongdoing upon which criminal charges could be based.[37] It can thus be inferred from the record that Lee may have suffered extensive harassment and intimidation solely because he provided exculpatory testimony to the grand jury investigating respondent.

Similarly, the grand jury investigation into the allegations that LaRue conducted illegal electronic surveillance at respondent's direction failed to result in any indictment against respondent. LaRue, however, was formally charged with six counts of install-

---

[34]*Id.* (affidavit of Charles Lee).

[35]*Id.* (affidavit of Charles Lee).

[36]Rec. Pt. I, Vol. VIII, Pleading No. 81 (affidavit of Michael Stuhff).

[37]Rec. Pt. I, Vol. VIII, Pleading No. 81 (affidavits of Charles Lee and Michael Stuhff); Respondent's Compendium, Docket No. 17294, filed September 2, 1986 (Pretrial Motion to Dismiss: First Trial—Grand Jury Abuse, at 70).

ing illegal listening devices.[38] These charges were unrelated to the previous allegations involving respondent. In an affidavit, LaRue has attested that after his indictment, an FBI agent advised him to "give up" Judge Claiborne.[39] Further, LaRue has averred:

> The agent advised me that if I would do that, all federal charges (the indictment against me) would be dropped. I told him to "give up" Judge Claiborne would be false since I didn't know a single thing illegal or unlawful that Judge Claiborne had ever done. The message was clear to me I could rid myself of all the expense, embarrassment, intimidation and sorrow that I had suffered and was about to suffer simply by lying against Judge Claiborne. This I pointedly refused to do and went to trial.

> I went through the anguish of defending myself against these false charges in Reno Federal Court. The Government removed the trial to Reno, Nevada, 500 miles from my home, which added additional financial burden in travel expenses for myself, my attorney and witnesses. After a week-long trial I was acquitted.

> This trial cost me $35,000 in attorney fees alone, to say nothing of the expense of taking my witnesses all across the State to the trial.

> I was wrongfully indicted for the sole purpose of giving the FBI leverage to make a deal with me. The sole purpose and object of my indictment was to "get" Judge Claiborne. He was their target, not me.[40]

Thus, the record reveals some factual basis for concluding that despite a lack of significant evidence of any wrongdoing, LaRue suffered harsh and retributive treatment as a result of his inability to provide inculpatory evidence against respondent.

Respondent contends that additional questions concerning the propriety of his pre-indictment investigation are raised by a curious event that took place on March 19, 1981. On that date, respondent opened his monthly American Express bill and found

---

[38]Rec. Pt. I, Vol. VIII, Pleading No. 81 (affidavit of Eddie LaRue); *see also* United States v. LaRue, Case No. CR-LV-80-109 AJA, United States District Court for the District of Nevada.

[39]Rec. Pt. I, Vol. VIII, Pleading No. 81 (affidavit of Eddie LaRue). We note that our reliance upon affidavits submitted to the United States District Court in respondent's criminal proceedings is necessary because in his criminal and impeachment proceedings, respondent was denied an opportunity to pursue and develop more extensive evidentiary support respecting his allegations of investigative overreaching. *See* note 15, *supra*.

[40]Rec. Pt. I, Vol. VIII, Pleading No. 81 (affidavit of Eddie LaRue).

that an American Express statement addressed to Nevada State District Judge Thomas O'Donnell was included along with respondent's. On April 9, 1981, respondent wrote to the American Express Company requesting an explanation and observed:

> In the envelope containing my last billing was also the bill for Judge Thomas J. O'Donnell. It would not be surprising that someone's bill was also included with mine but our curiosity is more than aroused in view of the fact that Judge O'Donnell is my closest and best friend. For his bill to be included with mine is a very unusual circumstance.
>
> If I were of a suspicious nature, I might suspect that someone is monitoring our accounts and replaced both of them in the same envelope by mistake. If this is true, then both Judge O'Donnell and I desire to pursue it further.[41]

Thereafter, the American Express Company replied that it could not explain the mix-up.[42]

Prior to his first criminal trial, respondent unsuccessfully moved the federal district court to dismiss the charges against him on the grounds of selective prosecution and governmental abuse.[43] Respondent attached an affidavit of Judge O'Donnell to that motion wherein Judge O'Donnell stated that he had at one time informed Judge Claiborne that Gus Gallo, a defendant convicted on gambling tax charges, was a "promising candidate for probation."[44] Judge O'Donnell further attested that he subsequently obtained material indicating that the FBI had investigated respondent in connection with the sentence that respondent ultimately imposed upon Gallo.[45] On the basis of these and other facts, respondent sought an evidentiary hearing to explore the logical inference that because the strike force and the FBI were dissatisfied with the sentence imposed upon Gallo, they instituted an investigation in which mail belonging to respondent and Judge O'Donnell was illegally intercepted resulting in the mix-up of

---

[41]Rec. Pt. I, Vol. II, Pleading No. 8 (Exhibit B).

[42]*Id.*

[43]Rec. Pt. I, Vol. II, Pleading No. 8.

[44]Rec. Pt. I, Vol. II, Pleading No. 8 (affidavit of Judge Thomas O'Donnell).

[45]Apparently, the presentence report on Gallo recommended an eight-month split sentence of four months in jail and four months on probation. Respondent apparently concluded, however, that a fine of $25,000 and two years on probation would have a greater impact upon Gallo than a short term in county jail and would "hit Mr. Gallo where it would hurt—in the pocketbook." Rec. Pt. I, Vol. II, Pleading No. 8 (affidavits of Judge O'Donnell and Judge Claiborne). *See generally* United States v. Gallo, 659 F.2d 110 (9th Cir. 1981).

their March, 1981 American Express statements.[46] Again, however, respondent was denied an opportunity fully to explore these events in evidentiary hearings before the federal district court or before the United States Senate.[47] Nonetheless, for the purposes of these proceedings, and in our view, these factual allegations are sufficiently supported to raise serious questions about the propriety of tactics employed in the pursuit of the indictment and prosecution of respondent.

## C. The Federal Government's Bargain With Joseph Conforte

After the Las Vegas grand jury failed to return an indictment against respondent, officials within the Department of Justice, the FBI and the IRS began to pursue certain allegations regarding respondent's association with a notorious felon by the name of Joseph Conforte. Three subsequent grand juries were empaneled, two in Portland, Oregon, and one in Reno, Nevada, in order to investigate allegations that respondent had solicited and accepted bribes from Conforte while serving as a federal district judge. *See* United States v. Claiborne, 781 F.2d 1327, 1328-29 (9th Cir. 1986) (Reinhardt, J., dissenting).

The first Oregon grand jury proceeding involving respondent was convened on May 11, 1982. This grand jury investigated allegations concerning respondent's involvement with Conforte in alleged violations of 18 U.S.C. § 201 (bribery of a public official), and 18 U.S.C. § 1952 (The Travel Act). The grand jury's mandate expired in December of 1982 without the return of any indictment against respondent. The second Oregon grand jury was convened on March 16, 1983. Similarly, this grand jury investigated, among other things, allegations that respondent accepted bribes from Conforte. The second Oregon grand jury also never returned an indictment against respondent. A third grand jury investigation was commenced in Reno, Nevada, in June of 1983.[48] Unlike the two prior Oregon investigations, the Reno grand jury heard the direct testimony of Conforte, and returned a seven-count indictment against respondent on December 8, 1983, one day after Conforte testified before it.[49] As detailed below, the factual history underlying the federal govern-

---

[46]Rec. Pt. I, Vol. II, Pleading No. 8.

[47]Rec. Pt. I, Vol. III, Pleading Nos. 26, 27; Rec. Pt. I, Vol. IV, Pleading No. 28 (transcripts of hearings on pretrial motions); Rec. Pt. I, Vol. IV, Pleading No. 37 (orders respecting pretrial motions); Senate Hearings, *supra* note 15, Pt. 1 at 108, 690, 876, 1181 (rulings of Chairman Mathias respecting scope of the impeachment committee's inquiry).

[48]Rec. Pt. I, Vol. V, Pleading No. 47 at 4-6, and note 6.

[49]Rec. Pt. I, Vol. I, Pleading No. 1.

ment's plea bargain negotiations with Conforte and the concessions that the government ultimately extended in exchange for Conforte's testimony raise additional questions about the integrity of investigatory tactics employed in the pursuit of respondent's conviction.

Joseph Conforte is a well-known owner of a house of prostitution located in Storey County, Nevada. Conforte's activities in Northern Nevada historically have attracted extensive public attention and media coverage. For example, following the release in March of 1976 of a Washoe County Grand Jury report detailing Conforte's associations and dealings with local politicians, the Reno Evening Gazette and the Nevada State Journal began an editorial campaign assailing Conforte's "web of influence" in local affairs. The newspapers' editorial series spanned a period of more than three months and "was intensified in May [of 1976] after Argentine heavyweight boxer Oscar Bonavena was shot and killed outside Conforte's Mustang Ranch brothel."[50] Subsequently, three *Gazette-Journal* editorial writers were awarded the Pulitzer Prize for editorial writing in recognition of their insightful and constructive series condemning Conforte's influence and activities in Northern Nevada.[51] Apparently, however, the intensive public scrutiny focused upon Conforte had little effect on his local activities.

In 1977, a ten-count indictment was filed against Conforte and his wife, Sally, charging them with willfully attempting to evade and defeat employment withholding taxes in violation of 26 U.S.C. § 7201. *See, e.g.,* United States v. Conforte, 457 F. Supp. 641 (D. Nev. 1978), *cert. denied,* 449 U.S. 1012 (1980) (decision denying Conforte's motion for new trial). As the federal district court noted in the above-cited decision, Conforte is no stranger to the criminal justice system. In particular, the court observed:

1. In 1960, he was convicted of extortion by a Nevada state court and was sentenced to state prison.

2. Shortly after that conviction, he pled guilty to a federal income tax violation charge in the District of Nevada and was sentenced by Judge William Mathes to federal prison. While serving his sentence, Conforte made a motion to withdraw his plea of guilty to the federal charge. That motion was heard by Judge Thompson and was denied. The defendant was subsequently released from McNeil Island federal prison in 1965.

---

[50]*Gazette-Journal Writers Win Pulitzer Prize,* Nevada State Journal, April 19, 1977.

[51]*Id.*

3.  In 1968, Conforte was indicted and tried before Judge Thompson for a violation of the Mann Act, 18 U.S.C. § 2421 et seq. At the conclusion of the government's case, Judge Thompson granted a motion for judgment of acquittal.

4.  In 1970, the Internal Revenue Service filed a civil complaint for condemnation and forfeiture of certain trailer houses used by Conforte in his prostitution business. Again, the matter was heard by Judge Thompson, who decided the case in Conforte's favor.

*Id.* at 645-46. Parenthetically, we note that respondent first became acquainted with Conforte when respondent successfully defended him in 1967 against the above-noted charges alleging that Conforte violated the Mann Act.[52]

Further, in July of 1979, Conforte was again indicted in Washoe County and charged with bribery of a Lyon County public official.[53] In the meantime, the federal district court had entered judgments of conviction against the Confortes on four of the ten counts of evasion of federal employment withholding taxes.[54] The Confortes appealed those convictions and the subsequent denial of their motion for a new trial to the Ninth Circuit Court of Appeals. On April 29, 1980, the Court of Appeals entered a decision affirming the judgments of conviction in the tax case, but vacating portions of the sentences imposed by the district court. *See* United States v. Conforte, 624 F.2d 869 (9th Cir.) *cert. denied,* 449 U.S. 1012 (1980). In part, the Court of Appeals concluded that although one of the five-year sentences imposed on Joseph Conforte was entirely proper, the sentences imposed by the federal district court on the remaining counts were improperly based upon a legal and factual conclusion for which there was no support. *Id.* at 882-83. Accordingly, the case was remanded to the district court for further sentencing. The Confortes then sought review in the United States Supreme Court, and that court denied certiorari on December 1, 1980. *See* Conforte et ux. v. United States, 449 U.S. 1012 (1980).

A resentencing hearing was scheduled for December 23, 1980,

---

[52]Rec. Pt. II, Vol. IV at 792; Rec. Pt. II, Vol. XII at 3013.

[53]State v. Conforte, Case No. C79-1045, Second Jud. Dist. Ct., Washoe Co. (indictment filed July 2, 1979).

[54]The federal district court sentenced Conforte to five years in prison on each of the four counts, the terms to run consecutively for a total of twenty years. In addition, Conforte was fined $10,000 on each count, for a total of $40,000. Mrs. Conforte was sentenced to concurrent prison terms of 4 years on each of the four counts; however, execution of the sentence was suspended, and she was placed on probation. She was also fined $10,000 on each count. *See* United States v. Conforte, 457 F. Supp. at 647.

before the federal district court in Reno, Nevada.[55] The night before that hearing, however, Conforte fled to Mexico carrying with him "at least a half a million dollars" in cash.[56] He testified at respondent's first trial that he fled the jurisdiction of the United States in order to avoid confinement under his sentence of imprisonment.[57] Thus, at the time Conforte left the United States, he faced a sentence of imprisonment of at least five years, and possibly as much as twenty years, pursuant to his tax conviction in federal court. Moreover, Conforte faced prosecution in Washoe County, Nevada, pursuant to the indictment alleging bribery of a local Lyon County official. In connection with that pending state criminal prosecution, Washoe County District Attorney Cal Dunlap publicly avowed that in the event that Conforte was convicted on the bribery charges, he would seek an habitual criminal enhancement warranting the imposition of a life sentence because of Conforte's prior felony convictions.[58] Additionally, as a result of his flight from the United States, Conforte was indicted by a federal grand jury on March 10, 1981, for failing to appear as required by the terms and conditions of his bond in violation of 18 U.S.C. § 3150(1).[59] The State of Nevada filed similar charges against Conforte in connection with his subsequent failure to appear in the Nevada bribery case.[60]

At the time Joseph Conforte fled the jurisdiction of the state and federal courts, and throughout the period during which he remained a fugitive from justice, the Confortes were engaged in an ongoing dispute with the IRS over the exact amount of their income tax liability, as well as their liability relating to the employment withholding taxes. *See, e.g.,* Conforte v. C.I.R., 692 F.2d 587 (9th Cir. 1982). The exact amount of Conforte's overall tax liability over the years has been difficult to assess. For example, in testimony before a federal grand jury on April 13, 1982, Gerald Swanson, the former director of the IRS for the District of Nevada, testified that since 1956 the IRS had been "working to try to get Mr. Conforte in conformance with the

[55]Rec. Pt. II, Vol. IV at 710; United States v. Conforte, Case No. CR-R-77-00024 JLS, United States District Court for the District of Nevada.

[56]*Id.* at 713.

[57]*Id.* at 712.

[58]*Conforte Life Term Is Sought,* Reno Evening Gazette, September 15, 1980. A review of the district court file in State v. Conforte, No. C79-1045, Second Jud. Dist. Ct., Washoe Co., reveals that a supplemental information alleging habitual criminal enhancement was filed in the district court on February 26, 1982.

[59]Rec. Pt. I, Vol. IV, Pleading No. 33, Ex. G.

[60]State v. Conforte, Case Nos. C79-1045 and C83-1879, Second Jud. Dist. Ct., Washoe Co.

Income Tax laws of the United States." Swanson further testified that "Mr. Conforte arranged his tax matters in such a fashion making it virtually impossible for the Internal Revenue Service to determine his proper income."[61]

According to Swanson, beginning in February of 1978, the IRS instituted jeopardy assessment proceedings against the Confortes' assets because of the likelihood that Conforte might flee the jurisdiction or place "his assets outside of the collection reach of the Internal Revenue Service."[62] Swanson further indicated that although the exact amount of Conforte's tax liability had not been finalized, as of April 13, 1982, the IRS had "liens of record of over $26 million of jeopardy assessments asserted against Mr. and Mrs. Conforte."[63]

In addition to the criminal and tax concerns facing Conforte, it is also noteworthy that at least two civil suits were pending against him in federal court at the time of his departure. Specifically, the family of the slain heavyweight contender, Oscar Bonavena, filed a civil action on May 18, 1977, alleging that Conforte's negligent supervision of an employee resulted in Bonavena's wrongful death.[64] Conforte was also named as a defendant in a civil action asserting claims for false arrest and for the violation of the civil rights of an individual arrested in connection with a fire at Conforte's house of ill repute.[65]

Under these circumstances, in December of 1980, Conforte apparently decided to avail himself of a warmer and more hospitable climate. Thus, he slipped across the border into Mexico, sojourned briefly in Acapulco and Mexico City, and eventually took up residence in Brazil, where he was free from the threat of extradition back to the United States.[66]

---

[61]Rec. Pt. I, Vol. IV, Pleading No. 33, Ex. A at 9.

[62]*Id.* at 11. *See also* Conforte v. U.S., 1980-1 U.S. Tax Cas. (CCH) para. 9159 (D. Nev. 1980) (court determined that imposition of jeopardy assessments was justified and amount of assessments was reasonable).

[63]Rec. Pt. I, Vol. IV, Pleading No. 33, Ex. A at 15. Swanson also indicated, however, that $26 million overstated the Confortes' tax liability due to duplicative assessments. *Id.* at 31. *See also* In re Conforte, Case No. 82-966, United States Bankruptcy Court for the District of Nevada (disclosure statements).

[64]DeBonavena v. Conforte, Case No. CV-R-77-81 ECR, United States District Court for the District of Nevada (filed May 18, 1977).

[65]Baliotis v. Del Carlo, et al., Case No. CV-R-79-281, United States District Court for the District of Nevada (filed December 18, 1979).

[66]Rec. Pt. II, Vol. IV at 714-15; *see* Treaty of Extradition Between the United States of America and the United States of Brazil, Jan. 13, 1961, 15 U.S.T. 2093, T.I.A.S. No. 5691.

Before he entered Mexico, however, Conforte endeavored to test the federal government's receptiveness to a deal respecting his most pressing concern, his pending imprisonment. He telephoned Geoffrey Anderson, the chief prosecutor for the federal strike force in Las Vegas.[67] Conforte testified at respondent's first trial that he had read in the newspapers that Anderson was in charge of the strike force, and that Anderson and Judge Claiborne were "fighting" or "opposing each other."[68] Conforte told Anderson that the only thing he was guilty of was owning "a little brothel," and suggested that in exchange for "some help" from Anderson, he could supply incriminating information about Judge Claiborne. Specifically, Conforte stated, "If you want him, I will give him to you in [sic] a platter."[69]

It is unclear whether this telephone conversation with Anderson in late 1980 constituted the first contact between Conforte and federal agents intent on investigating Judge Claiborne. Specifically, Conforte testified at respondent's first trial that when he telephoned Anderson in December 1980, he (Conforte) "didn't know anything about an investigation [involving Judge Claiborne]."[70] Conforte further testified that before he left the country in 1980, he had never met a special agent for the FBI named Dan Camillo.[71] Additionally, on November 2, 1982, Joseph Yablonsky, the special-agent-in-charge of the Las Vegas office of the FBI, testified in a related case that he had assigned an agent to contact Conforte only after Conforte had telephoned Anderson in December of 1980.[72]

On the other hand, respondent claims that Yablonsky had assigned special agent Dan Camillo to contact Conforte in the early summer of 1980.[73] Respondent further asserts that in the course of Camillo's visits with Conforte, Conforte was advised that Yablonsky was willing to work out a deal if Conforte would "deliver" Judge Claiborne. According to respondent, at that time, Conforte consistently maintained that "he had nothing on the judge."[74] Respondent also alleges that after the Ninth Circuit Court of Appeals rendered its affirmance of Conforte's tax con-

[67]Rec. Pt. II, Vol. IV at 898, Pt. II, Vol. V at 933.

[68]Rec. Pt. II, Vol. IV at 925.

[69]Rec. Pt. II, Vol. IV at 899.

[70]Rec. Pt. II, Vol. IV at 925-26.

[71]Rec. Pt. II, Vol. IV at 897.

[72]Rec. Pt. I, Vol. I, Pleading No. 6 at 93; Respondent's Compendium, Docket No. 17294, filed Sept. 2, 1986 (Letter Outlining Governmental Misconduct).

[73]Respondent's "Synopsis of Acts of Governmental Misconduct," Docket No. 17294, filed Aug. 29, 1986, at 11.

[74]*Id.* at 11, 14.

viction on April 29, 1980, Yablonsky instructed Camillo to take "one last shot" at Conforte due to Conforte's "frame of mind." Again, however, respondent maintains that Conforte allegedly indicated at that time that he knew nothing that could implicate respondent in any wrongdoing.[75]

Most of respondent's assertions in this regard appear to be based on information disclosed to reporters for the Las Vegas Sun in the late summer of 1982 by a "federal source with intimate knowledge of the operations of the Las Vegas FBI office."[76] In a hearing prior to respondent's first trial, however, two Las Vegas Sun reporters declined to reveal the official sources for those factual allegations.[77] Thus, in judging the credibility of the conflicting accounts in this regard, this court is presented with some difficulty. We feel obligated to note, however, that the reputations for veracity of Joseph Conforte, as well as Joseph Yablonsky, have at times been subject to question. In particular, as discussed below, much of Conforte's testimony at respondent's first trial and before the only grand jury to return an indictment against respondent has been discredited by substantial evidence presented by the defense.

Additionally, it seems that Yablonsky was not always as truthful, or at least as forthcoming, as one would expect in the case of a federal law enforcement official. In 1983, for example, Yablonsky was censured and placed on probation by the FBI Director, William Webster, as a result of improper inquiries Yablonsky had made to the United States Air Force about the personnel records of a candidate for state office in Nevada, Brian McKay.[78] At the time of Yablonsky's inquiries, McKay was running against Yablonsky's friend, Mahlon Brown, in a hotly contested race for the office of Nevada State Attorney General. Reportedly, Yablonsky first denied that he had made any such inquiries, then later admitted that he had done so but denied that he was fishing for disparaging information about McKay that would benefit his friend's campaign.[79] Although Director Webster characterized Yablonsky as a "highly competent and experienced

---

[75]*Id.* at 11.

[76]Respondent's Compendium, Docket No. 17294, filed Sept. 2, 1986 (Letter Outlining Governmental Misconduct); *see also* Rec. Pt. I, Vol. I, Pleading No. 6 at 68.

[77]Rec. Pt. I, Vol. III, Pleading No. 27 at 287-88, 291.

[78]Webster Nomination, *supra* note 17, at 150-51 (testimony of W. H. Webster). Director Webster stated that this sanction was "a very severe action" for a career agent such as Yablonsky.

[79]*See* Rec. Pt. I, Vol. I, Pleading No. 6 at 68. We observe that no information impugning McKay's integrity was ever disclosed by Yablonsky's inquiries.

field manager," Webster was also quoted as stating that Yablonsky's actions "were inappropriate and made at a time and under circumstances likely to bring into question the integrity of the FBI's inquiries."[80] Director Webster also characterized Yablonsky's actions as involving "extremely bad judgment in utilizing the files of another agency to inquire about Mr. McKay for a reason I did not consider adequate or sufficient."[81] Additionally, after his retirement, Yablonsky was investigated by the FBI and a federal grand jury concerning his failure to inform bank officials that his bank account had been mistakenly credited with $40,000 as a result of a computer error. The mistaken credit apparently went undiscovered for three years until it was ultimately revealed by a bank audit. The grand jury, under the direction of the Justice Department's Public Integrity Section, declined to return a criminal indictment against Yablonsky.[82]

At any rate, it is uncontested that Conforte's overture to Anderson piqued the considerable interest of some agents within the FBI, the Public Integrity Section, and the IRS. In June or July of 1981, special agent Camillo and another FBI agent went to the residence of John Colletti, Conforte's former bodyguard. Conforte telephoned Colletti's residence from Brazil and spoke with the agents.[83] On or about this time, Conforte also engaged the services of Nevada attorney Peter Perry for the sole purpose of assisting him in his negotiations with the federal government.[84] Thereafter, during the period that Conforte remained a fugitive from justice, numerous meetings between Conforte, Perry and agents of the FBI, the Public Integrity Section and the IRS took place in Brazil, Costa Rica, and Mexico.[85]

As the negotiations between Conforte, Peter Perry and the federal agents progressed, it became clear that Conforte was demanding an expensive price in exchange for his testimony that he had bribed Judge Claiborne. For example, Conforte refused to return to the United States to testify unless the federal government guaranteed he would spend no more than one year in

---

[80]*Yablonsky Given Probation,* Las Vegas Sun, July 2, 1983; *FBI Censures Yablonsky for McKay Inquiry,* Las Vegas Review-Journal, July 2, 1983; *Nevada AG: 'Time to Go, Joe' Yablonsky's Credibility Seen Nearly Destroyed,* Las Vegas Sun, March 27, 1983.

[81]Webster Nomination, *supra* note 17, at 117.

[82]*Federal Jury Ends Yablonsky Probe,* Las Vegas Review-Journal, April 21, 1985. *See* Webster Nomination, *supra* note 17, at 116-17, 152.

[83]Rec. Pt. II, Vol. IV at 717-18.

[84]Rec. Pt. II, Vol. IV at 913.

[85]Rec. Pt. II, Vol. IV at 719-26; State v. Conforte, Case Nos. C79-1045 and C83-1879, Second Jud. Dist. Ct., Washoe Co. (transcript of hearing on change of plea at 17, filed Jan. 11, 1984).

prison.[86] Additionally, the negotiations involved a demand that Conforte's overall tax liability be settled for approximately three and one-half million dollars.[87]

This latter demand, of course, necessitated the participation and cooperation of IRS officials in the negotiations. In an interview conducted by the Office of the United States Treasury Inspector General, the former IRS District Director for Nevada, Gerald Swanson, indicated that Yablonsky contacted Archie Banbury, an agent in the Criminal Investigation Division of the IRS, in September of 1981, and briefed Banbury on the substance of Conforte's demands.[88] Thereafter, according to Swanson, Banbury suggested that the IRS should interview Conforte in Brazil and convene a grand jury to look into the Claiborne matter.[89] Although Swanson was skeptical of Conforte's allegations because of his familiarity with Conforte's history, he gave permission for an IRS agent to go to Brazil to interview Conforte. Swanson, however, "wanted Banbury to get corroborative evidence before allowing the IRS to get involved in a grand jury proceeding as part of the 'deal' being proposed" by the FBI and the Department of Justice.[90] Following the IRS agent's return from Brazil in December of 1981, Swanson remained skeptical because, in his view, no corroborating "smoking gun" evidence was presented which could justify a grand jury inquiry.[91] Further, a memorandum of Swanson's interview with the Inspector General's office indicates that, based on a previous conversation with Yablonsky, it was clear to Swanson

> that Yablonsky had a "Joe Louis" mentality towards disposition of tax issues. In other words, Yablonsky made it clear to Swanson that he felt that IRS could simply reduce Conforte's tax liabilities along the lines of "10 cents on the dollar" in exchange for information Conforte allegedly had on Federal Judge Claiborne (along with other concessions Conforte wanted).[92]

According to FBI Director Webster, in February 1982, the IRS received a complaint from Peter Perry alleging that Swanson may have been involved in soliciting a bribe from Conforte. Perry claimed that Peter Lemberes informed him that Alex Lemberes could arrange a reduction in Conforte's tax liability from $7

---

[86]Rec. Pt. II, Vol. IV at 919.

[87]Rec. Pt. II, Vol. V at 1004.

[88]Rec. Pt. I, Vol. IV, Pleading No. 33, Ex. B at 7.

[89]*Id.*

[90]*Id.* at 8.

[91]*Id.*

[92]*Id.* at 8-9.

million to $3.5 million in exchange for $350,000. The IRS and the FBI then began investigating whether Swanson improperly disclosed tax information to Alex and Peter Lemberes.[93]

Subsequently, the FBI and the Public Integrity Section, assisted by agents of the IRS and Conforte's attorney Peter Perry, reportedly initiated a "sting" operation targeting Swanson, Alex Lemberes and Alex's brother, Peter Lemberes. Alex Lemberes, a close friend of Swanson, was a former Green Beret commander, a graduate of West Point and a recipient of the Army's Legion of Merit award.[94] To conduct this "sting" investigation known as "Confortescam," the FBI obtained the assistance of Conforte's attorney Peter Perry. The FBI wired Perry with electronic listening and recording equipment and dispatched him to secure incriminating evidence against Swanson and the Lemberes brothers in a conspiracy-bribery scheme. In essence, Perry's role was to entice Peter Lemberes with a substantial monetary incentive to persuade his brother Alex, and eventually Swanson, to conspire illegally to reduce Conforte's tax liability.[95] Interestingly, attorney Perry thus simultaneously served as counsel for Conforte, and as an agent for the federal government. Further, we note that just prior to these events, Perry had served as counsel for Peter Lemberes in a criminal case in Nevada. *See, e.g.,* Lemberes v. State, 97 Nev. 492, 634 P.2d 1219 (1981). Thus, it would appear that in assisting the FBI, Perry was motivated by more than an upright desire to uncover corruption. As Conforte's attorney, Perry had a vested interest in the outcome of the investigation. Obviously, by implicating Swanson in criminal wrongdoing, Perry could much improve Conforte's prospects of negotiating a favorable deal with the IRS.

Further, because of Swanson's skepticism about Conforte's proposed testimony incriminating respondent, and his expressed concerns about the propriety of a significant reduction in Conforte's tax liability, Swanson has asserted that federal agents may have targeted him in the "Confortescam" sting in order to remove him as "an obstacle to the 'deal' that would help them 'hang a federal judge.' "[96] Moreover, it has been alleged and reported that Peter Lemberes may have been targeted in the government's Confortescam sting because of rumors that he had

---

[93]Webster Nomination, *supra* note 17, at 240-41 (appendix).

[94]*Sting Snares Conforte Foes,* Las Vegas Sun, October 10, 1982; *Fed Bid to Frame IRS Boss Fizzles,* Las Vegas Sun, October 11, 1982.

[95]Rec. Pt. I, Vol. II, Pleading No. 9; Pt. I, Vol. IV, Pleading No. 31, Exhibits A and B; *'Confortescam': behind-the-Scenes Peek,* Reno Gazette-Journal, July 15, 1984.

[96]Rec. Pt. I, Vol. IV, Pleading No. 33, Ex. B at 10.

threatened to disclose evidence allegedly linking Conforte with the killing of Oscar Bonavena.[97]

Perry's questionable undercover activities eventually resulted in grand jury indictments against Alex and Peter Lemberes. The grand jury, however, declined to indict Gerald Swanson. Although Alex Lemberes eventually pleaded guilty to a reduced charge, the press has reported that he maintains he did nothing illegal, and that he only pleaded guilty in order to negotiate a lesser sentence for his brother, who faced a possible maximum sentence of twenty-five years.[98]

Swanson, although not indicted, was transferred to an IRS post in another jurisdiction.[99] A Treasury Department investigator later tendered a report condemning "the FBI-IRS sting operation as 'very dangerous, misleading and poor work.' " *See* United States v. Claiborne, 781 F.2d 1327, 1329 (9th Cir. 1986) (Reinhardt, J., dissenting). Again, as in the cases of Eddie LaRue and Charles Lee, it would appear that there is indeed factual support for respondent's assertion that in the pursuit of Judge Claiborne's removal from office, some federal agents may have overreached and abused their authority by dealing harshly, unjustifiably and apparently retributively with those who stood in the way of Judge Claiborne's prosecution.

Conforte, on the other hand, received substantial concessions from the federal and local authorities. In early December 1983, he returned to the United States and was taken into custody by federal agents. On December 7, 1983, he testified before the federal grand jury investigating Judge Claiborne in Reno, Nevada. As noted, the grand jury indicted respondent Claiborne the following day. In exchange for Conforte's testimony before the grand jury and at Judge Claiborne's subsequent trial, the Department of Justice agreed to recommend:

> (1) that Conforte be resentenced in his federal tax conviction case to concurrent five-year terms on each of the four counts upon which he was convicted;
>
> (2) that all but 15 months of each of the five-year sentences be suspended;

---

[97]Rec. Pt. I, Vol. I, Pleading No. 6 at 75.

[98]U.S. v. Lemberes, Case No. 82-00034 EBH, United States District Court for the District of Nevada; Rec. Pt. I, Vol. II, Pleading No. 9; Pt. I, Vol. I, Pleading No. 6; *"Confortescam": behind-the-Scenes Peek,* Reno Gazette-Journal, July 15, 1984. *See also* Webster Nomination, *supra* note 17, at 241 (appendix).

[99]Webster Nomination, *supra* note 17, at 241 (appendix).

(3) that any sentence imposed by the court should be served concurrently with any sentence imposed on Conforte pursuant to pending charges in the State of Nevada;

(4) that the federal indictment charging Conforte with failure to appear for resentencing in the tax conviction case should be dismissed;

(5) that the Department of Justice would assist Conforte in negotiating plea agreements with regard to the charges pending against him in Nevada.[100]

On December 9, 1983, Conforte appeared in Nevada district court and entered a negotiated plea of guilty to the charge alleging bribery of a Lyon County official.[101] In accordance with the plea negotiations, Nevada District Judge James Guinan sentenced Conforte to eighteen months to be served concurrently with the sentence that Conforte would thereafter receive pursuant to his federal conviction. In addition, Conforte was fined $10,000 and forfeited $200,000 in bail. Judge Guinan dismissed the pending charge respecting Conforte's earlier failure to appear in the state action, pursuant to the district attorney's recommendation.[102]

On December 15, 1983, Conforte was resentenced pursuant to his tax conviction in a federal district court in Washington, D.C.[103] Conforte's federal tax case had been transferred from the District of Nevada to Judge Smith in the United States District Court for the District of Columbia in 1982, by order of the Chief Justice of the Supreme Court, Warren Burger.[104] On December 15, 1983, Judge Smith resentenced Conforte in conformity with the terms of the agreement set forth above.

As Judge Reinhardt of the Ninth Circuit has pointed out:

> The reduction in Conforte's sentence may well have violated Fed. R. Crim. P. 35, *see United States v. Hetrick,* 644 F.2d 752 (9th Cir. 1980); *United States v. Pollack,* 655 F.2d 243 (D.C.Cir. 1980), as well as 18 U.S.C. § 3651 (1982), not to mention the Justice Department's policy on tardy motions to reduce sentences.

---

[100]Respondent's Compendium, Docket No. 17294, filed Sept. 2, 1986 (Conforte Plea Agreement); Rec. Pt. II, Vol. IV at 730-35; *see also* Webster Nomination, *supra* note 17, at 239-40 (appendix).

[101]State v. Conforte, Case Nos. C79-1045 and C83-1879, Second Jud. Dist. Ct., Washoe Co. (transcript of hearing on change of plea filed Jan. 11, 1984).

[102]*Id.* (transcript of hearing on change of plea filed Jan. 11, 1984, at 31-33) (judgment filed December 9, 1983).

[103]Rec. Pt. II, Vol. IV at 734; Respondent's Compendium, Docket No. 17294, filed Sept. 2, 1986 (Conforte Plea Agreement) (Dismissal of Conforte Indictment).

[104]U.S. v. Conforte, Case No. CR-R-77-00024 JLS, United States District Court for the District of Nevada (designation filed Oct. 4, 1982).

*See* United States v. Claiborne, 781 F.2d 1327, 1329 (9th Cir. 1986) (Reinhardt, J., dissenting). In the *Hetrick* case, cited above, the court ruled that the 120-day time limit established by Fed. R. Crim. P. 35 for reduction of a sentence is jurisdictional. *See Hetrick,* 644 F.2d at 756. Further, the court stated in *Hetrick:*

> We held in *United States v. United States District Court,* 509 F.2d 1352 (9th Cir.), *cert. denied sub nom. Rosselli v. United States,* 421 U.S. 962, 95 S.Ct. 1949, 44 L.Ed.2d 448 (1975), that the timely filing of a Rule 35 motion does not give a district court jurisdiction to entertain subsequent, untimely Rule 35 motions. The second motion will not be deemed to relate back to the first motion. 509 F.2d at 1356. Nor is the jurisdictional defect cured by styling the subsequent motion as a "motion for reconsideration." *Cf. United States v. United States District Court,* 509 F.2d at 1356 (motion styled as a "motion for clarification").

*Id.* (Footnote omitted.) In Conforte's case, the Ninth Circuit Court of Appeals affirmed Conforte's conviction and five-year sentence on Count VII of the charging indictment on April 29, 1980. *See* United States v. Conforte, 624 F.2d 869 (9th Cir.), *cert. denied,* 449 U.S. 1012 (1980). On April 8, 1981, Judge Reed, a federal district judge for the District of Nevada, entered an order denying a motion filed by Conforte's attorneys seeking a reduction in the sentence imposed in Count VII pursuant to Fed. R. Crim. P. 35.[105] Thus, in light of the *Hetrick* case, it would appear that Judge Reinhardt reasonably questioned the propriety of Judge Smith's order entered in December of 1983, resentencing Conforte well beyond the 120-day jurisdictional time limit set forth in Rule 35.[106]

In regard to Conforte's tax liability, his agreement with the federal government expressly stipulated:

---

[105]U.S. v. Conforte, Case No. CR-R-77-00024 JLS, United States District Court for the District of Nevada; *see* Rec. Pt. I, Vol. IV, Pleading 33, Exhibit F.

[106]In United States v. Claiborne, 765 F.2d 784, 792 n. 2 (9th Cir. 1985), *cert. denied,* 475 U.S. 1120 (1986), the appellate panel which affirmed Judge Claiborne's conviction cited the case of United States v. Smith, 650 F.2d 206 (9th Cir. 1981), in rejecting Judge Claiborne's assertion that Conforte's sentence was illegally reduced. Our reading of the *Smith* case reveals little if any support for the legality of the reduction of Conforte's sentence. In *Smith,* the court acknowledged that a district court had some flexibility to retain jurisdiction over *timely* motions for reduction of sentence for a "reasonable time" after the expiration of the 120-day time limit. *Id.* at 208-09. We would question whether Conforte's reduction of sentence occurred within a reasonable time. Moreover, as noted, Judge Reed had already denied Conforte's initial motion to reduce his sentence. It may well be, however, that the appellate panel properly concluded that Judge Claiborne lacked standing to raise the issue.

Mr. Conforte shall not receive financial benefit of any kind because of this agreement. The amount of any tax liability that Mr. Conforte may owe to the U.S. Treasury shall be determined between the Internal Revenue Service and/or the Tax Division, U.S. Department of Justice and himself. This agreement shall not favorably influence the determination of such tax liability. In fact, as Mr. Conforte believes, his cooperation as set forth herein has and may continue to detrimentally influence the government's determination of such liability.[107]

It would appear, however, that Conforte's financial prospects suddenly improved after he began negotiating with the federal agents regarding the Claiborne matter. Conforte himself testified at respondent's first trial in March of 1984, that although the IRS at one point claimed his tax liability was in the neighborhood of $19 or $20 million, he eventually settled his "whole tax liability" for $7.3 million.[108]

In summary, our review of the factual record reveals that in the pursuit of an indictment against Judge Claiborne, federal investigators and prosecutors convened no less than four grand juries before the testimony of a convicted felon, brothel owner and fugitive from justice finally convinced the Reno grand jury panel to return an indictment. The record before us further reveals substantial indications that a limited number of federal agents overzealously pursued a vendetta against respondent and quite possibly abused the authority and the public trust vested in them by virtue of their offices. In so doing, these agents may well have utilized retributive and retaliatory tactics in an effort to discredit those who maintained a less vindictive and more balanced perspective regarding the criminal investigatory process. Finally,

---

[107]Respondent's Compendium, Docket No. 17294 filed Sept. 2, 1986 (Conforte Plea Agreement); Rec. Pt. II, Vol. IV at 730-35; *see also* Webster Nomination, *supra* note 17, at 239-40 (appendix).

[108]Rec. Pt. II, Vol. V at 1002, 1005. Conforte's testimony in this regard finds some support in pleadings which comprise the public record in Chapter 11 Bankruptcy proceedings involving the Confortes' assets. On February 15, 1984, for example, the IRS and the Confortes entered into a stipulation wherein the IRS withdrew its objections to a proposed bankruptcy reorganization plan and set forth secured claims against the Confortes totaling approximately $18,446,530.47. The IRS also stated therein that its unsecured priority claims totaled approximately $653,614.08. A document dated November 17, 1984, entitled "Debtors Opposition to the Government's Motion to Convert to a Chapter 7 Proceeding or In the Alternative to Dismiss," states that negotiations had reduced a $25,000,000 lien against the Confortes' assets to $7,300,000. It is entirely possible, therefore, that Conforte may have testified credibly on this point. *See* In re Sally Conforte, Case No. 82-966, United States Bankruptcy Court for the District of Nevada (Petition for Relief Under Chap. 11 filed Nov. 26, 1982).

those agents, who for whatever reasons became intent upon the successful prosecution of Judge Claiborne, were reduced to striking a bargain with an individual whose past history and whose financial and fugitive status provided considerable incentives for him to distort the truth, as well as substantial indications that he would not be disinclined to do so. As noted hereafter, the record of respondent's first trial discloses abundant evidence that, whether or not they perceived it to be so, federal agents may well have purchased perjurious testimony in their bargain with Joseph Conforte.

## D. The Grand Jury Indictment

An analysis of the relationship between the grand jury indictment and respondent's conviction on tax counts at the conclusion of his second trial will be discussed in some detail hereafter. At this point it is important to reemphasize that the indicting grand jury in Reno was the only panel to hear the testimony of Conforte. We can only speculate as to the nature of the impact Conforte had on the members of the panel. Without the cleansing process of cross-examination and the presentation of documentary evidence to illuminate the true character of Conforte's offerings, it is conceivable that the grand jury found Conforte's testimony credible. It is also conceivable that the panel concluded that Claiborne's prior representation of Conforte as an attorney supported an inference of an ongoing association that was corrupt. As previously noted, if the grand jury believed that Conforte enriched Claiborne with bribe money, that fact alone would support two of the tax-related counts since Claiborne's tax returns failed to reflect such ill-gotten gain. In any event, it cannot reasonably be gainsaid that Conforte's testimony was the linchpin upon which the indictment was based. Despite the suspect character of the Conforte claims, as exposed during the abortive first trial, the Conforte foundation was later excised leaving the Conforte-generated, but now unconnected with Conforte, tax counts, as the vehicle upon which to achieve a conviction. As will later be seen, there remains gnawing doubt as to whether the second trial was free of the Conforte taint. At any rate, the significance of the tainted grand jury indictment is an aspect of the overall circumstances we are compelled to consider in addressing the subject of Claiborne's disciplinary entitlements.

## E. Respondent's First Trial

As noted, on December 8, 1983, a Reno, Nevada federal grand jury indicted respondent on seven felony counts. Four of the seven counts of the indictment, the so-called "Conforte counts," involved Conforte's assertions that respondent had solicited and

accepted bribes from Conforte. Two of the remaining counts involved respondent's income tax returns for the years 1979 and 1980. The final count charged that respondent had filed in 1979 a false financial disclosure statement to the Judicial Ethics Committee for the year 1978.[109]

On September 9, 1983, Chief Justice Warren Burger designated Judge Walter E. Hoffman, a senior judge from the Eastern District of Virginia, to preside over Judge Claiborne's trial.[110] Previously, Judge Hoffman had been specially designated by Chief Justice Burger to preside over the grand jury investigations of respondent in Portland, Oregon, and in Reno, Nevada. All of the district judges for the District of Nevada eventually recused themselves from any participation in respondent's case, and Judge Hoffman was designated after Chief Judge Browning of the Ninth Circuit requested the appointment of an out-of-circuit district judge to preside over the trial.[111] *See* United States v. Claiborne, 781 F.2d 1327, 1330 (9th Cir. 1986) (Reinhardt, J., dissenting).

Prior to the commencement of the trial, respondent's counsel filed in excess of thirty pre-trial motions.[112] Judge Hoffman denied

---

[109]Rec. Pt. I, Vol. I, Pleading No. 1. Essentially, the indictment alleged that while serving as a federal judge:

> (1) Respondent solicited and accepted a bribe from Joseph Conforte "in return for being influenced in his performance of an official act . . ." in violation of 18 U.S.C. § 201(c). (Count I)
>
> (2) Respondent violated the provisions of 18 U.S.C. § 1343 by devising and executing a scheme to defraud and obtain money from Conforte and by utilizing an interstate telephonic communication in the execution of that fraudulent scheme. (Count II)
>
> (3) Respondent attempted to persuade a witness subpoenaed to testify before a Portland, Oregon grand jury to give false testimony in violation of 18 U.S.C. § 1503. (Count III)
>
> (4) Respondent, under penalties of perjury, signed income tax returns for the years 1978, 1979, and 1980 which he knew were not true and correct as to every material particular in violation of 26 U.S.C. § 7206(1). (Counts IV, V, VI)
>
> (5) Respondent willfully and knowingly filed a false financial disclosure statement for the year 1978 to the Judicial Ethics Committee in violation of 18 U.S.C. § 1001. (Count VII)

Count IV involved Conforte in that the government alleged that, among other income, in 1978 respondent failed to report the monies he allegedly received in bribes from Conforte.

[110]Rec. Pt. IV, Vol. III, Pleading No. 32 at 3.

[111]*Id.*

[112]Rec. Pt. IV, Vol. III, Pleading No. 32 (minutes of first trial); *and see, e.g.,* Motion to Dismiss Indictment for Selective Prosecution, Rec. Pt. I, Vol. II, Pleading No. 8; Motion to Dismiss for Grand Jury Abuse and to Discover Grand Jury Materials and for Evidentiary Hearing, *id.,* Pleading No. 9; Motion to File Supplemental Memorandum and Evidentiary Proffer on Motion to Quash Indictment, *id.,* Pleading No. 17.

many of these motions without conducting evidentiary hearings respecting the factual allegations set forth therein. In the matters in which evidentiary hearings were allowed, Judge Hoffman severely limited the scope of the inquiries.[113] We are hesitant to question the propriety of many of Judge Hoffman's rulings in this regard prior to and during respondent's trials. In particular, we do not deem it appropriate to comment upon whether, as a matter of federal law, respondent had set forth sufficient allegations supported by affidavits or other evidence to establish a *prima facie* case entitling him to pretrial evidentiary hearings in all the matters raised. We observe, however, that from our perspective and in fulfilling our responsibility to review all the circumstances underlying respondent's conviction, it is indeed unfortunate that a more comprehensive factual record was not developed respecting respondent's claims of investigative and prosecutorial abuse. Others, as well, have voiced similar concerns regarding respondent's allegations and have suggested that investigative and prosecutorial abuses violated respondent's right to due process of law, thereby rendering respondent's conviction "the fruit of the poisoned tree."[114]

For example, shortly after the United States Senate voted to remove respondent from office, Senator David H. Pryor addressed the Senate in part as follows:

> After sitting for days as a member of the impeachment committee, I have attempted to the best of my ability to fairly judge and determine the case of Harry Claiborne. I must admit to my colleagues that a month ago, I, like most Americans, wondered why we were giving him even the benefit of the doubt. As the weeks passed, after reading transcripts and listening to and observing witness after witness, I must say at this time, and during this day, that at least in my mind there was a reasonable doubt about his willfulness or his deliberate intent to defraud the Government.

> But, Mr. President, there is no reasonable doubt in my mind about another aspect of this case, and that is the long arm of the U.S. Government and the abuse of power that ultimately led to Judge Claiborne's conviction.

> I have concluded that he was targeted by the Federal Bureau of Investigation in a very arbitrary and capricious manner. If we have any doubts about Judge Claiborne having been a target, then I ask these questions:

---

[113]Rec. Pt. I, Vol. III, Pleading Nos. 26, 27; Rec. Pt. I, Vol. IV, Pleading No. 28 (transcripts of pretrial hearings of January 9, 10 and 11, 1984); Rec. Pt. I, Vol. IV, Pleading No. 37 (order respecting various motions, filed February 17, 1984).

[114]132 Cong. Rec. S15779 (daily ed. Oct. 9, 1986) (statement of Senator Pryor).

Why did our Government forgive $16 million in back income taxes to a criminal fugitive named Conforte to come back from Brazil and help make a case against Judge Claiborne?

Why did Harry Claiborne, unlike most other citizens, not have the opportunity to face an IRS audit in the civil division before criminal prosecution charges occurred?

Why did one IRS agent assigned to this sting operation of Harry Claiborne become so incensed and rebelled to the degree that he refused to participate, and ultimately was demoted and sent to another State?

Why was it that after administering a polygraph test to Harry Claiborne, a test which he passed, the polygraph operator, himself, became a target of intimidation by the Federal Bureau of Investigation?

What is going on in this country when we allow this sort of practice to occur?

In the Article of Impeachment No. III, we were asked by the managers to impeach from office Harry Claiborne. Why? Because, simply, he was convicted by a lower court and a jury.

My question concerning Article III this afternoon was, how was that conviction actually obtained?

Once again, I have concluded in my own mind that had Harry Claiborne not been a target of the Federal Government, had Harry Claiborne's accountant not been intimidated by the U.S. Government, had Harry Claiborne had the opportunity to submit all evidence into the lower court decision and trial, had an appeal en banc to the Ninth Circuit Court of Appeals been granted, I believe the case of Harry Claiborne might not have been before the U.S. Senate today.

See 132 Cong. Rec. S15778 (daily ed. Oct. 9, 1986) (statement of Senator Pryor); see also 132 Cong. Rec. S15779 (daily ed. Oct. 9, 1986) (remarks of Senator Heflin expressing the view that there is "no question that most of the Members of the Senate feel that there should be an investigation by an appropriate committee pertaining to the possible overreaching by the executive branch into the judicial branch and an investigation into the procedure which has been called targeting"); 132 Cong. Rec. S16824 (daily ed. October 16, 1986) (remarks of Senator Levin indicating that the "evidence clearly suggests that the Government engaged in a pattern of selective prosecution, prosecutorial overreaching, and perhaps intimidation of witnesses and other improprieties"). Such concerns ultimately prompted the United States Senate to adopt a resolution on October 18, 1986, calling for hearings before the Senate Judiciary Committee on procedures for protect-

ing citizens against improper investigations and prosecutorial practices. *See* S. Res. 514 (99th Cong., 2d Sess., 132 Cong. Rec. S17058 (daily ed. Oct. 18, 1986)).

One of the most troubling allegations in this regard concerns the possibility that prior to Conforte's grand jury appearance and respondent's first trial, some federal agents involved in respondent's investigation and prosecution may have known or had substantial cause to suspect that Conforte's bribery allegations were false. The possibility that this occurred has significant implications. It is arguable, for example, that Conforte's grand jury testimony may have had a contaminating effect upon the only grand jury to hear his testimony and to return an indictment against respondent. Arguably, the entire indictment may have been tainted by Conforte's testimony, including the counts seemingly unconnected with Conforte's allegations. Moreover, if indeed all the counts of the indictment returned by the grand jury were infected by the testimony of Conforte, and the government had reasonable cause to suspect that Conforte's testimony was perjurious, then it may be appropriate to depreciate the substantial respect and weight normally accorded a judgment of conviction for the purposes of disciplinary action. *See* SCR 114; Selling v. Radford, 243 U.S. 46, 51 (1917). Although respondent was eventually convicted on the tax counts alone and those counts were seemingly unrelated to Conforte's allegations, we must question whether an indictment on any of the counts would have been returned, or whether any prosecution whatsoever would have gone forward in the absence of an investigative and prosecutorial mind-set bent on prosecuting respondent at all costs, and in the absence of Conforte's contaminating and infectious allegations disparaging respondent's integrity. *See, e.g.*, Mesarosh v. United States, 352 U.S. 1, 14 (1956) (where government informant had given false testimony, Court concluded that informant had "poisoned the water in this reservoir, and the reservoir cannot be cleansed without first draining it of all impurity"). Conforte's allegations and testimony underlying the first count of the indictment, and the manner in which the prosecution proceeded on that count, are particularly troublesome in this regard.

Specifically, Count I of the indictment alleged:

> *Between on or about December 14, 1978 and December 15, 1978,* in the District of Nevada, the Defendant, HARRY EUGENE CLAIBORNE, being a public official, that is a United States District Court Judge for the District of Nevada, directly and indirectly, corruptly asked, demanded, exacted, solicited, sought, accepted, received and agreed to receive for himself a thing of value, that is United States currency in the amount of $30,000, from Joseph Conforte,

158

in return for being influenced in his performance of an official act, that is the decisions and rulings . . . with regard to two consolidated motions to quash grand jury subpoenas then pending before him, said motions captioned, In the Matter of Application of Olga Irene Karaway For an Order to Show Cause, Misc. R-78-36, and In Re Grand Jury Subpoena Served on Sessina Lowe, Misc. R-78-35; in violation of Title 18, United States Code, Section 201(c).[115]

(Emphasis added.) Prosecutions under 18 U.S.C. § 201(c) (1982) (bribery of public officials) are governed by 18 U.S.C. § 3282 (1982), which provides:

Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

In general, the period of limitations imposed by this statute begins to run at the moment the crime is complete. *See* United States v. Coia, 719 F.2d 1120 (11th Cir. 1983), *cert. denied,* 466 U.S. 973 (1984). Because the grand jury did not indict respondent on Count I until December 8, 1983, and because of the five-year limitation provision established by 18 U.S.C. § 3282, the government was necessarily restricted to proof that the alleged bribery occurred *after December 8, 1978.*

In this respect, respondent has observed:

In one of the first interviews with FBI agents, CONFORTE related that the bribery scenario in Count I occurred in late November, 1978. At the trial, CONFORTE testified as to whether he had told the FBI the event occurred in late November, 1978: "Could be." CONFORTE testified he is "not sure he did not state late November," he just didn't recall. . . . The time of this scenario would not have been acceptable to the prosecution because the asserted offense would have been barred from prosecution by the applicable statute of limitations.[116]

At the trial, however, Conforte testified that on the evening of Monday, December 11, 1978, he was at his home watching football when he received a telephone call from Judge Claiborne. According to Conforte, Judge Claiborne requested him to ''come

115Rec. Pt. I, Vol. I, Pleading No. 1.

[116]Rec. Pt. I, Vol. VI, Pleading No. 63 at 10, *citing* Conforte testimony in Rec. Pt. II, Vol. IV at 823-24.

158

up to my place tomorrow night."[117] Conforte further testified that on Tuesday, December 12, 1983, he made arrangements to drive a "ladyfriend's" car to respondent's Reno apartment where he met with Judge Claiborne later that evening at approximately 8:00 p.m. to 9:00 p.m.[118] Conforte further testified at trial that the following events then transpired:

1. Respondent escorted Conforte into a kitchen-dining room area and Conforte sat down and faced respondent across a table, or a counter separating the dining area from the kitchen.[119]

2. Judge Claiborne gestured or indicated that his apartment might be "bugged" and wrote a message on a yellow pad of paper and passed it to Conforte stating, "I need $30,000 and don't worry about your case." Conforte read the message and wrote in reply "Which case?" The judge replied, again in writing, "The subpoenas."[120]

3. Conforte then wrote back "I don't have it with me, I will bring it tomorrow." According to Conforte, the judge then "shook his head meaning it was okay," burned the paper upon which these communications were written, and washed the ashes down the kitchen sink.[121]

4. The following day, on Wednesday, December 13, 1978, Conforte claimed he "got together" $30,000 in cash partly from the receipts of the brothel and, "to the best of [his] memory," from cash he had available in a safe deposit box at the Nevada National Bank in Sparks, Nevada.[122]

5. Later, on the night of Wednesday, December 13, 1978, Conforte claimed that he went back to Judge

---

[117]Rec. Pt. II, Vol. III at 587.

[118]*Id.* at 587, 590-91.

[119]Rec. Pt. II, Vol. III at 592-94; Rec. Pt. II, Vol. IV at 837-38.

[120]Rec. Pt. II, Vol. III at 593, 596-97. Subpoenas had been issued in the fall of 1978 to two of Conforte's employees in a federal voting fraud investigation probing Conforte's voter registration efforts in Storey County, Nevada. *See* Rec. Pt. II, Vol. III at 576. Conforte hired counsel for the two subpoenaed employees who filed motions in federal court to quash the issuance of the subpoenas. *Id.* at 579-80.

[121]Rec. Pt. II, Vol. III at 597-98.

[122]Rec. Pt. II, Vol. III at 604-09. At the trial, under cross-examination by respondent's counsel, Conforte hedged somewhat as to whether he actually withdrew money from his safe deposit box at Nevada National Bank on the date in question. He acknowledged, however, that he had told the grand jury that he did in fact do so. Rec. Pt. II, Vol. IV at 845.

Claiborne's Reno apartment and personally delivered the $30,000 to the judge.[123]

Thereafter, at respondent's trial, the defense elicited testimony and presented evidence conclusively establishing that the events described in Conforte's above-referenced testimony simply could not have occurred on two successive days during the week in question.

First, it was established at trial that the Conforte story described above could not have occurred because Conforte was not even in Reno, Nevada, on December 12, 1978, the night that Conforte claimed he first visited respondent's apartment and respondent had allegedly solicited a $30,000 bribe. Specifically, an employee of the United States Department of State testified that a review of official passport records revealed that Conforte personally applied for and picked up a passport on an emergency basis *in New York City* on December 12, 1978. The passport official further testified that if another person had picked up the passport for Conforte there would have been a letter of authorization. Apparently, the official records revealed no such letter.[124] Additionally, Conforte's passport records indicated that he entered Brazil sometime between and including December 13 and 18, 1978.[125] It should be noted that, at one point in his testimony, Conforte himself acknowledged that he personally had obtained a passport in New York City, on an emergency basis.[126]

Second, an operations manager at Nevada National Bank testified that "firm and solid" procedures of the bank required customers wishing to gain access to their safe deposit boxes to sign an entry ticket before they would be allowed such access.[127] The operations manager further testified that she personally conducted a search of the bank's records of the entry tickets of Conforte's safe deposit box and found that the records indicated that Conforte had not accessed his safe deposit box between December 5, 1978 and December 15, 1978.[128] As respondent noted in a motion to dismiss the indictment against him filed shortly before the second trial, the government had knowledge of these bank records prior to the first trial.[129]

---

[123]Rec. Pt. II, Vol. III at 614-15.

[124]Rec. Pt. II, Vol. XI at 2756-82; Rec. Pt. I, Vol. VI, Pleading No. 63 at 8.

[125]*Id.* at 2780.

[126]Rec. Pt. II, Vol. IV at 884-85.

[127]Rec. Pt. II, Vol. VI at 1376-77.

[128]Rec. Pt. II, Vol. II at 1375-76.

[129]Rec. Pt. II, Vol. VI at 1370; Rec. Pt. I, Vol. VI, Pleading No. 63 at 11. We note in this regard that Conforte's assertion that he would sometimes enter his safe deposit box without signing the entry record is belied by the

Third, FBI Special Agent Wick testified at trial that his investigation of the apartment complex where respondent resided in 1978 revealed that some studio apartments in the complex contained a long counter at which a person could sit and which divided the open areas of the apartments from the kitchen areas. Such an arrangement would have been consistent with Conforte's description of respondent's apartment. Wick testified, however, that *he did not find such an arrangement in the apartment in which respondent resided.*[130] Further, the manager of the apartment complex testified that respondent's apartment did not have a bar, or a *counter of any kind where persons could sit* on either side and look at one another.[131] Thus, the defense established that the floorplan of respondent's apartment was simply not as Conforte had described it in his sworn testimony.

It is apparent from the foregoing evidence that it was quite conclusively established at respondent's first trial that the bribery scenario alleged by Conforte could not possibly have occurred on the dates in question.[132] Moreover, because Conforte's passport revealed that he was clearly not in the United States after December 18, 1978, and because the statute of limitations required the government to prove that the bribery occurred after December 8, 1978, the prosecution was necessarily restricted to proof that the alleged bribery occurred between December 8, 1978 and December 18, 1978.

In addition, it was established at the trial that Judge Claiborne ultimately ruled in *favor* of the government and *against Conforte's interests* in the matter involving the subpoenas which Conforte claimed was the basis of the alleged $30,000 bribe. Specifically, in April of 1979, Judge Claiborne denied the motions filed on behalf of the two Conforte employees seeking to

---

testimony of the bank operations officer. Specifically, the officer testified that if a bank employee had allowed someone to enter a safe deposit box without signing in properly, the bank would have dismissed that employee and since officers of the bank always sit towards the back of the bank, in the safe deposit area, she was "sure if someone had gone in without signing, we would be aware of it." *See* Rec. Pt. II, Vol. VI at 1378. We further observe that although this particular bank operations officer was not stationed at the Sparks branch on the exact date in question, she had been employed by Nevada National Bank since 1975 and testified that the safe deposit entry procedures were the same for "all of our offices." *Id.* at 1377.

[130]Rec. Pt. II, Vol. X at 2336.

[131]Rec. Pt. II, Vol. X at 2357.

[132]It is noteworthy that in spite of the fact that Conforte's agreement with the government was predicated upon Conforte giving truthful testimony, and in spite of the considerable evidence that he failed to do so, the government fulfilled all its obligations under its agreement with Conforte and, thus far, has declined to prosecute Conforte for perjury.

quash the service of the grand jury subpoenas.[133] Further, Leland Lutfy, the assistant United States Attorney who handled these subpoena matters for the government, testified that he observed nothing "irregular on the part of Judge Claiborne in his handling of [the] case."[134] Thus, Judge Claiborne's actual rulings in that matter were not favorable to Conforte's best interests.

As we previously indicated, the untruthful nature of Conforte's allegations underlying Count I of the indictment posed inherent difficulties of proof for the prosecution, which suggest, at the very least, that the prosecutors had reasonable cause to question the veracity of Conforte's scenario prior to trial. Interestingly, respondent's counsel has observed that during Conforte's grand jury testimony "not once . . . was [Conforte] ever asked . . . to state the day, the day of the month, or even the year, when the scenario of Count I was supposed to have occurred."[135]

Moreover, the record reveals that the prosecution had considerable difficulties in pinpointing the exact dates that the offense in Count I allegedly occurred. In particular, the record reveals that the government prosecutors served three successive amended demands for notice of alibi upon respondent prior to trial. *See* Fed. R. Crim. P. 12.1(a) (upon written demand of attorney for the government, the defendant shall within ten days serve upon the government's attorney a written notice of the defendant's intention to offer a defense of alibi stating the specific place at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon which the defendant intends to rely). On January 23, 1984, for example, the government notified respondent's counsel that it "believe[d] the evidence [would] establish" that the offense alleged in Count I occurred at respondent's Reno apartment, *"[b]etween approximately 6:00 p.m. and 11:00 p.m. on December 14, 1978; and between approximately 6:00 p.m. and 11:00 p.m. on December 15, 1978. . . ."*[136] In response, respondent submitted a notice of intention to offer the testimony of Mary Hilt, the official court reporter in 1978 for the federal court in Reno, Nevada. Respondent indicated that Ms. Hilt would testify that she was with respondent from approximately 7:00 p.m. to 10:00 p.m. on December 14, 1978.[137] Later, at the trial, Ms. Hilt did in fact testify that on December 14, 1978, she drove respondent to his apartment at the end of the workday, and later, at approximately

[133]Rec. Pt. II, Vol. X at 2498-99.

[134]Rec. Pt. II, Vol. X at 2503.

[135]Rec. Pt. I, Vol. VI, Pleading No. 63 at 13.

[136]Rec. Pt. I, Vol. II, Pleading No. 18 at 2.

[137]Rec. Pt. I, Vol. IV, Pleading No. 39.

7:00 p.m. to 7:30 p.m., she picked up respondent at his apartment and drove him to a car lot in Reno. Further, Ms. Hilt testified that she and respondent later dined together at a Reno restaurant, and that she returned respondent to his apartment that evening at approximately 10:00 p.m.[138] Similarly, respondent's counsel submitted a notice of intention to offer the testimony of numerous witnesses as well as evidence obtained from airline records establishing that respondent was in Las Vegas, Nevada, at the time in question on the night of December 15, 1978.[139]

Thereafter, after investigating the evidence revealed in respondent's notice of alibi, on March 9, 1984, two days after respondent filed his notice of alibi, the prosecution filed a "Second Amended Demand For Notification of Intention to Offer Alibi Defense."[140] In this demand, the prosecution asserted that "recently conducted government interviews and investigation [had] revealed that the crime alleged in Count I . . . may have occurred on days immediately preceding the December 14-15 cited dates cited in the indictment." Accordingly, the prosecution amended its demand for notice of intention to offer an alibi to the offense charged in Count I, to include the hours of 6:00 p.m. through 11:00 p.m. on the dates between and including December 12, 1978, and December 15, 1978.[141] On March 12, 1984, the date that the jury selection for the trial was set to commence, the prosecution filed a third amended demand, once again enlarging the time frame to encompass the period between and including December 11 and December 15, 1978.[142] These events suggest that Conforte's position was sufficiently flexible to shift with the strength of respondent's alibi evidence.

A hearing before Judge Hoffman was conducted just prior to the start of the jury selection on the morning of March 12, 1984, relating to the propriety of the government's second and third amended demands. At this hearing, respondent's counsel represented to the court that substantial time and resources over a period of six weeks had been expended in an attempt to piece together respondent's whereabouts on the particular dates of December 14 and 15, 1978, in reliance upon the government's indication that it would attempt to prove the facts alleged in Count I specifically occurred on those dates.[143] Further, counsel represented that the defense team had expended substantial time pre-

---

[138]Rec. Pt. II, Vol. XII at 2856-59.

[139]Rec. Pt. I, Vol. IV, Pleading No. 39 and No. 43 at 5.

[140]Rec. Pt. I, Vol. IV, Pleading No. 40.

[141]*Id.*

[142]Rec. Pt. I, Vol. IV, Pleading No. 42.

[143]Rec. Pt. I, Vol. IV, Pleading No. 43 at 4-5.

paring the opening argument to the jury which would stress the fact that respondent could effectively refute the government's allegations that the alleged offense occurred on December 14 and 15, 1978.[144] Counsel also articulated the substantial time and difficulties involved in trying to refresh the recollections of potential witnesses who might have been able to assist respondent in reconstructing and establishing his exact whereabouts during an entire week over five years before. Finally, counsel argued that severe prejudice to respondent's defense would occur if the prosecution was allowed to expand the time frame of the alleged offenses in accordance with its last-minute demands. Accordingly, defense counsel urged the court to hold the government to proof that the offense alleged in Count I took place as originally represented by the prosecution. Alternatively, defense counsel requested a two-week continuance of the trial so that respondent could effectively investigate and discover respondent's whereabouts between and including December 11 and December 15, 1978. Counsel observed that "[i]t's not just a question of responding [to the government's amended demands], . . . it's a question of being properly prepared to defend the case."[145] Judge Hoffman ultimately ruled, however, that although respondent should not be required to respond to the government's new demands within the time frame provided in Fed. R. Crim. P. 12.1, the prosecution would not be limited to proof that the alleged offense took place on December 14 and 15, 1978. The judge also denied respondent's motion for a continuance.[146] Prior to the ruling, the prosecutor objected to the continuance, noting that the actual presentation of respondent's case would not "even start for a period of three weeks" and that respondent would have "a full week to conduct any investigation he needs."[147] Judge Hoffman, in refusing the two-week delay, stated, "All right. It's your responsibility. I'm not going to worry about it."[148] Thus, the issues of fundamental fairness and due process of law were left to another time and another court. However, the issue relating to Judge Hoffman's refusal to grant a continuance was ultimately rendered moot when the jury at the first trial could not agree upon a verdict as to any of the seven counts upon which respondent was

---

[144]*Id.* at 8.

[145]*Id.* at 15.

[146]*Id.* at 21-28.

[147]*Id.* at 28. We note in this regard that the actual trial commenced on March 15, 1984, three days after the above-referenced hearing. In the opening remarks to the jury on the first day of trial, the prosecution summarized the Conforte bribery scenario and indicated that it took place "some time after the 10th of December. The week after the 10th of December." *See* Rec. Pt. II, Vol. I at 13.

[148]Rec. Pt. I, Vol. IV, Pleading No. 43 at 28.

indicted, and when the prosecution elected to proceed only on the counts unrelated to Conforte's allegations in the second trial.[149]

Although prosecutor Shaw specifically represented to Judge Hoffman that no prosecution witnesses had changed their stories in light of the notice of alibi provided by respondent, it strains credulity to suppose that at some point, in the course of these events and prior to the commencement of the first trial, the prosecution did not begin to suspect that the difficulties it was encountering in terms of proof might well have stemmed from a scenario that was simply not verifiable in truth. Nonetheless, in spite of these obstacles the government prosecutors insisted upon sending to the jury the counts based upon the obviously suspect accusations volunteered by Conforte.[150] *See* United States v. Basurto, 497 F.2d 781, 785-86 (9th Cir. 1974) (prosecutor who discovers perjury by a grand jury witness after indictment must inform the defendant, the trial court and the grand jury so that the indictment can be cured); *see also* United States v. Bracy, 566 F.2d 649, 655 (9th Cir. 1977), *cert. denied*, 439 U.S. 818 (1978).

The defense did not discover the evidence establishing that Conforte was absent from the Reno area on December 12, 1978, until well after the first trial had begun.[151] Prior to the discovery of that information, however, the defense had subpoenaed a member of this court to testify as to his personal knowledge of certain facts at respondent's first trial.[152] Pursuant to that subpoena, on March 30, 1984, this court's present Chief Justice, E.M. Gunderson, testified that he and Judge Claiborne had dinner together at a hotel in downtown Reno, Nevada, on December 12, 1978, and that he was with Judge Claiborne from approximately 7:30 p.m. to 11:00 p.m. on that particular night.[153] Quite

---

[149]Rec. Pt. II, Vol. XVI at 3780 (court declared a mistrial as to all counts in first trial); Rec. Pt. I, Vol. VI, Pleading No. 58 (government's motion to dismiss all but counts V, VI, and VII for purposes of second trial).

[150]It is important to note that Conforte's testimony that he paid respondent a second bribe in March of 1979, in Portland, Oregon, was also discredited during the course of the first trial. *See* Rec. Pt. II, Vol. XII at 2973-98; Rec. Pt. II, Vol. XIV at 3394 (testimony of Ben and Susan Johnson, and Clyde R. Maxwell contradicting Conforte's scenario that he *only* met with respondent in an underground garage while in Portland and indicating that Conforte was seen with respondent in the hallway of the federal courthouse); *see also* Rec. Pt. II, Vol. III at 635-47; Pt. II, Vol. IV at 868 (setting forth Conforte's version of the Portland bribery scenario).

[151]Rec. Pt. II, Vol. IX at 2142-55 (transcript of proceedings of March 27, 1984, on defense motion for order directing the issuance of subpoena duces tecum).

[152]Rec. Pt. II, Vol. XII at 2834.

[153]*Id.* at 2846.

apart from Chief Justice Gunderson's testimony, however, it was conclusively established that respondent could not possibly have solicited a bribe from Conforte on the night of December 12, 1978, because, as the United States State Department official unequivocally confirmed, on December 12, 1978, Conforte was in fact in New York City picking up his passport.

On April 13, 1984, after a lengthy trial and prolonged deliberations, the jury announced that it was "hopelessly deadlocked" and was unable to come to a unanimous verdict on any of the seven counts charged in the indictment. Accordingly, Judge Hoffman declared a mistrial and ordered that the case be retried.[154] Judge Hoffman further directed that the retrial would commence on July 31, 1984.[155]

On June 27, 1984, the prosecution filed a motion seeking to dismiss the "Conforte counts" of the indictment.[156] The prosecution expressed the belief that the evidence presented in the first trial relating to the "Conforte counts" may have "distracted the jury in its consideration of [the remaining counts] and contributed to its inability to reach a verdict. . . ."[157] Thus, after subjecting respondent to prolonged grand jury investigations and a lengthy, sensational trial based on Conforte's accusations of bribery and corruption, all accompanied by extensive media coverage, the prosecution finally, impliedly admitted that Conforte's allegations lacked substance.[158] Nonetheless, in light of the intense publicity surrounding the allegations of bribery and corruption of a federal judge by a brothel owner, respondent's reputation and integrity were sullied notwithstanding the jury's failure to convict on any of the counts at the first trial. The allegations of corruption reported in the media were given added credence by the prosecution's refusal to recognize explicitly the questionable veracity of Conforte's accusations, by its continued adherence to the terms of the Conforte bargain, and by the failure to seek the criminal prosecution of Conforte on charges of perjury. In our view, given the conduct of the prosecution and the intense media scrutiny of the evidently false bribery accusations, there can be little doubt that the public's perception of respondent's character and integrity was severely diminished within the Reno community. This publicity may well have affected respondent's ability to obtain a

---

[154]Rec. Pt. II, Vol. XVI at 3778-83.

[155]*Id.* at 3784.

[156]Rec. Pt. I, Vol. VI, Pleading No. 58.

[157]*Id.*

[158]It appears that under Rule 14 of the Federal Rules of Criminal Procedure and existing case law, Garris v. United States, 418 F.2d 467 (D.C. Cir. 1969), the government could have moved to merely sever, rather than dismiss, the Conforte counts if it perceived the counts to have any merit.

fair second trial from a jury untainted by the spurious allegations linking him with a notorious brothel owner and attacking his honesty and integrity. *See, e.g.,* United States v. Claiborne, 765 F.2d 784, 800 (9th Cir. 1985), *cert. denied,* 475 U.S. 1120 (1986) (discussing trial judge's refusal to excuse two trial jurors for cause thus requiring defendant's use of peremptory challenges); *see also* Rec. Pt. IV, Vol. I, Pleading No. 3 at 34-39 (Claiborne's opening brief on appeal citing voir dire testimony of the two prospective jurors in question). Although the prosecution's decision no longer to pursue the "Conforte counts" in the second trial prompted media criticism of the prosecution's tactics, the damage to respondent's public image undoubtedly had already been done.[159]

The costs of defending against the false Conforte accusations must be calculated not only monetarily but also in human terms taking into account the substantial opprobrium and obloquy to which respondent has been exposed. As we discuss in more detail below, these factors are relevant to our deliberations in the instant matter and are appropriately considered in mitigation of any conduct warranting discipline. *See* In re Ross, 99 Nev. 657, 660, 668 P.2d 1089, 1092 (1983); Carter v. Cianci, 482 A.2d 1201 (R.I. 1984). Further, we may appropriately consider whether respondent obtained an impartial evaluation in the second trial from a jury untainted by the Conforte allegations of corruption and dishonesty in assessing the weight to be accorded respondent's conviction for disciplinary purposes. SCR 114; Selling v. Radford, 243 U.S. 46, 51 (1917).

---

[159]In this regard, we note that one such criticism, an editorial entitled *Conforte Reels in Some Mighty Big Suckers,* appeared in the Reno Gazette-Journal on June 29, 1984. From our review of the record of the first trial, as summarized above, we are hard-pressed to dismiss or devalue the insights expressed by the Reno Gazette-Journal concerning the motives and actions of some of the federal agents involved. In particular, the editorial observed that retaliation against respondent may have been a primary motivation for the investigation and prosecution, and that the government "dug and dug, and when Conforte put out his bait, the government swallowed it right up to the fishing pole." Additionally, the editorial observed that "Conforte's testimony at Claiborne's trial was riddled time and again by the defense," and recited the major contradictions in Conforte's allegations which we have detailed above. Further, the editorial observed that "[t]he defense discovered all this [the contradictory evidence] easily. Why couldn't the Justice Department? Because Justice was too busy with its retaliation to bother with the facts." *See Conforte Reels in Some Mighty Big Suckers,* Reno Gazette-Journal, June 29, 1984. Although we are inclined to accord general respect for the observations of the editorial, we would add, as a matter of clarification, that the questionable conduct involved was not undertaken by the Justice Department, the FBI or the IRS as a whole, but was instead the indiscretion of a very limited number of people.

One of the most compelling reasons for focusing at length on the Conforte aspects of the Claiborne prosecution is because it is cogently arguable that in spite of an unrelenting prosecutorial commitment, no criminal indictment would have issued without the facile foundation supplied by Conforte.[160] Although our record does not include transcripts of any of the grand jury proceedings, it is strongly inferable that government allegations of Claiborne's failure to report the Conforte bribe money on his tax returns infected the grand jury proceedings in both Oregon and Reno. In fact, it appears from our overall survey of the record available to us, that the tax counts evolved from the Conforte nexus to the ultimate case that was unmoored from its initial Conforte foundation. This evolution of the tax counts has great significance, it seems, for it fairly implicates an entirely different scenario for Claiborne that would have altogether obviated the criminal indictment and conviction. Although we will hereafter examine in some detail the 1979 and 1980 tax returns relevant to Claiborne's criminal conviction, suffice it to observe here that absent the patently criminal nature of the alleged Conforte involvement in Claiborne's generation of taxable income, other, more reasonable circumstances and inferences likely would have prevailed. For example, the record reflects, as we will hereafter specify, that Claiborne's 1979 and 1980 tax returns were legitimate prospects for a civil audit by the Internal Revenue Service. In the context of a civil audit, it appears beyond speculation to suggest that Claiborne's former tax accountant and C.P.A., Joseph C. Wright, would have approached the subject of his former client's taxes much differently than he did in the criminal arena.[161] As will be seen hereafter, there is substantial evidence to support Claiborne's contention that he never concealed income from his

---

[160]We take judicial notice of the fact that this is not the first occasion when Conforte sought to exercise a maleficent influence on the future course of the lives of public officials in the State of Nevada. In Conforte v. State, 77 Nev. 269, 362 P.2d 274 (1961), Conforte was convicted of extortion in threatening the respected district attorney of Washoe County if he did not arrange the dismissal of a criminal charge against Conforte. Similarly, in 1983, Conforte entered a plea of guilty for attempting to bribe the district attorney of Lyon County in order to secure a brothel license. State v. Conforte, Case Nos. C79-1045 and C83-1879, Second Jud. Dist. Ct., Washoe Co. (transcript of hearing on change of plea filed Jan. 11, 1984).

[161]Wright, who had undergone lung surgery and radiation therapy in 1982, also moved his office, destroyed various papers thought unimportant, and was subjected to prolonged and intensive preparation by federal agents prior to his trial testimony. Moreover, he admitted that most of his testimony was based upon reconstruction of events as assisted by federal agents, rather than independent recollection. Wright also expressed concern for his own well-being during his involvement with government authorities over the Claiborne matter. *See* Senate Hearing, *supra* note 15, Pt. 1 at 534, 555, 557-58, 559-61, 565-66.

accountants or otherwise sought to evade payment of his tax obligations. The Conforte connection simply cannot be ignored in any fair analysis of respondent's predicament, including his entitlement to further discipline by this court.

### F. The Second Trial and Subsequent Appellate and Congressional Proceedings

On July 10, 1984, Judge Hoffman granted the prosecution's unopposed motion to dismiss the first four counts of the indictment pending against respondent.[162] The second trial thus proceeded on only those counts involving respondent's income tax returns for the years 1979 and 1980, and the count pertaining to respondent's judicial financial disclosure report for 1978. Once again, respondent filed pretrial motions attacking the validity of the entire indictment because of investigative and prosecutorial misconduct. In addition, respondent argued that the entire indictment should be dismissed because the perjurious testimony of Conforte had unfairly prejudiced the indicting grand jury. Respondent renewed his requests for evidentiary hearings and discovery on his allegations of governmental abuses.[163] Further, defense counsel sought the recusal or disqualification of Judge Hoffman from further participation in the case, alleging that the judge had demonstrated bias against respondent in the first trial.[164] Judge Hoffman subsequently denied these pretrial motions and, thereafter, the retrial commenced on July 31, 1984.[165]

On August 10, 1984, the jury in the second trial returned guilty verdicts on the two income tax related counts. Respondent was acquitted on the charge that he had submitted a false judicial financial disclosure report.[166] On October 3, 1984, Judge Hoffman entered a judgment of conviction, pursuant to the jury's verdict, and sentenced respondent to serve two years in federal prison on each count, the terms to be served concurrently. Respondent was also fined a total of $10,000.[167] In addition to the $10,000 fine, Judge Hoffman assessed costs of prosecution in the amount of $14,384 against respondent.[168]

---

[162]Rec. Pt. I, Vol. VI, Pleading No. 58; Rec. Pt. I, Vol. VI, Pleading No. 62.

[163]Rec. Pt. I, Vol. VI, Pleading Nos. 63-67.

[164]Rec. Pt. I, Vol. V, Pleading Nos. 49, 51; Rec. Pt. I, Vol. VI, Pleading No. 57.

[165]Rec. Pt. I, Vols. V and VI, Pleading Nos. 50, 56, 61, 68; Rec. Pt. IV, Vol. I, Pleading No. 4 at 70.

[166]Senate Hearings, *supra* note 15, Pt. 3 at 1488-89 (transcript of second trial).

[167]Rec. Pt. I, Vol. VI, Pleading No. 75.

[168]Rec. Pt. I, Vol. IX, Pleading No. 98.

A specially designated three-judge panel comprised of senior judges from the second, seventh and tenth circuits heard respondent's appeal and affirmed his conviction. *See* United States v. Claiborne, 765 F.2d 784 (9th Cir. 1985), *cert. denied,* 475 U.S. 1120 (1986). Thereafter, defense counsel filed a petition for rehearing and a "suggestion of appropriateness of rehearing *en banc*" with the Ninth Circuit Court of Appeals.[169] The petition for rehearing was denied by the same senior circuit judges who heard respondent's appeal, and the Ninth Circuit Court of Appeals sitting *en banc* voted upon and rejected the request for an *en banc* rehearing.[170] Six out of the twenty-five judges recused themselves from this vote and three judges dissented from the outcome.[171] Respondent, thereafter, petitioned the United States Supreme Court for a writ of certiorari. That Court denied the petition without comment in April of 1986. *See* Claiborne v. United States, 475 U.S. 1120 (1986). Respondent began serving his sentence in May of 1986, after the Ninth Circuit Court of Appeals denied his request for a stay of execution of sentence.[172]

In September of 1986, trial proceedings were instituted in the United States Senate on four articles of impeachment voted by the House of Representatives.[173] In an unprecedented procedure, evidence was presented to a twelve-member special committee of the Senate, rather than to the Senate as a whole. Notably, respondent was once again denied an opportunity to solicit and present detailed evidence concerning his allegations of governmental and prosecutorial misconduct leading to his indictment and subsequent conviction.[174] The Senate committee, however, did allow respondent's counsel to present witnesses and other evidence pertaining to Judge Claiborne's allegations of improper prosecutorial influence and "coaching" of witnesses at the trials and grand jury proceedings.[175]

On October 9, 1986, the full Senate voted on the four articles of impeachment. The necessary two-thirds of the members voted "guilty" on all of the articles except Article III, which premised

---

[169]Rec. Pt. IV, Vol. II, Pleading No. 8.

[170]Rec. Pt. IV, Vol. IV, Pleading No. 44 at A-125 (Order of United States Court of Appeals for the Ninth Circuit, No. 84-1294, filed Dec. 10, 1985).

[171]The three dissents were written by Judge Ferguson, *see* United States v. Claiborne, 781 F.2d 1325 (9th Cir. 1985), Judge Reinhardt, *see* United States v. Claiborne, 781 F.2d 1327 (9th Cir. 1986), and Judge Pregerson, *see* United States v. Claiborne, 781 F.2d 1334 (9th Cir. 1986).

[172]Rec. Pt. IV, Vol. III, Pleading No. 23.

[173]Senate Hearings, *supra* note 15, Pt. 1 at 6-10.

[174]Senate Hearings, *supra* note 15, Pt. 1 at 689-91.

[175]Senate Hearings, *supra* note 15, Pt. 1 at 848-913 (testimony of D. Skelton, R. Jesinger and L. Halper).

respondent's removal from office solely on the basis of his conviction. The requisite two-thirds of the Senate did not view this as an adequate and appropriate basis upon which to remove respondent from office.[176]

As we previously observed, it is neither our function nor within our jurisdiction to sit in review of the federal and congressional proceedings resulting in respondent's conviction and removal from office. Nonetheless, just as the United States Senate declined to remove respondent from his office on the sole ground that he was convicted of violating the provisions of 26 U.S.C. § 7206(1), so must we consider more than just the fact of respondent's conviction in discharging our disciplinary function. In essence, we view it as our obligation to scrutinize carefully the entire record heretofore compiled in this matter in order to weigh those factors which reflect upon respondent's fitness to practice law and to make an independent factual determination regarding the extent of the bar discipline that is warranted by the whole course of respondent's conduct and career, as well as the circumstances underlying his conviction. *See* Sloan v. State Bar, 102 Nev. 436, 726 P.2d 330 (1986); In re Cochrane, 92 Nev. 253, 549 P.2d 328 (1976); In re Kristovich, 556 P.2d 771 (Cal. 1976). Moreover, as previously suggested, we have determined that in light of the substantial indications of investigative and prosecutorial improprieties, we are obligated to examine the record of the federal court proceedings to ascertain whether any violations of due process of law should diminish the weight normally accorded a judgment of conviction in disciplinary matters.

---

[176]132 Cong. Rec. S15761 (daily ed. Oct. 9, 1986) (Roll call vote on Article III). We note that Senator Howell T. Heflin has publicly remarked on this topic:

> Along these same lines, during the Senate floor trial of Judge Claiborne, many of my colleagues believed that a prior criminal conviction in either federal or state court was sufficient basis for impeachment. The third article of impeachment passed by the House of Representatives against Judge Claiborne stipulated that the prior conviction of Judge Claiborne was, itself, an adequate offense for removal from office. While I believe that a Senate impeachment trial should certainly take any prior conviction into consideration, I did not believe that the conviction, alone, constituted sole or determinative grounds for impeachment—similarly, I do not believe that the verdict of not guilty in a criminal case absolves a defendant in an impeachment trial. Rather, I believe an impeachment trial should always be separate and distinct from a trial in a federal or state court. Therefore, when the Senate voted on this article of impeachment, I voted present, and was joined by 34 other senators. Because a two-thirds majority of the Senate did not vote guilty on this article, it was not approved, and precedent was not set.

Speech of Senator Howell T. Heflin Before the American Judicature Society on the Federal Impeachment Process (Feb. 6, 1988) at 9.

Accordingly, with these obligations in mind, in our review of the second trial and the proceedings which followed, we have focused primarily on three major categories of facts and circumstances relevant to our deliberations. First, we have focused on those facts relevant to the fairness and impartiality of the grand jury proceedings resulting in the indictment upon which respondent was tried and convicted. Second, we have considered all the facts and evidence disclosed in the second trial, as well as in the Senate impeachment hearings, which bear upon the question of respondent's willful and knowing violation of the income tax code in the years 1979 and 1980. Third, we have focused upon those facts relevant to the issue of whether the federal judicial and congressional proceedings were conducted in such a manner so as to afford respondent a fair and full opportunity to present his defense.

### 1. CONCERNS AND CONSEQUENCES OF THE GRAND JURY INDICTMENT

In his pretrial pleadings, and on appeal, respondent argued that the counts in the indictment upon which he was tried and convicted in the second trial were the product of a biased grand jury which was prejudiced by perjurious testimony.[177] Specifically, respondent maintained that as a matter of fundamental fairness an accused has the basic right to an indictment returned by a legally constituted and unbiased grand jury.[178] *See* Costello v. United States, 350 U.S. 359 (1956). Respondent supported this contention by noting that only one of the three grand juries that had investigated him had returned an indictment, and that the indicting grand jury was the only one that had actually heard Conforte's testimony.[179] Further, as noted, respondent argued on appeal that not once during Conforte's grand jury appearance did the prosecution ever question Conforte respecting the specific dates upon which the bribe alleged in Count I took place.[180]

---

[177]Rec. Pt. I, Vol. VI, Pleading No. 63 (pretrial motion to dismiss indictment); Rec. Pt. IV, Vol. I, Pleading No. 3 (Claiborne's opening brief on appeal).

[178]Rec. Pt. I, Vol. VI, Pleading No. 63 at 5.

[179]The prosecution attempted to explain away this fact by noting that the term of the first Portland grand jury expired before returning an indictment, and that the second Portland grand jury was never asked to return an indictment. *See* Rec. Pt. IV, Vol. II, Pleading No. 6 at 19; Rec. Pt. I, Vol. V, Pleading No. 47 at 4-6. In our view, however, this explanation only serves to highlight the apparent significance and importance which the prosecution attached to Conforte's grand jury testimony as it *pertained to all the counts* and buttresses respondent's contention that the grand jury was unduly influenced and prejudiced by Conforte's perjury.

[180]Rec. Pt. IV, Vol. I, Pleading No. 3 at 12. We have been unable to verify this allegation because the transcript of the grand jury proceedings is not

Additionally, respondent pointed to the numerous instances detailed above, wherein testimony and evidence adduced at the first trial substantially contradicted and discredited Conforte's testimony. Respondent also argued in his appeal that the prosecution's three amended demands for notices of intention to rely on an alibi defense strongly implied that prior to the first trial federal agents and prosecutors knew, or at least had good cause to suspect, that Conforte's testimony was self-serving and perjurious. Thus, respondent maintained on appeal that his conviction should be reversed because the entire indictment was the product of a grand jury persuaded by perjurious testimony that Judge Claiborne was a corrupt judge. Respondent noted that the prosecution had conceded that the Conforte counts may have distracted the jury in the first trial. Thus, it was likely that the grand jury, in the absence of the evidence discrediting Conforte's scenario, may have been unfairly influenced against respondent by Conforte's testimony. In essence, respondent asserted that the indictment on the counts unrelated to Conforte's accusations was unfairly obtained and that those counts "were no more than 'the tail of the dog.' "[181] *See* United States v. Hogan, 712 F.2d 757, 761 (2d Cir. 1983) (dismissal of indictment is justified if necessary to eliminate prejudice to a defendant or, pursuant to court's supervisory power, to prevent prosecutorial impairment of grand jury's independent role); United States v. Samango, 607 F.2d 877, 882 (9th Cir. 1979) ("[a]lthough deliberate introduction of perjured testimony is perhaps the most flagrant example of misconduct, other prosecutorial behavior, even if unintentional, can also cause improper influence and usurpation of the grand jury's role."); United States v. Basurto, 497 F.2d 781, 785-87 (9th Cir. 1974) (due process considerations prohibit the prosecution from obtaining an indictment based on material testimony known to be perjurious, and conviction was reversed where the prosecuting attorney failed to take appropriate action to "cure the indictment" after pretrial discovery of the perjury). *See also* United States v. Bracy, 566 F.2d 649, 655 (9th Cir. 1977), *cert. denied,* 439 U.S. 818 (1978).

On appeal, however, the specially designated appellate panel concluded:

included in the record before us. Respondent explained in his brief on appeal that because he was not accorded an evidentiary hearing on his pretrial motion to dismiss the indictment, "the Conforte grand jury testimony was not made part of the record. . . ." *Id.* at 11. We note, however, that the prosecution never refuted respondent's allegation that Conforte was not questioned before the grand jury regarding the specific dates on which the bribe alleged in Count I had occurred.

[181]Rec. Pt. I, Vol. VI, Pleading No. 63 at 6.

There is no evidence to support [Judge Claiborne's] assertions. The defendant has made no showing, beyond mere speculation, that Conforte gave perjured testimony before the grand jury or at the first trial. Nor has he made any showing that the Government had any reason to believe that Conforte's testimony was perjured. Speculation cannot justify this court's intervention into the grand jury's proceeding. *See United States v. Chanen,* 549 F.2d 1306, 1312 (9th Cir. 1977) (discussing separation of powers reasons for court's refusal to intervene in grand jury proceedings), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83. Under these circumstances, the Government's presentation of Conforte's testimony to the grand jury was not the sort of flagrant misconduct required to justify dismissal of the indictment under the Due Process Clause of our supervisory powers. *United States v. Sears, Roebuck & Co.,* 719 F.2d 1386, 1391-92 (9th Cir. 1983), *cert. denied,* ...... U.S. ......, 104 S.Ct. 1441, 79 L.Ed.2d 762 (1984).

*See* United States v. Claiborne, 765 F.2d at 792 (footnote omitted).

Moreover, the appellate panel concluded that even if Conforte did perjure himself before the grand jury, his testimony was not *material* to the counts of the indictment unrelated to his allegations and upon which Judge Claiborne was convicted. *Id.* Accordingly, the panel held that "the trial judge committed no abuse of discretion in refusing to dismiss defendant's indictment due to presentation of perjury before the grand jury." *Id.* (Citation omitted.)

Although we cannot fault the legal analysis set forth in the appellate panel's opinion, we must respectfully disagree with the factual predicate upon which that analysis is based. As we have set forth in some detail above, the enormity of the concessions that the government extended to Conforte in exchange for his testimony, and the conclusive nature of the evidence adduced at the first trial contradicting and discrediting Conforte's allegations, persuade us that respondent's allegations of perjury amounted to much more than "mere speculation."

Additionally, we note that Conforte was not resentenced in accordance with the terms of his agreement with the government until after he had testified before the grand jury and an indictment had been obtained. In Franklin v. State, 94 Nev. 220, 225-26, 577 P.2d 860, 863 (1978), this court stated:

By bargaining for specific testimony to implicate a defendant, and withholding the benefits of the bargain until after the witness has performed, the prosecution becomes com-

> mitted to a theory quite possibly inconsistent with the truth and the [search] for truth. We deem this contrary to public policy, to due process, and to any sense of justice.

(Footnote omitted.) Even though respondent was not convicted on the "Conforte counts," and the agreement between Conforte and the prosecution expressly provided that its terms were not dependent upon any conviction resulting from Conforte's testimony, we are inclined to view the manner in which the indictment apparently was obtained in the instant case with similar concern. In our view, the facts surrounding the prosecution's presentation of Conforte's testimony to the grand jury implicates issues of public policy, due process and a sense of justice.

Moreover, our review of the record indicates that Conforte's testimony could well have had a material effect, not only upon the indicting grand jury, but also upon the outcome of respondent's second trial. At the outset of the investigation, it appears that there was more than a mere casual nexus between the Conforte allegations and the income tax violations for which respondent was ultimately convicted. For example, in September of 1982, the Public Integrity Section of the Justice Department initially obtained access to respondent's 1978 and 1979 income tax returns through an *ex parte* order issued by Judge Hoffman. The order was issued upon the representations of Justice Department prosecutors that there was reasonable cause to believe "based upon information believed to be reliable that" respondent may have solicited and accepted bribes from Conforte.[182] Thus, it appears that the initial investigation into respondent's tax returns began as a direct result of Conforte's allegations.

Additionally, it cannot be questioned that Conforte's allegations raised serious questions about respondent's honesty and integrity. As we have suggested, Conforte's aspersions on respondent's character were the subject of extensive media attention prior to and during the first trial. Thus, it is likely that the jury venire in the second trial, as well as the indicting grand jury, may well have been exposed to and influenced by Conforte's accusations.[183] Where, as here, the determination of guilt was predicated upon a finding that respondent willfully and knowingly signed materially false income tax returns, Conforte's allegations of corruption may well have had a material impact upon all the counts of the indictment returned by the grand jury, as well as the

---

[182]Rec. Pt. I, Vol. VI, Pleading No. 66 (attachment to government's opposition to motion to dismiss).

[183]Rec. Pt. IV, Vol. I, Pleading No. 3 at 34-39 (Claiborne's opening brief on appeal detailing voir dire examination of two potential trial jurors who admitted to being influenced by press accounts of first trial).

verdict of guilt rendered by a trial jury from a community exposed to extensive media coverage of these false accusations. At the very least, where respondent's credibility and his wrongful intent were crucial factors in the jury's deliberations, the impact of Conforte's accusations cannot be ignored.

Lastly, and significantly, we again observe that by obtaining the release of Claiborne's tax returns for the purpose of investigating Conforte's bribery allegations, the prosecution arguably succeeded in bypassing what appears to be customary steps and routine procedures normally accorded taxpayers in any tax investigation. Specifically, respondent has contended:

> At any one of these steps, when some mistake or omission has been made by a taxpayer, he may correct the matter in conference or other proceedings. The customary steps include: (a) audit; (b) Intelligence Division investigation; (c) conference between taxpayer and Intelligence Division Supervisor; (d) forwarding the case to IRS Regional Counsel who will notify taxpayer he may ask for a conference, which if requested will not be denied; (e) transfer from IRS Regional Counsel to Justice Department; (f) pre-indictment conference. In the instant case, only the last step was taken, and that only shortly before indictment.[184]

In this regard, evidence was presented at this court's hearing of November 24, 1987, indicating that respondent's tax returns for the years 1979 and 1980 reflected "tax preparer errors" which normally would not have been the basis of any prosecution.[185] In light of this evidence, we are of the opinion that Conforte's allegations unquestionably and materially impacted upon respondent's indictment, his trial and his conviction. More importantly, however, for our purposes, these circumstances cast a substantial shadow upon the fairness and impartiality of the grand jury deliberations that ultimately led to respondent's indictment and conviction. Accordingly, we are constrained to view with measured depreciation the continuing vitality of respondent's conviction as a reliable precursor to further discipline.

### 2. EVIDENCE OF RESPONDENT'S "WILLFUL AND KNOWING" CONDUCT

As noted, respondent was convicted of willfully filing a false income tax return for the years 1979 and 1980 in violation of 26 U.S.C. § 7206(1) (1967), which provides in pertinent part:

---

[184]Rec. Pt. IV, Vol. I, Pleading No. 3 at 15-16.

[185]State Bar v. Claiborne, Docket No. 17294, Reporter's Transcript of Hearing of November 24, 1987 (testimony of R. Paul Sorenson at 59-64).

> Any person who . . . [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . . shall be guilty of a felony. . . .

Proof of a violation of this statute "requires more than a showing of careless disregard for the truth" but rather, a voluntary, intentional violation of a known, legal duty. *See* United States v. Pomponio, 429 U.S. 10, 12 (1976). Respondent contended at his trial and during the impeachment proceedings that although he may have been negligent and careless, he did not willfully and purposefully submit false tax returns. *See* Senate Hearings, *supra* note 15, Pt. 1 at 1149; United States v. Claiborne, 765 F.2d at 797. Defense counsel argued in this regard that respondent fully and accurately reported his income in 1979 and 1980 to his accountants, and that he relied in good faith on the expertise of his accountants when he signed his returns. Such good faith reliance on a qualified accountant coupled with full disclosure of taxable income is "a valid defense to a charge of filing a false return. . . ." *See* United States v. Whyte, 699 F.2d 375, 379 (7th Cir. 1983).

### a. THE 1979 RETURN

Joseph Wright was the accountant who prepared respondent's 1979 return. Wright had previously prepared respondent's tax returns over a period of approximately thirty years.[186] A significant issue regarding the question of respondent's full disclosure of income to Wright centers around a copy of a handwritten letter which respondent contended he wrote and sent to Wright on April 11, 1980.[187] The letter stated in pertinent part:

> Enclosed check in the amount of $8,000 and W-2 form from U.S. Courts as requested. Fees received during 1979 for practice before I became a judge are $41,073.93. I also sold my airplane in April. Received $11,000. I paid $11,000 for it, so there is no profit or loss.

The amount of legal fees, $41,073.93, plus the statement of earnings contained in Judge Claiborne's W-2 form constituted the full and correct amount of income he received during 1979.[188] The

---

[186]Rec. Pt. III, Vol. I at 118.

[187]Rec. Pt. III, Vol. II at 293; and *see* Senate Hearings, *supra* note 15, Pt. 4 at 2185.

[188]Senate Hearings, *supra* note 15, Pt. 1 at 124.

$8,000 check, to which the letter refers, was to accompany an application for an extension which Wright was preparing.[189]

Judge Claiborne testified that he instructed his secretary, Judy Ahlstrom, to deliver the W-2 form, the $8,000 check dated April 11, 1980, and the letter to Mr. Wright's office on the morning of April 11, 1980.[190] Ahlstrom consistently testified that she did in fact deliver these documents to Wright's office on that date and personally handed them to a secretary.[191] Ken Swanson, an employee of Wright's accounting firm, further corroborated this story at the Senate hearings by testifying that, at or near the time tax returns were due in either 1979 or 1980, he witnessed a woman who was identified to him as Judge Claiborne's secretary deliver something to Wright's office.[192]

Both Wright and Wright's wife, however, testified that they could not recall having received the April 11, 1980 letter.[193] Further, they maintained that the first time they could recall having seen this letter was in the fall of 1983 when respondent's counsel, Oscar Goodman, showed them a copy of it.[194] Mr. Wright also testified that he had no recollection of ever losing or mislaying any tax documents concerning Judge Claiborne.[195]

Thus, a crucial issue before the jury involved the question of whether Wright actually received the letter of April 11, 1980. If the jury believed that respondent's secretary delivered the letter, then it necessarily followed that respondent had fully disclosed his income to his accountant. On the other hand, if the jury found Wright's story to be credible, then respondent's defense of full disclosure was severely jeopardized.

In reaching its verdict, the jury was not apprised of two important pieces of evidence reflecting on the credibility of the witnesses concerning the delivery of the letter of April 11, 1980. First, the Wrights' story was contradicted, and Ms. Ahlstrom's story was corroborated at the Senate hearings by an affidavit submitted by Ellen Arthur, an employee of Wright's accounting firm during the period in question. Ms. Arthur did not testify at the second trial; however, in the Senate impeachment hearings she submitted her affidavit stating that on or about April 11, 1980, she received a telephone call from Judge Claiborne's

[189]Rec. Pt. III, Vol. II at 276.

[190]Rec. Pt. III, Vol. IV at 869.

[191]Rec. Pt. III, Vol. III at 618-21; Senate Hearings, *supra* note 15, Pt. 1 at 677.

[192]Senate Hearings, *supra* note 15, Pt. 1 at 667-68.

[193]Rec. Pt. III, Vol. II at 276, 351-52.

[194]*Id.*

[195]Rec. Pt. III, Vol. VI at 1178.

secretary, and that the secretary indicated that she would hand-deliver some "tax materials, including [respondent's] W2 and income information for the tax year 1979."[196] Additionally, Ms. Arthur's affidavit confirms that Ahlstrom did in fact deliver an envelope and that Arthur placed it on Mr. Wright's desk with a note instructing Wright "to look on his desk so that he would not miss seeing the envelope."[197] Arthur further attested to the fact that "[t]he loss or misplacing of materials was not an unusual occurrence in Mr. Wright's office."[198] Notably, Arthur explained that although she did attempt to contact attorney Goodman during the second trial to divulge this information, she did not pursue the matter in part because "she was fearful of repercussions against her by the IRS or the FBI."[199] Finally, Arthur's affidavit indicates that "two or three days" after Ahlstrom delivered the envelope to Wright's office, "Mrs. Wright came into Affiant's office clearly tense and somewhat agitated and she asked Affiant if she had seen the information from Mr. Claiborne's letter as it could not been [sic] found or had been misplaced."[200] Thus, Arthur's testimony at the second trial would have substantially corroborated Ms. Ahlstrom's testimony and, consequently, would have significantly supported respondent's defense that he had fully disclosed his income to Wright in the letter of April 11, 1980.

Second, respondent has argued that his defense was unfairly deprived of exculpatory information in the possession of the prosecution that would have allowed for impeachment of Wright's trial testimony. Specifically, Judge Claiborne contended in his appeal from his conviction that the trial court had committed reversible error by refusing to disclose to the defense certain summaries of statements made by Mr. Wright to FBI agents during the pretrial investigation. In these pretrial interviews with government agents, Wright revealed that tax documents and

---

[196]Senate Hearings, *supra* note 15, Pt. 4 at 2077-82.

[197]*Id.* at 2080.

[198]*Id.* at 2081.

[199]*Id.* at 2078.

[200]*Id.* at 2080. We note that Ahlstrom testified that when she delivered the letter, she handed it to a secretary who she later concluded must have been Mrs. Wright. *See* Senate Hearings, *supra* note 15, Pt. 1 at 677. At the Senate hearings, Annette Quintana submitted an affidavit asserting that she was familiar with the appearance of both Mrs. Wright and Ellen Arthur. Quintana averred that, in her opinion, "it would not be unusual for a person who did not know either Mrs. Wright or Mrs. Arthur to take one for the other after a brief encounter." *See* Senate Hearings, *supra* note 15, Pt. 4 at 2076. Under these circumstances, and in light of the fact that Mrs. Wright denied having ever received the April 11th letter, it is perhaps understandable that the defense investigation did not reveal Arthur's testimony and evidence prior to trial.

records of a substantial number of his clients had been misplaced or "thrown away" by Wright's office on at least one prior occasion. *See* United States v. Claiborne, 781 F.2d 1325, 1326 (9th Cir. 1985) (Ferguson, J., dissenting); United States v. Claiborne, 765 F.2d 784, 800-01 (9th Cir. 1985), *cert. denied,* 475 U.S. 1120 (1986).

Prior to the trial, the defense specifically requested discovery of all statements, known as *Brady* material, in the possession of the prosecution that would tend to impeach the credibility of any government witness, and for the production of Jencks Act material in advance of trial.[201] During the two trials, Judge Hoffman had conducted *in camera* reviews of potential Jencks Act or *Brady* material in order to ascertain whether the material contained information to which the defense was entitled. After the jury returned its verdict in the second trial, however, Judge Hoffman discovered that he had a packet of FBI summaries and analogous documents prepared by IRS investigators which he had failed to examine for such information. This unexamined material included summaries of Wright's statements to FBI and IRS investigators.[202] *See* United States v. Claiborne, 781 F.2d 1325, 1326 (9th Cir. 1985) (Ferguson, J., dissenting).

On appeal, the special appellate panel concluded that the FBI summaries of Wright's statements were not Jencks Act materials and that, therefore, the defense was not entitled to their disclosure under 18 U.S.C. § 3500 (1985). *See* United States v. Claiborne, 765 F.2d at 801-02. Further, the appellate panel concluded that although some of the undisclosed information was *Brady* impeachment evidence, the failure to disclose the *Brady* material was not prejudicial to the defense and accordingly did not warrant reversal of respondent's conviction. *Id.* at 802-03; *see also* United States v. Claiborne, 781 F.2d at 1326 (Ferguson, J., dissenting).

The appellate panel's analysis in these respects was subsequently severely criticized. Specifically, in his dissent from the order of the Ninth Circuit denying Judge Claiborne's petition for a rehearing of the appeal, Judge Ferguson explained:

---

[201] Due process requires the prosecution to disclose materially exculpatory information in its possession to the defense upon a proper request. *See* United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976); Brady v. Maryland, 373 U.S. 83 (1963). Additionally, the Jencks Act, 18 U.S.C. § 3500 (1985), provides for the mandatory disclosure of certain pretrial statements made by a trial witness in pretrial interviews or during the witness's grand jury testimony. *See* Campbell v. United States, 373 U.S. 487 (1963).

[202] Rec. Pt. IV, Vol. I, Pleading No. 3 at 42.

The panel's *Brady* analysis ignored *United States v. Bagley,* ...... U.S. ......, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), announced six days before *Claiborne.* Under *Bagley,*

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Id.* at 3384. The panel should have decided whether suppression of the Wright interview material "undermined confidence in the outcome of the trial." Instead, the panel employed a two part test: whether the evidence would have "created a reasonable doubt" or whether it "might have affected the outcome" of the trial. *Claiborne,* 765 F.2d at 802-03.

> *Ample evidence from the record supports the conclusion that suppression of the material undermines confidence in the trial outcome. Wright was a key witness in the government's case. Evidence that a significant number of his clients' files had been discarded, directly contradicting his earlier testimony, would certainly undermine his credibility sufficiently for the jury to conclude that the defendant had testified truthfully. Thus, Claiborne's conviction should have been reversed because the government withheld Brady impeachment evidence of one of its key witnesses.*

*See* United States v. Claiborne, 781 F.2d at 1326 (1985) (emphasis added). Judge Ferguson also concluded that the appellate panel's Jencks Act analysis was incorrect because it not only conflicted with Supreme Court precedent, but restricted a criminal defendant's access to witness statements transcribed contemporaneously with the FBI interview and taken down in a substantially verbatim fashion. *Id.; see also* Campbell v. United States, 373 U.S. 487, 492 n.6 (1963) (it is not necessary for Jencks Act statements to be signed or written by the witness nor are they required to be substantially verbatim recordings of a prior statement). Further, Judge Ferguson criticized the appellate panel for failing to review the material at issue:

> The fundamental error the panel committed was its failure to conduct an independent examination of the materials on which the trial court based its rulings. I fail to see how the panel, without looking at that material, could have fairly decided whether those rulings were erroneous. A reviewing court has an obligation to examine *Brady* and Jencks Act material to ensure that the district court's rulings were cor-

> rect. *See Campbell,* 373 U.S. at 493, 83 S.Ct. at 1360. After the district court judge opened the *in camera* material at the posttrial hearing, he resealed the withheld documents. The documents have not been unsealed or read by anyone since the district court's posttrial hearing.

*See* United States v. Claiborne, 781 F.2d at 1327. Under the fragile circumstances of this case, we are in accord with Judge Ferguson's analysis and his conclusion that the failure to disclose the Wright summaries to the defense undermines confidence in the trial outcome. Moreover, as noted, the affidavit of Ms. Arthur corroborating Judy Ahlstrom's testimony adds substantial weight to the other evidence presented at the second trial supporting respondent's contention that he fully disclosed his income to his accountant. This has special significance in light of the fact that three persons, including respondent, his former secretary and one of Wright's former employees, testified affirmatively as to Claiborne's provision of his income information to his accountant, whereas Wright and his wife were only able to state they did not recall seeing the disclosure statement supplied by Claiborne.

The additional evidence presented warrants some discussion. For example, the 1979 application for an extension of time to file respondent's return was signed by Wright and dated April 11, 1980.[203] The application indicates a "balance due" of $8,000, the precise amount of respondent's check also dated April 11, 1980, that Ms. Ahlstrom claimed she delivered to Wright's office along with the letter of April 11, 1980.[204]

Moreover, respondent testified that later, on the afternoon of April 11, 1980, Wright called him and asked him to bring by another check in the amount of $2,500 to accompany a voucher of estimated declaration of tax due for 1980. Respondent stated that he did in fact take a $2,500 check to Wright later that day and signed the 1980 estimate at that time.[205] The check number on the $8,000 check is 0302, and the check number on the $2,500 check (also dated April 11, 1980) is 0303.[206] Respondent also testified that he saw the April 11, 1980, letter on Wright's desk at the time he delivered the second check.[207]

Respondent further testified that in May of 1980, he called Wright to inform him that he was being assigned to Los Angeles

---

[203]Senate Hearings, *supra* note 15, Pt. 4 at 2115.

[204]*Id.* at 2115, 2222; Rec. Pt. III, Vol. III at 620.

[205]Senate Hearings, *supra* note 15, Pt. 4 at 2146-47; Rec. Pt. III, Vol. IV at 870-71.

[206]Senate Hearings, *supra* note 15, Pt. 4 at 2147.

[207]Rec. Pt. III, Vol. IV at 871; Senate Hearings, *supra* note 15, Pt. 1 at 994.

to try a case and would be there for a considerable period of time. Accordingly, respondent contends that he and Wright agreed that respondent should sign a blank tax return in order to avoid having to file another extension.[208] Respondent stated that Wright telephonically requested additional information regarding his 1979 income, including the precise information that had been provided in the April 11, 1980, letter.[209] According to respondent, when he told Wright that he had already provided those figures, Wright paused for a moment, and then announced that he did have the figures, but misstated Claiborne's income from his former law practice to be $22,332.87, instead of $41,073.93. Respondent contends that he (respondent) wrote this misstated figure on a worksheet along with the additional tax data requested and later supplied this worksheet to Wright.[210] In sum, it was respondent's testimony that this miscommunication resulted in Wright's utilization of an incorrect $22,332.87 figure on the 1979 tax return that respondent signed in blank in Wright's office before it was completed.[211]

Unquestionably, there was a substantial body of evidence compiled in both the trial and impeachment proceedings establishing that the letter of April 11, 1980, fully disclosing respondent's income for the year 1979, was delivered to Wright's office. The jury, however, did not have Ms. Arthur's evidence before it when it reached its verdict. Further, materially exculpatory evidence was withheld from the defense that tended to impeach Wright's credibility on the issue of whether respondent fully disclosed his income. As Judge Ferguson observed, this fact alone is sufficient to undermine confidence in the jury verdict regarding respondent's 1979 return.

### b. The 1980 Return

In 1981, after thirty years with Joseph Wright, Judge Claiborne elected to employ the services of Jerry Watson to prepare his 1980 income tax return. Watson was the owner of a financial planning business known as Creative Tax Planning. Respondent explained that after he became a federal judge, he perceived his tax situation to be considerably less complicated than it was when he was in private practice. Additionally, respondent suggested that his relationship with Wright had turned somewhat cold, and that he felt he was "imposing" on Wright.[212]

---

[208]Rec. Pt. III, Vol. IV at 873-76.

[209]*Id.* at 873-76.

[210]*Id.*

[211]*Id.* at 876.

[212]Senate Hearings, *supra* note 15, Pt. 1 at 381, 938-39; Rec. Pt. III, Vol. V at 969.

Judge Claiborne was introduced to Watson by the judge's ex-wife, and the judge was immediately impressed by Watson's air of professionalism. Judge Claiborne also recognized Watson as a fellow member of his church.[213] However, Watson apparently held himself out to be more professional and knowledgeable on tax matters than reality allowed. One of Watson's former employees, Charlotte Travaglia, testified before the Senate Impeachment Committee and characterized Watson's demeanor towards the public as "exalted." Travaglia further indicated that "he professed to know what he was doing in all areas."[214] Respondent testified that Watson appeared to be a "topright man" and that "he talked like he knew what he was doing."[215] Watson testified, however, that "of all the things I am, the thing I'm not is an accountant. And I own a tax preparation company and an accounting business, but that doesn't mean that I am a qualified accountant, nor have I held myself out to be."[216] Nonetheless, it appears that one could easily adopt a good faith belief in Watson's qualifications, competency and professionalism as a tax preparer. Certainly, one could assume from Watson's letterhead, which listed approximately thirty different types of financial planning and consulting services, that Watson's firm offered expert and professional tax and investment advice.[217]

Watson's testimony before the Senate panel, however, left a somewhat different impression. For example, at the conclusion of Watson's final appearance before the committee, Senator Rudman commented that Watson's testimony should be forwarded to the Justice Department for appropriate action. Senator Rudman further stated:

> Anyone sitting through this trial has seen an active effort to defraud the taxpayers of this country, certainly by this alleged accountant.
>
> And the third comment I want to make—and I will do this myself—I intend to write to the Internal Revenue Office in Nevada, and suggest that they start forthwith an audit on any return that Mr. Watson has prepared, because I frankly think that we have seen here a pattern of the most egregious fraud on taxpayers, aside from whether Judge Claiborne has any knowledge of them. A separate question.

[213]Senate Hearings, *supra* note 15, Pt. 1 at 939; Rec. Pt. III, Vol. IV at 883-86.

[214]Senate Hearings, *supra* note 15, Pt. 1 at 783.

[215]Rec. Pt. III, Vol. V at 970.

[216]Senate Hearings, *supra* note 15, Pt. 1 at 720.

[217]Senate Hearings, *supra* note 15, Pt. 4 at 2149.

This witness that has been before this panel today, and yesterday, in my many years of trying cases, has to be the most incredible witness that I have ever seen, particularly before a hearing conducted before the United States Senate.[218]

As noted, in 1981, however, after meeting Watson and being impressed with his professional demeanor, respondent engaged Watson to prepare his 1980 return.[219] Pursuant to a subsequent conversation, respondent supplied Watson with a handwritten list of his tax information.[220] This list specifically indicated respondent's wages in 1980 as a federal judge and $88,500 in income during that year "from private practice before appointment [to the judiciary] in 1978. . . ."[221] As such, this handwritten list fully disclosed respondent's income for the year 1980. *See, e.g.,* United States v. Claiborne, 765 F.2d at 796.

Charlotte Travaglia was employed by Watson's firm at the time Claiborne's 1980 return was being prepared.[222] She did not testify at either the first or second trials, but she did appear before the Senate panel and testified in some detail about the preliminary work she did on respondent's 1980 return.[223] In particular,

[218]Senate Hearings, *supra* note 15, Pt. 1 at 1104.

[219]Rec. Pt. III, Vol. IV at 886.

[220]Senate Hearings, *supra* note 15, Pt. 4 at 2223; Rec. Pt. III, Vol. IV at 888.

[221]*Id.*

[222]Senate Hearings, *supra* note 15, Pt. 1 at 782.

[223]*Id.* at 781-826. In this regard, we observe that Travaglia was originally subpoenaed by the prosecution to testify at respondent's first trial. She was under the impression, as a result of that subpoena, that she should not talk to the defense and in fact refused to discuss her involvement in the matter with defense counsel prior to the first trial. *See* Senate Hearings, *supra* note 15, Pt. 1 at 789. In pretrial interviews with an FBI agent, after she had testified before the grand jury, Travaglia identified a document known as the "yellow sheet" upon which respondent had fully disclosed his income to Watson. She further indicated in that interview that she utilized the yellow sheet in the preliminary work she did on respondent's return. A copy of the FBI report of that interview is attached as Exhibit 1 to this opinion. *See* Senate Hearings, *supra* note 15, Pt. 3 at 2047 (FBI Report of Interview); *see also* Affidavit of Charlotte Travaglia, Senate Hearings, *supra* note 15, Pt. 3 at 1992. Respondent has alleged that the prosecution withheld this evidence from the indicting grand jury, and that the FBI agent's memorandum of interview was wrongfully withheld from the defense during the pretrial discovery and at trial. *See* Rec. Pt. I, Vol. IX, Pleading No. 105 at 7, 13 (amended motion to vacate judgment of conviction). Apparently, Travaglia, although available to testify at the first trial, was excused as a witness by the defense and the prosecution prior to trial. Respondent's counsel represented, in the opening brief on appeal to the Ninth Circuit, that Travaglia was ill with cancer during the second trial and did not testify. *See* Rec. Pt. IV, Vol. I, Pleading No. 3 at 31. We observe that disclosure to respondent's counsel of Travaglia's statements memorialized in the FBI agent's memorandum of interview may well have

Travaglia testified that Watson, at one point, assigned her the task of preparing a preliminary worksheet regarding respondent's 1980 return.[224] Watson handed her a stack of tax information which contained the aforementioned handwritten list compiled by respondent.[225] This list has been referred to as the "yellow sheet" because it was written on yellow legal paper. A copy of the "yellow sheet" is attached to this opinion as Exhibit 2. Travaglia further stated that her own handwriting appears on the yellow sheet, and that she placed an asterisk beside the $88,500 figure that Judge Claiborne had indicated was his income received from fees due from his private practice prior to his appointment to the bench.[226] Travaglia testified that certain items appearing on page one of respondent's list were her notations in her handwriting.[227]

Travaglia's testimony, as well as Watson's testimony, reveals that Watson had contrived a plan by which he hoped to reduce Judge Claiborne's tax liability by somehow writing off losses that the judge suffered from quitting his law practice and assuming the bench. Watson testified, for example, that respondent's fee income inappropriately appeared on Schedule D of the return as a capital gain rather than on Schedule C as income.[228] According to Watson, Travaglia apparently added the $88,500 legal fee income with some unidentified amounts that Judge Claiborne received from a sale of books from his law library to establish a capital gain of $150,000.[229] This figure then appeared on Schedule D of the return as a capital gain which partially offset the $250,000 in capital losses.[230] How Watson arrived at the $250,000 amount as a capital loss from the "loss" of respondent's private practice remains somewhat of a mystery.[231] Although Watson maintained that he and Travaglia came up with the $250,000 figure, Travaglia denied any complicity in this "plan."[232] At any rate, Schedule

insured that the defense would have attempted to present her exculpatory testimony to the trial jury. Like the FBI memoranda of Mr. Wright's statements, defense counsel's unawareness of Travaglia's exculpatory statements to the FBI prior to trial may have significantly affected the outcome of the trial.

[224]Senate Hearings, *supra* note 15, Pt. 1 at 783.

[225]*Id.* at .783-84.

[226]*Id.* at 807; and *see* Senate Hearings, *supra* note 15, Pt. 4 at 2223 (copy of yellow sheet in question).

[227]*Id.* at 807.

[228]Senate Hearings, *supra* note 15, Pt. 1 at 720; Pt. 4 at 2137.

[229]Senate Hearings, *supra* note 15, Pt. 1 at 722-24, 1165.

[230]Senate Hearings, *supra* note 15, Pt. 4 at 2137.

[231]Senate Hearings, *supra* note 15, Pt. 1 at 1045-50 (detailing Watson's enigmatic explanation).

[232]*Id.* at 805.

D reflected a total capital loss of $100,000.[233] A copy of respondent's Schedule D form is attached to this opinion as Exhibit 3.

It is clear that this procedure was improper mainly because there was never a sale of the law practice, and the legal fees were *income* not *capital gains*. The fees therefore belonged on Schedule C and not on Schedule D. Respondent testified, however, that Watson had not fully explained his concept of treating the legal fee income as capital gains on Schedule D until well after respondent had signed the return.[234] Travaglia also testified that the return that respondent signed was essentially the preliminary worksheet she had prepared for Watson, and that she had never intended it to be a final return.[235] Additionally, she stated that she indicated on several occasions to Watson that there were problems with the return, that the preliminary work was *incorrect*, and that she needed more information in order to straighten out some of the things that she felt were wrong on the return.[236] When help from Watson was not forthcoming, she finally put her preliminary work product on Watson's desk, never intending it to be a final, completed return.[237]

Apparently, this preliminary work product was essentially the return which respondent signed and which was filed. Judge Claiborne testified that he subsequently was notified by Watson that the return was ready and he went to Watson's office to sign it. According to respondent, Watson was not present, but a secretary brought him a number of loose documents. The signature page had a paper clip on it and he signed it, thumbed briefly through the documents, asked the secretary to have Watson mail him a copy of the return and left.[238]

Three days later Watson came to Claiborne's office with the bill for his services and the return. Respondent glanced through it again and questioned Watson about how he had accomplished a refund. Watson explained, in a authoritative manner, that he had found a way to establish a loss on respondent's law practice. Respondent told Watson that he wanted no trouble with the IRS because he had "all the trouble with the FBI that I can handle right now."[239] Watson, nonetheless, assured him that he could

[233]Senate Hearings, *supra* note 15, Pt. 4 at 2137-38.

[234]Senate Hearings, *supra* note 15, Pt. 1 at 1025; Rec. Pt. III, Vol. IV at 897-98.

[235]Senate Hearings, *supra* note 15, Pt. 1 at 786.

[236]*Id.* at 786, 820, 822-23.

[237]*Id.*

[238]*Id.* at 946; Rec. Pt. III, Vol. IV at 893-95.

[239]Senate Hearings, *supra* note 15, Pt. 1 at 946-48.

"support" the return.[240] Again, after Watson's appearance before a Portland grand jury, Watson told Judge Claiborne that the return was correct, and that he had shown the return to two IRS employees, both of whom said that the return was "right."[241]

The return, however, cried out for an audit. It was written in pencil. Schedule D had an arrow drawn on it indicating the words "type here." A copy of Schedule D is attached to this opinion as Exhibit 3. Expert testimony established that such a return would ordinarily raise an audit.[242]

In sum, the evidence regarding the 1980 return suggests that Judge Claiborne placed his good faith confidence in a man who superficially exuded authoritative knowledge and skill in tax matters. Watson, however, clearly handled respondent's return incompetently. Further, Travaglia's Senate testimony, which the trial jury did not hear, confirms that respondent disclosed, on the yellow sheets, all the income received from his former law practice to Watson for the purpose of preparing the 1980 tax return. He apparently hid nothing from Watson, but due to Watson's incompetence and his misperceptions of fundamental concepts of tax accounting, the return incorrectly obscured respondent's income.

Shortly after the United States Senate voted on the articles of impeachment, Senator Orrin Hatch, a member of the Senate panel charged with the responsibility of gathering evidence on behalf of the full Senate, addressed the Senate and set forth his analysis of the evidence.[243] Senator Hatch expressed his view that the Senate had a constitutional obligation and "duty to reach [its] own independent conclusion about the facts which gave rise to these charges," and should not simply defer to the existence of respondent's criminal conviction in discharging its obligations under the impeachment clause of the constitution.[244] *See* U.S. Const. art. I, § 3. Further, the Senator stated:

> [I]f there remains a reasonable doubt about [Judge Claiborne's] intentions, then the Senate was obligated to conclude that he should not have been convicted in court and that he should not have been impeached and that he should not have been convicted by the Senate. Relying as they did on the criminal conviction, the House Articles of Impeachment

---

[240]*Id.*

[241]*Id.* at 710-11, 952.

[242]*Id.* at 829; Senate Hearings, *supra* note 15, Pt. 4 at 2137.

[243]132 Cong. Rec. S15763-66 (daily ed. Oct. 9, 1986) (statement of Senator Orrin Hatch).

[244]*Id.* at S15763.

required the Senate to ascertain whether, beyond a reasonable doubt, Judge Claiborne intentionally filed a false return.[245]

After reviewing the pertinent provisions of 26 U.S.C. § 7206(1), the statute under which respondent was convicted in federal court, Senator Hatch further observed:

> All of the issues before the Senate today were reducible to one simple question: Did Judge Harry Claiborne willfully file a false tax return? Both Judge Claiborne and the House agreed that the 1979 and 1980 tax returns fail to report taxable income. The issue before the Nevada District Court and the Senate today was whether that under-reporting was "willful."

> The Supreme Court, in *United States v. Pomponio,* 429 U.S. 10 (1976) stated that the term "willfully" in the tax code requires more than a showing of carelessness or negligence; it requires proof of an intentional violation of a known legal duty. In *United States v. Bishop,* 412 U.S. 346 (1973), the Supreme Court stated:

>> Degrees of negligence give rise in the tax system to civil penalties . . . The Court's consistent interpretation of the word "willfully" to require an element of mens rea implements the pervasive intent of Congress to construct penalties that separate the purposeful tax violator from the wellmeaning, . . . mass of taxpayers. *Id.* at 360-361.

> The import of these cases is that willfulness is the intentional, deliberate, voluntary, or witting violation of a known legal obligation.

> Certainly Judge Claiborne knew the duty to file an accurate and complete tax return. It is far from clear from the evidence presented either in trial or during the impeachment proceedings that Judge Claiborne deliberately or intentionally or wittingly or purposefully tried to escape the obligation of every taxpayer. To the contrary, there is much to indicate that Judge Claiborne's deliberate actions were an attempt to file an accurate and complete return. According to the judge and much corroborating evidence, miscommunications with accountants and mistakes by those accountants caused errors in the judge's tax returns, of which he was [un]aware until the criminal investigation was already underway. If the judge is correct, the voluminous evidence at most shows that he was negligent in failing to detect his accountant's errors. This, however, would not be willfulness. It would not be

---

[245] *Id.*

deliberate and witting tax evasion. It would be simple negligence, which as the Supreme Court's Bishop case stated, would be corrected by a civil proceeding, not a criminal action.[246]

Senator Hatch further observed that no direct evidence of respondent's willful violation of the provisions of the tax code existed in this case. Therefore, in order to establish Judge Claiborne's willful intent it was necessary to infer such an intent from circumstantial evidence. Senator Hatch noted that the factors appropriately considered in this regard included (1) evidence of a consistent pattern of underreporting, (2) the magnitude of the error in the return, and (3) factors such as sudden changes in accountants.[247] After carefully reviewing the evidence set forth above and concluding that it clearly established that Judge Claiborne fully disclosed his income to his accountants, Senator Hatch analyzed the first of these factors as follows:

> On the point of whether this alleged underreporting was a consistent activity, the House made much of the fact that these errors occurred in 2 successive years. An examination of the evidence, however, offers a plausible explanation. After all, Judge Claiborne had only recently taken his position on the bench. He was still adjusting to new financial arrangements, new work schedules, new responsibilities, new demands on his time and talents. It was time of turmoil and change in his life. He was selling his residence and purchasing another. He was turning over his law firm to his former partners and liquidating his assets in that business. These drastic changes were also an important reason that he elected to switch accountants. With changes of this magnitude underway in his life, it is not wholly unexpected that miscommunications, misperceptions, and mistakes might occur in these 2 years.[248]

The Senator concluded in this regard that "[i]n sum, Judge Claiborne did not underreport his income—consistently or otherwise."[249]

In regard to the circumstantial evidence relating to the magnitude of the error, Senator Hatch observed:

> The next circumstantial point made by the House concerns the magnitude of the error. The $18,700 shortfall in his 1979

---

[246]*Id.*

[247]*Id.* at S15764.

[248]*Id.*

[249]*Id.*

return was not due to any willful act on Judge Claiborne's part. He thought the income he disclosed on April 11 was part of the return. The judge did not actually review the 1979 tax return before it was filed. On May 2, 1980, he was leaving town to take an assigned case in another jurisdiction. Fearing that he might not return before the filing deadline, the judge went to Wright's office and signed a return in blank. He signed the return in blank because he was going out of town on assignment. He certainly expected that it would contain income which he had reported to his accountant in an earlier hand-written and hand-delivered letter.

Wright's testimony on this point is that he had changed his practice of allowing tax returns to be signed in blank. It is nonetheless uncontroverted that early in his career Wright had permitted tax returns to be signed in blank. Judge Claiborne had been associated with Wright for 30 years. The recent changes in practice may not have been binding on a longstanding customer like Judge Claiborne who testifies persuasively that he signed the form in blank sometime on May 2.

In 1980, Judge Claiborne reported to Watson the $88,500 in income on the now-famous "yellow sheets." Watson told the judge that the income was reflected in the schedule D form concerning capital gains because it was part of the sale of the law business. Watson pointed out that this method had been checked by the CPA who did the actual work on the judge's tax return and further checked with the IRS.

The 1980 tax return was a mess. It contained numerous blatant errors. It did not even credit Judge Claiborne with the $22,000 he had already paid in estimated taxes for that same tax year. It was filled out in pencil and had arrows drawn from one part of the return to others. If the judge had intended to defraud, he certainly would have been more cunning. *If Judge Claiborne had intended to defraud, he certainly would not have filed a return full of red flags pointing to its likely deficiencies.*[250]

(Emphasis added.)

As for the third aspect of circumstantial evidence of willfulness, Senator Hatch remarked that respondent had several good reasons to change accountants after thirty years:

> In the first place, he no longer was managing a law business. He had no need of the wide range of services provided by Wright. Moreover, Wright had treated the judge coldly in some of their recent conversations. This may well have been

---

[250]*Id.* at S15764-65.

because Mr. Wright had moved on to a different clientele after 30 years in the business. He may have wished he was receiving more compensation for his services. The reasons that Judge Claiborne and his accountant began drifting apart are not fully stated. It is clear, however, that the judge perceived that his accountant was no longer as interested in his account as he had been in the past.

Mr. Watson, on the other hand, came highly recommended by the judge's wife and had impressed the judge on the one occasion he had to observe his work. Watson was very interested in Judge Claiborne's account. He forthrightly solicited Judge Claiborne's business with the promise that he might be able to save him money on taxes in a legitimate manner. Judge Claiborne was selling his large home and Watson specifically mentioned in his letter a plan to treat that transaction favorably. In light of the distance between the judge and his former accountant, this offer must have been very attractive.[251]

Additionally, Senator Hatch noted that, contrary to the House brief, Judge Claiborne was no tax expert. Not only did respondent refer his personal tax matters to specialists such as Wright, during his years in private practice he also repeatedly referred his clients' tax matters to other attorneys.[252] In this regard, the Senator concluded that Judge Claiborne had justifiably relied in good faith on both Wright and Watson:

As a matter of law, reliance on a tax accountant is justified if the judge fully disclosed all pertinent facts and if his reliance was in good faith. In this case, the judge had fully disclosed his income in both 1979 and 1980. He had reason to rely in good faith on Wright because Wright had done his taxes for 30 years without a hitch. He had a reason to rely in good faith on Watson because Watson came highly recommended by his wife and seemed to handle business competently.[253]

Finally, in Senator Hatch's view, respondent did not turn a "blind eye" to the problems of his returns. Senator Hatch observed that, in 1979, Judge Claiborne signed the return in blank, fully relying on Wright to report his income correctly as detailed in the letter of April 11, 1980, because he had been assigned to preside over a case outside of Nevada. As for 1980, Senator Hatch found it

---

[251]*Id.* at S15765.

[252]*Id.*

[253]*Id.*

"simply inconceivable that Judge Claiborne would attempt to escape tax liability" when he knew the FBI was investigating him and scrutinizing his affairs. "Not even a 4-year-old attempts to raid the cookie jar when he knows he is being watched."[254] Senator Hatch further found the sloppiness of this return to be significant:

> It is even more unlikely that in this time of tension Judge Claiborne would file a fraudulent return that begs for examination and audit. This is the equivalent of the judge shouting at the top of his lungs that he intends to raid the cookie jar and then proceeding to attempt the feat under his parents' noses.[255]

Neither could Senator Hatch reconcile Judge Claiborne's full disclosure of his 1980 income on an ethics report, with a "willful" failure to report income to the IRS for that year. A copy of respondent's financial disclosure report for 1980 is attached to this opinion as Exhibit 4. The Senator queried: "Why would he deliberately evade taxes and then tell the Government the facts that disclose his fraud in another filing?"[256] Answering his own question, Senator Hatch remarked: "If Judge Claiborne was acting with a criminal state of mind, it is inexplicable that he would lie on one Government filing and confess his guilt on another. The judge simply did not act willfully."[257]

Senator Hatch concluded that there was no evidence that Judge Claiborne willfully filed a false tax return:

> If he had intended to violate the law, he would not have done it so poorly. Neither the 1979 nor the 1980 return shows any evidence of cunning or guile. They contain mistakes discernible by a grade school observer. The judge relied too heavily on unreliable accountants. The judge was negligent in failing to check his accountant's errors. Frankly if one of the Articles of Impeachment had cited the judge's gross negligence and disregard, I would have voted to impeach. The House Articles, however, are all based on the criminal conviction. The criminal conviction is only valid if Judge Claiborne acted willfully. For the reasons I have cited, I could not find sufficient evidence of willfulness.[258]

---

[254] *Id.*

[255] *Id.*

[256] *Id.* at S15766.

[257] *Id.*

[258] *Id.*

Senator Hatch's assessment of the evidence of the willfulness of Judge Claiborne's conduct is persuasive. As a member of the impeachment committee, Senator Hatch personally heard all the testimony presented, and had an opportunity to evaluate the demeanor of the various witnesses. Comparing the judge's testimony, with that of the other witnesses, Senator Hatch found Judge Claiborne to be a credible witness, believed the judge's explanation of the circumstances leading to his conviction, and found that the other evidence presented supported that explanation.[259]

> I listened very carefully to every aspect of the testimony before the Impeachment Committee. I compared each witness' statements to the assertions made by other witnesses. In the long run, I found Judge Claiborne to be a credible witness. I believed him. Moreover, the evidence in this case supported the judge's explanations of the circumstances that led to his indictment and conviction. Giving the judge the benefit of the doubt, as I believe we are obligated to do when his life's work and reputation are at stake, the evidence did not support a finding of willfulness. The evidence clearly showed that the judge had been grossly negligent and had carelessly disregarded his obligations as a taxpayer. He did not, however, conspire or craftily design a plan to defraud the Government. In the absence of willfulness, beyond a reasonable doubt, he should not have been convicted, should not have been impeached, and, in my opinion, should not have been removed from office. This was why I voted not guilty on each of the Articles of Impeachment.[260]

Our review of the record compels respect for Senator Hatch's evaluation of the facts. Furthermore, his assessment of the credibility of the witnesses is compelling because he had an opportunity to view their testimony first-hand. More importantly, as Senator Hatch states, there is a significant lack of evidence showing that respondent willfully sought to falsify his income tax returns. The evidence weighs more persuasively that respondent acted negligently concerning his obligations as a taxpayer.

### 3. THE JUDICIAL AND CONGRESSIONAL PROCEEDINGS

In addition to the specific matters discussed above, the procedural history of Judge Claiborne's case raises disturbing questions about whether or not he received a full and fair opportunity to present his defense. As noted, prior to respondent's first trial, Judge Hoffman denied a series of pretrial motions filed by the

---

[259] *Id.*

[260] *Id.*

defense. Respondent immediately appealed those rulings to the Ninth Circuit Court of Appeals. *See* United States v. Claiborne, 727 F.2d 842 (9th Cir.), *cert. denied,* 469 U.S. 829 (1984). As Judge Reinhardt of the Ninth Circuit has explained:

> At the time of the pre-trial appeal, the case against Judge Claiborne still included the charges relating to his alleged acceptance of a bribe intended to influence the results in an appeal before one of our panels. We as a court agreed, although in a rather informal manner, to recuse ourselves from hearing Judge Claiborne's pretrial appeal. The Chief Justice then specially selected a panel of three judges from other circuits to hear it. The special panel affirmed the pretrial rulings of the specially assigned district judge. 727 F.2d 842, *cert. denied,* ...... U.S. ......, 105 S.Ct. 113, 83 L.Ed.2d 56 (1984).

*See* United States v. Claiborne, 781 F.2d 1327, 1330 (9th Cir. 1986) (Reinhardt, J., dissenting).

Upon the entry of the judgment of conviction in the second trial, Judge Claiborne again appealed to the Ninth Circuit. In explaining the Ninth Circuit's actions respecting that appeal, Judge Reinhardt stated:

> This time we took no action to recuse ourselves. In fact, we did nothing at all. Although the bribery charges that indirectly involved our court in the proceedings were no longer a part of the case, we simply failed to consider, formally or informally, the question whether we now had an obligation to hear the appeal or whether a new special panel should be appointed. Apparently acting on the assumption that our prior recusal was a continuing one, the Chief Justice specially selected another panel of three judges from other circuits to hear the appeal.

*Id.*

Noting that an "overwhelming majority of the judges" of the appellate court "believed that they were not required to recuse themselves from voting on a critical aspect of the proceedings on appeal," Judge Reinhardt went on to explain why in his view the Court of Appeals had committed a "serious error" with "serious consequences." *Id.* Judge Reinhardt wrote:

> Specifically, we erred when we failed to consider whether we should hear Judge Claiborne's appeal from his conviction or whether, instead, the appointment of a second special panel was required. Because of our error, outside judges were appointed to hear an appeal that we had an obligation to hear ourselves. Our court system is structured so that a defendant will normally have his trial and any appeals heard

by judges residing in the circuit in which the charged crime was allegedly committed. Here, we erroneously, albeit inadvertently, deprived Judge Claiborne of this feature of our laws; en banc consideration of the Judge's case would have been a proper means of at least partially remedying our mistake.

Rehearings en banc provide a means for ensuring that the law of our circuit is applied not only consistently but correctly. Here, as a result of our failure to act, judges from other circuits, not as familiar as we are with the precedents of our court, considered a case that we had a duty to hear. Judge Claiborne's appeal raises several issues of importance. In disposing of at least one of those issues, the special outside panel cited no authority from any appellate court, let alone a decision by the judges of this court. The special panel also stated that it was not following the result reached in two of the three district court opinions that it cited. 765 F.2d at 794-95. In my view, when a substantial question of law not previously decided by the judges of this court is decided by a panel of outside judges and we subsequently recognize that we have erred in failing to decide that question ourselves, it is our responsibility to grant en banc reconsideration.

*Id.* at 1330-31 (footnotes omitted).

In Judge Reinhardt's view, the fact that Judge Claiborne was, at that time, a United States District Judge from the Ninth Circuit may have figured in the decision of some of the judges of the Ninth Circuit to deny Judge Claiborne a rehearing *en banc,* because to do so might have raised an appearance of impropriety. In this regard, Judge Reinhardt stated:

The fact that Harry Claiborne is a United States District Judge does not mean that he is less entitled than any other individual to the full benefit of the orderly procedures of this court. Those procedures, including en banc consideration, have been established to ensure that justice is done. Our en banc process is also designed, as I noted earlier, to ensure that the law of this circuit will be applied uniformly to all defendants. Judge Claiborne has just as much right to have his case considered en banc as any other defendant. En banc proceedings are different in one critical respect, however, from all other proceedings this court conducts: only the judges of our court can hear a case of ours en banc. There is no procedure in current law for obtaining an out-of-circuit en banc panel. This is true even when an appeal is heard initially by a specially selected panel of out-of-circuit judges. Thus, if in fact an appearance of impropriety existed

here, the rule of necessity would apply, and we would be required to disregard that appearance. Accordingly, if a factor in our decision to deny Judge Claiborne en banc consideration of his case was our concern over an appearance of impropriety, we have, in my view, seriously misconstrued our duty as judges of this circuit. In doing so, we have, unfortunately, also denied Judge Claiborne equal justice.

*Id.* at 1331-32.

Moreover, in Judge Reinhardt's view, an equally significant appearance of impropriety would have existed regardless of whether Judge Claiborne's appeal was heard by the members of the Ninth Circuit Court of Appeals, or by a panel of out-of-circuit judges. In Judge Reinhardt's opinion, the failure of the Ninth Circuit judges to grant an *en banc* rehearing allowed "the record to rest with the appearance that Judge Claiborne may have been the object of *adverse* special treatment and, thus, the victim of injustice." *Id.* at 1332 (emphasis in original). Further, Judge Reinhardt concluded:

Judge Claiborne is one of the few criminal defendants in the Ninth Circuit, if not in the nation, whose case has been handled, both in the District Court and in the Court of Appeals, exclusively by judges specially and specifically chosen to hear that particular case. There is, in my opinion, a rather substantial appearance of injustice when a defendant who claims he is the victim of a vendetta on the part of various branches and agencies of the Department of Justice is deprived of the opportunity to be judged by those who would normally preside over his case and instead is tried and convicted before, and has his appeal heard by, judges all of whom are specially selected for their assignments.

There is no doubt that every step taken in appointing the specially designated judges fully complied with all existing statutes and rules. Moreover, there is no suggestion in this case that there was in fact anything improper about the designation of the judges, or that any of the judges involved in the selection process acted with anything less than the utmost integrity. Nevertheless, in a case in which the defendant contends that he is the object of a prosecutorial vendetta, in which the judges who heard the case were all specially selected under a process that permits the selector total discretion to choose whom he wishes, and in which we as a court erred in permitting the specially selected panel to hear the appeal, I believe that an en banc hearing is required—if for no other reason than to ameliorate, to the extent possible, the appearance of injustice. En banc consid-

eration by the judges of this court, judges who were not specifically selected to hear Judge Claiborne's appeal, would have gone a considerable way towards accomplishing that objective.

Unfortunately, as events unfolded, only an en banc review by this court or a hearing by the United States Supreme Court could have afforded Judge Claiborne consideration of his case by a tribunal that had all the appearances of fairness. All courts that have previously heard his case are open to the charge that they were specially selected for the purpose of ensuring the desired governmental objective. *In my opinion, the proceedings thus far afforded Judge Claiborne fall far short of meeting the "appearance of justice" standard. Because of our obligation to administer justice in a manner that maintains confidence in the fairness and objectivity of the judicial system, I believe that it was our duty and responsibility to hear his case en banc.*

*Id.* at 1332-33 (emphasis added; footnote omitted).

Although it is not our intention to invade the province of the federal courts, we are in sympathy with the views expressed by Judge Reinhardt. As detailed above, from the very inception of this case, there has been, at the very least, an appearance that respondent was unfairly targeted for investigation, unfairly indicted and unfairly tried and convicted. Further, as Judge Reinhardt indicates, there is also an appearance of injustice relating to the conduct of the appellate proceedings which suggests that respondent may well have received "adverse special treatment" and may well have been denied the full measure of his procedural rights solely on account of his office and position.

Moreover, it appears that anomalous and arguably unfair procedures were imposed upon Judge Claiborne during the United States Senate impeachment proceedings. Specifically, for the first time in history, the Senate utilized an impeachment procedure whereby a twelve-member special committee was formed to receive evidence on behalf of the full Senate. *See* S. Res. 481, 99th Cong., 2d Sess. (1986), Senate Hearings, *supra* note 15, Pt. 1 at 2-3 (providing for "the appointment of a committee to receive and to report evidence with respect to articles of impeachment against Harry E. Claiborne").[261]

In recent remarks before the American Judicature Society, Senator Howell T. Heflin discussed the federal impeachment

---

[261]S. Res. 481 was enacted pursuant to Rule XI of the Rules of Procedure and Practice in the Senate When Sitting on Impeachment Trials. Rule XI was adopted by the Senate in its present form in 1935, after the impeachment trial of Judge Harold Louderback in 1933. Rule XI provides:

That in the trial of any impeachment the Presiding Officer of the Senate, upon the order of the Senate, shall appoint a committee of

process in light of his experience during the impeachment proceedings involving Judge Claiborne.[262] Senator Heflin explained his perceptions of the special procedures invoked in Judge Claiborne's case, in part, as follows:

> In 1935, in an attempt to modernize the Senate impeachment process, the Senate adopted Rule 11 of the Rules of Procedure and Practice in the Senate When Sitting on Impeachment Trials. . . . Reportedly, this rule was adopted because of the high level of absenteeism among senators during the protracted trial of Judge Harold Louderback in 1933. This committee was first utilized by the Senate in the fall of 1986 to compile an official record of information and hear the testimony of Judge Claiborne and other witnesses. However, the committee was not allowed to make any recommendation whatsoever in regards to whether or not Judge Claiborne should be removed from office. The legitimacy of the committee was, itself, questioned—a challenge that I feel

---

twelve Senators to receive evidence and take testimony at such times and places as the committee may determine, and for such purpose the committee so appointed and the chairman thereof, to be elected by the committee, shall (unless otherwise ordered by the Senate) exercise all the powers and functions conferred upon the Senate and the Presiding Officer of the Senate, respectively, under the rules of procedure and practice in the Senate when sitting on impeachment trials.

Unless otherwise ordered by the Senate, the rules of procedure and practice in the Senate when sitting on impeachment trials shall govern the procedure and practice of the committee so appointed. The committee so appointed shall report to the Senate in writing a certified copy of the transcript of the proceedings and testimony had and given before such committee, and such report shall be received by the Senate and the evidence so received and the testimony so taken shall be considered to all intents and purposes, subject to the right of the Senate to determine competency, relevancy, and materiality, as having been received and taken before the Senate, but nothing herein shall prevent the Senate from sending for any witness and hearing his testimony in open Senate, or by order of the Senate having the entire trial in open Senate.

*See* Senate Manual Containing the Standing Rules, Orders, Laws, and Resolutions Affecting the Business of the United States Senate, S. Doc. No. 1, 96th Cong., 1st Sess. at 174-75. Although Rule XI was adopted prior to the impeachment trial of Judge Halsted Ritter in 1936, the Senate did not proceed in accordance with the provisions of that Rule until Judge Claiborne's case came before it. *See* Senate Hearings, *supra* note 15, Pt. 1 at 241-51 (Judge Claiborne's Motion to Declare "Rule XI, Rules of Procedure and Practice in the Senate When Sitting on Impeachment Trials" as Unconstitutional).

[262]Senator Heflin is a former Chief Justice of the Supreme Court of Alabama, a former Chairman of the National Conference of Chief Justices, and was selected as the Most Outstanding Appellate Judge in the United States by the Association of Trial Lawyers of America in 1976. *See* Congressional Directory, 100th Cong. 4 (1987). He is a member of the Senate Judiciary Committee and served on the twelve-member Senate Impeachment Trial Committee in the proceedings involving Judge Claiborne.

was indicative of the overall problems of the current impeachment process. I believe, however, that there is no question that the Senate was authorized to form such a committee. Constitutional justification for the creation of the Select Impeachment Committee lies in Article I, Section 5, Clause 2 of the Constitution, which states that, "Each House (of Congress) may determine the Rules of .its Proceedings. . . ."

Yet, even with the existence of the committee, there were tremendous problems in the overall impeachment process. One problem was that while the 12 senators on the select impeachment committee were well aware of the facts and issues in the case, this is not true for the rest of the Senate. The transcript of the Claiborne hearing totaled over 3500 pages, and *it is highly improbable that many senators had time to review this material thoroughly. Not surprisingly, at the time of the actual trial on the Senate floor, a majority of the Senate had neither the benefit of the information in the report, nor the time to prepare properly for deciding Judge Claiborne's fate.* Furthermore, after the committee finished its work and the matter went before the full Senate, the Senate leadership decided not to rehear committee witnesses but to accept the committee's written record, and to only allow the House managers, Judge Claiborne and his attorneys to make statements on the floor. *During these statements on the Senate floor, approximately 40 members were not present in the Senate chamber during any portion of Judge Claiborne's closing statement and I estimate that at least 35 senators were never on the floor during the presentations by the prosecution and defense.*

*Though other senators had some very important business to attend to, their absence from the proceedings (I hesitate to call it a trial) was not, in my judgment, fair to Judge Claiborne.* While I believe that the Senate satisfied its constitutional responsibilities in the impeachment trial of Judge Harry Claiborne, I believe the process can, and should, work better. In the future—even, perhaps, in the immediate future—the Senate may be faced with a number of impeachment trials. A United States Senator cannot carry out his impeachment responsibilities if he neither participates in the committee hearing nor has an opportunity to gain knowledge of the case from a full trial on the Senate floor.

(Emphasis added.)[263]

---

[263]Speech of Senator Howell T. Heflin on The Federal Impeachment Process before The American Judicature Society (Feb. 6, 1988) at p. 4-6; *see also* 132 Cong. Rec. S15779 (daily ed. Oct. 9, 1986) (statement of Senator Heflin).

Other Senators have also expressed criticism of the manner in which the Senate proceeded in Judge Claiborne's case. Senator Daniel J. Evans observed, for example, that "[i]n prior impeachment cases, the full Senate had an opportunity to receive all the evidence directly. No committee was appointed to serve as a buffer between the accused and those responsible for making the final judgment."[264] Senator Evans further remarked:

> Our vote was the final word on Judge Claiborne's career. We were the trial court and the appellate court at the same time. It was thus incumbent upon us to take the utmost care to ensure that our proceedings were proper. I believe we lost sight of the fact that *the procedures of justice are often more important than the substance of the laws in creating the perception of fairness.*

(Emphasis added.)[265]

Senator Carl M. Levin also criticized aspects of the process employed during respondent's impeachment trial and noted that the full Senate deprived itself of a crucial feature of the fact-finding process, the opportunity to evaluate firsthand the demeanor and credibility of witnesses. Commenting that only the twelve members of the Senate comprising the impeachment panel had such an opportunity, Senator Levin observed:

> The "rule 11" committee did an excellent job of developing a record. I have the greatest respect for the members and staff of the committee—they had a difficult job and they discharged it with dignity and devotion. The record they developed is essential to understanding the case. *But, in my view, it was not adequate to let the Senate make findings in those disputed areas where witness demeanor or credibility is critical to the process of determining what the facts are.* The Senate, as a finder of fact, did not hear or see a single witness. And, as a result, our ability to fairly reach decisions, when the facts were in dispute, was restricted.
>
> To reach a judgment on issues involving disputed facts where the demeanor and credibility of the witnesses are important, I believe the Senate needed to see the witnesses— as the "rule 11" committee did—and not just see a record or even tapes of witnesses testifying.
>
> When we voted not to hear any additional witnesses, we set up a process which made it impossible for the Senate, as

---

[264]132 Cong. Rec. S16821 (daily ed. Oct. 16, 1986) (statement of Senator Evans entitled "The Trial of Judge Harry E. Claiborne").

[265]*Id.*

the finder of fact, to fully and fairly evaluate the credibility of witnesses.[266]

(Emphasis added.) Thus, whether or not one is persuaded that respondent's conviction and his removal from office were justified by the facts, there can be little doubt that an appearance and atmosphere of procedural impropriety has plagued his case from its inception.

An additional circumstance contributing to the general perception and appearance of injustice surrounding this matter warrants our discussion. Following the first trial, respondent's counsel filed motions seeking the recusal or disqualification of Judge Hoffman from further participation in the case.[267] The initial motion alleged that "bystanders" and "courtroom observers" had reported that Judge Hoffman "appeared to be partial towards the prosecution, and biased against the Defendant." Therefore, defense counsel requested Judge Hoffman to

deliberately and consciously assess his state of mind with reference to the foregoing matters and determine whether or not:

(a) his impartiality might reasonably be questioned;

(b) he has a personal bias or prejudice concerning the Defendant;

(c) he has a personal bias or prejudice concerning the Defendant's counsel; or

(d) he has personal knowledge of disputed evidentiary facts concerning a proceeding.[268]

In subsequent supplemental pleadings, defense counsel alleged specific instances wherein Judge Hoffman had purportedly demonstrated bias and prejudice toward respondent. On June 22, 1984, Judge Hoffman filed a thirty-six page order denying respondent's motion and responding to each factual allegation suggesting bias or the appearance of bias or prejudice on Judge Hoffman's part.[269]

Again, following the second trial, respondent filed post-conviction motions (1) to vacate his judgment of conviction and sentence; (2) for evidentiary hearings; (3) for discovery proceed-

---

[266]132 Cong. Rec. S16823 (daily ed. Oct. 16, 1986) (statement entitled: "Opinion of Senator Levin on the Claiborne Impeachment").

[267]Rec. Pt. I, Vol. V, Pleading Nos. 49 and 51; Vol. VI, Pleading No. 57 (motion for judicial recusal under 28 U.S.C. § 455, and first and second supplements thereto).

[268]Rec. Pt. I, Vol. V, Pleading No. 49 at 3.

[269]Rec. Pt. I, Vol. V, Pleading No. 56.

ings; and (4) for a new trial.[270] On July 15, 1986, Judge Hoffman entered an order apprising the parties that on July 8, 1986, Chief Justice Burger had designated him to continue as the presiding judge in any further post-conviction proceedings arising out of respondent's criminal case.[271] Judge Hoffman's order further observed that counsel for Claiborne had not assigned as error on appeal Judge Hoffman's prior refusal to recuse himself from presiding over the trial. Judge Hoffman concluded, therefore, that any further motions for recusal and specific allegations of "bias and prejudice must be confined to acts, words or events" occurring since the last order denying recusal was entered. Accordingly, Judge Hoffman allowed defense counsel fifteen days within which:

> [T]o file any appropriate motion for recusal, specifically alleging facts in support of any charge of bias and prejudice on the part of the undersigned United States District Judge, but such allegations of fact shall be limited to acts, words or events occurring since the entry of the last order denying the motion to recuse, filed in late July, 1984. If such motion is not filed, the Court will assume that no acts, words or events indicating bias or prejudice of the undersigned judge in fact exist.[272]

In response, on July 28, 1986, defense counsel filed a "Verified Motion for Judicial Disqualification or Recusal."[273] Counsel asserted that Judge Hoffman should recuse himself from further participation in the case because of (1) "attitudinal bias and partisanship . . . in favor of the prosecution herein and against the Defendant; and (2) [t]he appearance of impropriety." In this regard, defense counsel noted that a motion had been filed on behalf of respondent in the Court of Appeals seeking the designation of a judge from within the Ninth Circuit to preside over any post-conviction proceedings. Further, counsel observed that he had received a letter from Judge Hoffman, dated July 11, 1986, in which Judge Hoffman stated that he had written to Chief Judge Browning of the Ninth Circuit "with respect to the need for a new

---

[270]Rec. Pt. I, Vol. VIII, Pleading No. 81; Rec. Pt. I, Vol. IX, Pleading No. 105. Recently Judge Hoffman entered an order denying the relief requested in those post-conviction proceedings. United States v. Claiborne, Case No. CR-R-83-57 WEH, United States District Court for the District of Nevada (filed Jan. 27, 1988). We understand that respondent is presently pursuing an appeal.

[271]Rec. Pt. I, Vol. IX, Pleading No. 91.

[272]*Id.*

[273]Rec. Pt. I, Vol. IX, Pleading No. 92.

designation if there was any desire for me to hear the post-conviction motions."[274]

On October 6, 1986, after further pleadings addressing this issue were submitted, Judge Hoffman entered an order denying the motion of judicial disqualification.[275] Judge Hoffman stated that he entertained no "feeling of bias or prejudice against Judge Claiborne as evidenced by the record and transcripts. . . ."[276]

We do not suggest that defense counsel set forth sufficient factual allegations of bias or prejudice on the part of Judge Hoffman to warrant the reversal of respondent's conviction; nor do we suggest that Judge Hoffman was, in fact, biased or prejudiced against respondent. We have, however, considered counsel's allegations and Judge Hoffman's conduct of the legal proceedings in the context of the overall atmosphere and appearance of injustice associated with the federal proceedings involving respondent. In this context, we regretfully conclude that a number of Judge Hoffman's rulings may have contributed to a perception that respondent was subjected to anomalous and prejudicial procedures in the course of the proceedings against him. Specifically, we refer to: (1) Judge Hoffman's refusal to allow evidentiary hearings respecting many of respondent's accusations of investigative and governmental misconduct; (2) his rulings relative to the *Brady* and Jencks Act material; (3) his rulings in connection with the prosecution's demands for notices of alibi; and (4) his denial of the defense motion for a continuance prior to the first trial. We also note that Judge Hoffman ordered the sequestration of a critical defense witness, Judy Ahlstrom, during a recess in the second trial.[277] Respondent's counsel has alleged that up until that point no such action had been taken preventing a witness from communicating with counsel during a recess. Accordingly, respondent has asserted that Judge Hoffman's action unfairly prevented defense counsel from attempting to reassure and calm Ms. Ahlstrom and allow her to collect her thoughts after she was visibly shaken by a particularly grueling cross-examination.[278] Again we stress that although these and similar allegations do not establish actual bias or prejudice against respondent during the conduct of the trial, they do contribute to the aforementioned perception and

[274]*Id.* at 4-5; *see* Respondent's Compendium, Docket No. 17294 filed Sept. 2, 1986 (section entitled "Judge Hoffman").

[275]Rec. Pt. I, Vol. IX, Pleading No. 106.

[276]*Id.* at 14.

[277]Rec. Pt. III, Vol. III at 633.

[278]Rec. Pt. IV, Vol. I, Pleading No. 3 at 44-47. It should also be noted that Judge Hoffman himself conducted a good part of that cross-examination.

appearance of injustice and suggest that special adverse and prejudicial procedures were imposed upon respondent.

In sum, these circumstances are relevant to our deliberations in two respects. First, we consider them in the context of the punishment thus far exacted during the course of respondent's trials and incarceration. *See* In re Ross, 99 Nev. 657, 660, 668 P.2d 1089, 1092 (1983). Second, of course, they detract from the weight which we would ordinarily accord a judgment of conviction. In our view, the record suggests that respondent may have been subjected to special adverse treatment restricting his right to established procedures. The imposition of special procedures in respondent's case may well have restricted his ability to present and defend his position fully. Accordingly, these circumstances reflect upon the punishment respondent has suffered, as well as the weight which should be accorded his conviction, for the purpose of assessing disciplinary sanctions.

Lastly, we observe that two additional circumstances reflect upon the unusual procedures and the extent of the punishment thus far imposed in the protracted course of this matter. At this court's hearing in Las Vegas on November 24, 1987, for example, more than one witness alluded to the scorn and notoriety attached to the judicial and congressional proceedings and the obvious torment respondent suffered as a result of that notoriety.[279] Unquestionably, as discussed below, the scorn and ignominy respondent has suffered as a result of the protracted federal judicial proceedings and the ensuing impeachment proceedings has been substantial.

In June of 1987, following his removal from office and after serving thirteen months in prison, respondent was released from prison to a federally supervised halfway house in Las Vegas to complete his term.[280] In all, respondent served seventeen months of his two-year term before he was fully released from confinement.[281]

## IV. RESPONDENT'S PROFESSIONAL BACKGROUND

Respondent Harry E. Claiborne officially assumed the duties of United States District Judge for the District of Nevada on September 1, 1978. He was nominated by President Carter to fill a vacancy on the bench in July of that year, and was confirmed by

---

[279]*See, e.g.,* State Bar v. Claiborne, Docket No. 17294, Reporter's Transcript of Hearing at 45.

[280]*Claiborne Returns to L.V. to Complete Term,* Las Vegas Sun, June 17, 1987.

[281]*Claiborne Disbarment Hearing Set,* Las Vegas Sun, November 17, 1987.

the United States Senate on August 11, 1978.[282] During the appointment process, on August 8, 1978, a hearing was held before the United States Senate Committee on the Judiciary respecting Mr. Claiborne's qualifications and background.[283] At the start of that hearing, the acting chairman, Senator DeConcini, stated for the record that he had been advised that a "substantial majority" of the Standing Committee on the Federal Judiciary of the American Bar Association was of the opinion that Mr. Claiborne was "well qualified" for appointment to the federal bench. A minority of the Bar Association's committee found him not qualified on the sole ground that Claiborne was, at that time, sixty-one years of age.[284]

Thereafter, Senator DeConcini recognized Senators Howard W. Cannon and Paul Laxalt of Nevada who testified on Mr. Claiborne's behalf respecting his character and his qualifications. Specifically, Senator Cannon praised Mr. Claiborne as "one of the foremost criminal attorneys in the west" and noted that "[h]e is known and respected in every courtroom in our state and, by reputation, in many others throughout the United States." In regard to respondent's professional accomplishments, Senator Cannon observed that Mr. Claiborne had distinguished himself not only as an exceptional defense attorney but also as a police officer, an assistant district attorney, a city attorney for North Las Vegas and Henderson, Nevada, and an assemblyman in the Nevada Legislature.[285] In the latter position, Senator Cannon observed that although respondent had served only one term in the Nevada State Assembly,

> he was elected Assistant Majority Leader and chairman of the Judiciary Committee. And, in that one term he was primarily responsible for passage of legislation placing the question of a probation law on the ballot for statewide consideration. He then campaigned throughout the state to win approval of the measure. When the probation law was approved, he was then appointed to be Nevada's first Director of Probation.[286]

---

[282]*The American Bench* 1453 (S. Livermore 3rd ed. 1985/86); W. Dornette and R. Cross, *Federal Judiciary Almanac* 648-49 (1986); *see generally Claiborne to be Nominated to Judgeship,* Reno Evening Gazette, July 24, 1978.

[283]Senate Hearings, *supra* note 15, Pt. 4 at 2251-62.

[284]Senate Hearings, *supra* note 15, Pt. 4 at 2254-55 (Claiborne Ex. 24).

[285]Senate Hearings, *supra* note 15, Pt. 4 at 2256-57 (Claiborne Ex. 24, statement of Senator Howard Cannon). *See* Rec. Pt. III, Vol. IV at 820-21.

[286]Senate Hearings, *supra* note 15, Pt. 4 at 2256-57 (Claiborne Ex. 24, statement of Senator Howard Cannon).

Senator Laxalt also praised Mr. Claiborne's nomination to the federal bench testifying in part:

> The people of the State of Nevada are very, very respectful of this man's abilities not only as a lawyer but as a person who has been heavily engaged in all aspects of community activity in our state.[287]

The record of the United States Senate Judiciary Committee proceedings of August 8, 1978, further discloses that in 1974 and 1975 Mr. Claiborne served as a special assistant to the United States Senate Committee on Rules and Administration during the historic hearings on Nelson Rockefeller's nomination to the vice-presidency.[288]

At the time of respondent's nomination and confirmation by the United States Senate, the print media throughout this state echoed the testimony of Senators Laxalt and Cannon respecting respondent's background, qualifications, contributions to the legal community, and the high esteem in which he was held by his colleagues. For example, on August 6, 1978, in an editorial entitled: *U.S. Judge Claiborne More Than Qualified,* the Las Vegas Review-Journal stated that "few attorneys can boast the kind of record Harry Claiborne has put together in his 31 years in the state of Nevada."[289] The *Review-Journal* observed that Mr. Claiborne "has a great deal of respect from his peers, and one consistent thing about his character keeps popping up—hardworking. Everyone describes the intense determination he puts into his efforts in a courtroom or while studying his legal papers."[290]

Similarly, in an editorial entitled: *Claiborne Good Choice,* the Reno Evening Gazette stated:

> Claiborne also has caught the attention and praise of his peers for his charity work. *He tops the list of Nevada trial lawyers willing to represent people and organizations without compensation whenever he was impressed by the importance of a case or the gravity of an issue to be defended by an individual or organization unable to pay.*[291]

---

[287]Senate Hearings, *supra* note 15, Pt. 4 at 2258 (Claiborne Ex. 24, statement of Senator Paul Laxalt).

[288]Senate Hearings, *supra* note 15, Pt. 4 at 2261 (Claiborne biography).

[289]*U.S. Judge Claiborne More Than Qualified,* Las Vegas Review-Journal, Aug. 6, 1978.

[290]*Id.*

[291]*Claiborne Good Choice,* Reno Evening Gazette, July 27, 1978.

(Emphasis added.) The *Gazette's* observation in this regard is evidenced by the fact that, in 1972, Mr. Claiborne was recognized for supporting and providing legal services to the poor when he received an annual award from the Clark County Legal Services.[292] Moreover, over the years Mr. Claiborne has unselfishly responded to the call of the trial courts of this state whenever they experienced difficulties in finding attorneys to represent an unpopular cause.[293] Further, the *Gazette* correctly noted that Mr. Claiborne has provided his considerable talents as a defense attorney, without charge, to numerous indigent defendants whose legal problems stirred his compassion.[294] *See, e.g.,* Roy v. State, 87 Nev. 517, 489 P.2d 1158 (1971) (respondent Claiborne successfully prosecuted appeal of mentally retarded defendant employed as a busboy who had been convicted of the offense of selling a "lid" of marijuana to an undercover police officer who had feigned interest in and friendship for the defendant).

The many newspaper articles and editorials appearing throughout the state during this period of time observed that Mr. Claiborne first came to Nevada during World War II as a member of the United States Army Air Corps stationed at what is now known as Nellis Air Force Base.[295] Previously, he was educated at Ouachita Baptist University, and he received his degree in law from Cumberland University in 1941.[296] In 1942, he was admitted to practice in his home state of Arkansas, but, after the war, he remained in Southern Nevada and worked for approximately two years as a police officer in Las Vegas before taking and passing the Nevada Bar Examination in 1946.[297] Later, Mr. Claiborne not only represented many police officers in legal matters without charge, but helped establish the police protective association in Las Vegas and was instrumental in securing the passage of legis-

---

[292]Senate Hearings, *supra* note 15, Pt. 1 at 194 (pre-trial statement of H. E. Claiborne).

[293]Senate Hearings, *supra* note 15, Pt. 3 at 1513-14.

[294]*See also* Rec. Pt. III, Vol. IV at 823.

[295]*Prominent Vegas Attorney in Line for Federal Judgeship,* Nevada State Journal, July 25, 1978; *Claiborne to be Nominated to Judgeship,* Reno Evening Gazette, July 24, 1978; *U.S. Judge Admits to "Being Colorful",* Las Vegas Review-Journal, August 6, 1978; *Where I Stand,* Las Vegas Sun, July 30, 1978 (editorial by H. Greenspun). *See also* Senate Hearings, *supra* note 15, Pt. 4 at 2254-61 (Claiborne Ex. 24); and Rec. Pt. III, Vol. IV at 818-19.

[296]*The American Bench, supra* note 14; Rec. Pt. III, Vol. IV at 817.

[297]*The American Bench, supra* note 14; Senate Hearings, *supra* note 15, Pt. 1 at 925 (testimony of H. E. Claiborne) and Pt. 4 at 2256-57 (Claiborne Ex. 24, statement of Senator Howard Cannon); Rec. Pt. III, Vol. IV at 819-20.

lation providing for civil service status for policemen and firemen by the Nevada legislature.[298]

For the next thirty-one years, as the above-noted articles, editorials, and testimony indicate, he earned the wide respect of his peers, as well as the public-at-large. He was considered a consummate professional dedicated to the practice of law. In 1960, his colleagues in the State Bar of Nevada presented him with an award in recognition of his outstanding service in a criminal case.[299] His colleagues also elected him as president of the Clark County Bar Association in the early 1970's. Additionally, he was named a Fellow in the American College of Trial Lawyers.[300] Thus, it cannot be questioned that, on September 1, 1978, when Mr. Claiborne officially assumed the duties of United States District Judge, he left behind a well-respected and well-established private practice reflecting thirty-one years of dedication to exemplary legal advocacy. It is equally noteworthy that the conviction giving rise to this proceeding is apparently the only spot on respondent's previously unblemished record. Our review of the record before us, as well as this court's disciplinary files, reveals that the instant proceeding is the only instance in which the question of respondent's ethical fitness to practice law has been submitted to this court. Further, the State Bar has not apprised us of any other disciplinary action against respondent during the course of his career. As a justice of the Illinois Supreme Court observed in a case remarkably similar to this one:

> This record indicates that this member of our bar, who has given so much to public service, now in his seventieth year, has until this unhappy event enjoyed an excellent reputation—something which cannot be bought or sold in any market place, but is acquired only by cultivation in all phases of human conduct.

*See* In re Walker, 364 N.E.2d 76, 79 (Ill. 1977) (Dooley, J., concurring). In light of this record, we conclude that we would be remiss in our obligations in this disciplinary proceeding if we failed to give "careful and thoughtful consideration [to] the evidence of good character and reputation of the Respondent, and his exemplary professional standing. . . ." *See* State v. Steger, 433 P.2d 225, 227 (Okla. 1966); *see also* District of Columbia Bar v. Kleindienst, 345 A.2d 146 (D.C. 1975); In re Ford's Case, 149 A.2d 863, 864 (N.H. 1959).

---

[298]Senate Hearings, *supra* note 15, Pt. 1 at 926 (testimony of H. E. Claiborne).

[299]*The American Bench, supra* note 14.

[300]*Id.*

## V. DISCUSSION

As previously indicated, in order to afford the parties an opportunity to present their respective views concerning the legal issues before us, and, if they so desired, to present the testimony of witnesses addressing the factual and legal issues under consideration, we scheduled a public hearing in this matter for November 24, 1987. At that hearing, present Bar Counsel, John Howe, Esq., appeared for and on behalf of the State Bar of Nevada. Oscar Goodman, Esq., and David Goldwater, Esq., appeared for and on behalf of respondent Claiborne. Numerous other persons appeared and spoke as friends of the court. In addition, counsel for the parties advised this court as to their respective positions regarding the applicable law.

Thereafter, on November 25, 1987, we issued a preliminary decision observing in part:

> Fundamentally, the authorities cited to us by counsel for both parties establish that: (1) the paramount objective of bar disciplinary proceedings is not additional punishment of the attorney, but rather to protect the public from persons unfit to serve as attorneys and to maintain public confidence in the bar as a whole; *see* In re Cochrane, 92 Nev. 253, 549 P.2d 328 (1976); (2)"[i]n a disciplinary proceeding, it is the duty of this court to look beyond the label given to a conviction in order to determine whether the underlying circumstances of the conviction warrant discipline"; *see* Sloan v. State [Bar], 102 Nev. 436, 726 P.2d 330 (1986); In re Cochrane, *supra;* (3) this court must also consider the isolated nature of an attorney's conduct as well as his prior, exemplary professional standing; *see* Sloan v. State [Bar], *supra;* In re Francovich, 94 Nev. 104, 575 P.2d 931 (1978); and (4) this court should examine the retribution and punishment already exacted in determining whether further discipline is warranted. *See* Sloan v. State Bar, *supra;* In re Ross, 99 Nev. 657, 668 P.2d 1089 (1983); Flanders v. State Dep't of Commerce, 87 Nev. 303, 486 P.2d 499 (1971); In re Reno, 57 Nev. 314, 64 P.2d 1036 (1937). Furthermore, humanitarian concerns such as age, ill health, or other disability warrant consideration in disciplinary proceedings. *See* In re Parks, 64 Nev. 478, 480, 184 P.2d 355, 356 (1947).

Our preliminary decision stated that application of these fundamental legal principles to the facts reflected in the record persuaded us that no further discipline was warranted, and that, therefore, we declined "to impose additional punishment upon respondent by way of professional discipline." *See* Docket No. 17294, order filed November 25, 1987.

Having heretofore set forth in some detail the facts disclosed by our review of the record, we now turn to a more particularized discussion of the applicable legal principles as they relate to those facts and the evidence adduced at the hearing of November 24, 1987.

We begin our analysis by again emphasizing that it is this court's obligation in a disciplinary proceeding to look beyond the label given to a conviction to the true nature of the facts, in order to determine whether the underlying circumstances of the conviction warrant discipline. *See* Sloan v. State Bar, 102 Nev. 436, 440, 726 P.2d 330, 333 (1986); *see also* In re Cochrane, 92 Nev. 253, 549 P.2d 328 (1976). Although SCR 111(3) provides that a certificate of conviction is "conclusive evidence of the commission of the crime stated in it in any disciplinary proceeding instituted against an attorney based on the conviction," it remains this court's obligation to explore the actual conduct of the attorney that resulted in that conviction. After all, the question of the extent of the discipline to be imposed centers around the attorney's conduct itself, not merely the fact of a conviction. *See* Sloan v. State Bar, *supra;* In re Cochrane, *supra; see also* In re Gross, 659 P.2d 1137, 1140 (Cal. 1983) (whatever may prompt an inquiry into an attorney's fitness to practice law, it is the attorney's conduct itself which warrants discipline, and not the conviction which arises therefrom); In re Crane, 178 N.E.2d 349, 350 (Ill. 1961) (a consideration of the actual conduct of an attorney is not only proper, but may be indispensable, to an informed appraisal of the appropriate disciplinary action).

It is true, of course, that courts have considered the facts and circumstances underlying an attorney's conviction in different contexts and for various purposes. First, in disciplinary matters courts often review the underlying circumstances of a conviction to ascertain whether the attorney's conduct involved moral turpitude. In the cases of In re Hallinan, 272 P.2d 768 (Cal. 1954), and In re Hallinan, 307 P.2d 1 (Cal. 1957), for example, the California Supreme Court considered the matter of an attorney who had been convicted of "willfully and knowingly fil[ing] false and fraudulent income tax returns," in violation of 26 U.S.C. § 145(b).[301] *See Hallinan,* 272 P.2d at 770 n.1. In the first *Hallinan*

---

[301]At that time, 26 U.S.C. § 145(b) provided:

Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be

decision, Justice Traynor, writing for the court, concluded that an attorney's conviction under 26 U.S.C. § 145(b), was insufficient to warrant summary disbarment because, under the applicable California statutes, summary disbarment of an attorney is only warranted "when the *crime* of which he was convicted involves moral turpitude." *Id.* at 771 (emphasis in original). Moreover, Justice Traynor observed, "If an attorney could be summarily disbarred after conviction for a crime, the minimum elements of which do not involve moral turpitude, he would never have an opportunity to be heard on the issue on which his disbarment depends." *Id.* at 772. After reviewing the pertinent authorities, Justice Traynor further observed:

> The foregoing cases establish that fraud is not an essential element of the offense proscribed by section 145(b), that some measure of bad faith or evil intent is an essential element, but that such bad faith or evil intent, which can be inferred from evidence that the defendant acted without justifiable excuse, without ground for believing his acts were lawful, or in careless disregard of the lawfulness of his acts, *do not necessarily involve moral turpitude.*

*Id.* at 774 (emphasis added). Accordingly, Justice Traynor concluded:

> When, as in the present case, it appears that an attorney, whose conviction does not warrant summary disbarment, might nevertheless have been guilty of acts involving moral turpitude, we have established the practice of referring the matter to the State Bar for an investigation of the question whether in the commission of the crime the convicted lawyer was guilty of misconduct that requires his suspension or disbarment. This court has inherent power over the admission, suspension, and disbarment of attorneys, and in the exercise thereof can initiate disciplinary proceedings on its own motion, and, in so doing, it may adopt *"any suitable process or mode of proceeding."*

*Id.* at 774-75 (citations omitted; emphasis added). In short, the California court's two decisions in the *Hallinan* matter demonstrate that the facts and circumstances underlying an offense are properly considered where there is sufficient doubt whether the

---

fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution.

The Internal Revenue Code has since been amended. The provisions of 26 U.S.C. § 145(b) have been incorporated primarily in 26 U.S.C. § 7201 (attempt to evade or defeat tax) and 26 U.S.C. § 7202 (willful failure to collect or pay over tax).

elements of the crime and the actual conduct resulting in the conviction necessarily involve moral turpitude. *See also* In re Cochrane, 92 Nev. 253, 254-55, 549 P.2d 328, 329 (1976) (this court's *de novo* review of the facts underlying an attorney's conviction for willful failure to file an income tax return under 26 U.S.C. § 7203 established insufficient facts to support a finding that the attorney had an intent to defraud, or was intentionally dishonest for the purpose of personal gain; accordingly, this court refused to deem the conviction to be one involving moral turpitude).

Second, even where the elements of a conviction necessarily establish conduct involving moral turpitude, courts examine the facts and circumstances underlying an attorney's conviction to determine the severity of the discipline warranted by the conduct involved. For example, in the case of In re Kristovich, 556 P.2d 771 (Cal. 1976), the California Supreme Court concluded:

> We are here concerned with petitioner's fitness to continue serving as an attorney. "[T]he purpose of a disciplinary proceeding is not to punish the attorney but to inquire into the moral fitness of an officer of the court to continue in that capacity and to afford protection to the public, the courts and the legal profession." (Clancy v. State Bar (1969) 71 Cal.2d 140, 151, 77 Cal.Rptr. 657, 664, 454 P.2d 329, 336.) For the purposes of these proceedings, petitioner's convictions for perjury conclusively establish that he committed acts under circumstances which together constitute perjury (Bus. & Prof. Code, § 6101). *The question of moral turpitude is one of law, and the determination of that issue is this court's responsibility.* (In re Higbie (1972) 6 Cal.3d 562, 569, 99 Cal.Rptr. 865, 493 P.2d 97.)
>
> We have repeatedly regarded the offense of perjury, which entails a willful false statement, contrary to oath, as to a material matter which one knows to be false, to involve moral turpitude. (See In re Rothrock (1940) 16 Cal.2d 449, 454, 106 P.2d 907; In re Allen (1959) 52 Cal.2d 762, 768, 344 P.2d 609, (soliciting others to commit perjury).) Accordingly, petitioner has engaged in conduct involving moral turpitude, and this court is required by section 6102 subdivision (b) of the Business and Professions Code to discipline him. *The severity of such discipline depends upon the gravity of the crime and the circumstances of the case. In examining the circumstances giving rise to the offense in question, we are not restricted to a consideration of the specific elements of the crime, but may look to the whole course of the attorney's conduct which reflects upon his fitness to practice law. (In re Higbie, supra, 6 Cal.3d 562,*

*572, 99 Cal.Rptr. 865, 493 P.2d 97.) Therefore, we now proceed beyond the bare conviction to the wider analysis, including the facts of petitioner's case and his explanation of them.*

556 P.2d at 773 (emphasis added).

Similarly, in In re Walker, 364 N.E.2d 76 (Ill. 1977), the Illinois Supreme Court considered the extent of the discipline warranted in a case involving an attorney convicted of the same crime as respondent Claiborne. The court observed:

We need not consider whether the offense defined in section 7206(1) of title 26 of the United States Code is a crime involving moral turpitude. The Hearing Board found that the respondent's conviction of that offense tended to bring the legal profession into disrepute and warrants discipline. This finding was concurred in by the Review Board. *Although a mere conviction may not necessarily establish moral turpitude, it does establish misconduct constituting grounds for discipline in the absence of mitigating circumstances.* (In re O'Hallaren, 64 Ill.2d 426, 1 Ill.Dec. 332, 356 N.E.2d 520.) As we stated in In re Andros, 64 Ill.2d 419, 426, 1 Ill.Dec. 325, 327, 356 N.E.2d 513, 515: "An attorney, above all others, is aware of the responsibility to observe the requirements of the law." We have reviewed the record and conclude that the finding that the respondent's conviction tended to bring the legal profession into disrepute is supported by clear and convincing evidence and justifies disciplinary action. Indeed the respondent's brief does not seriously contend otherwise. *The issue before us, then, is what quantum of discipline is merited by respondent's conviction. In making that determination, we may look beyond the plea and the conviction, not to consider whether discipline is warranted, but to consider the nature of the discipline justified by the conduct of respondent.* In re Andros, 64 Ill.2d 419, 1 Ill.Dec. 325, 356 N.E.2d 513; In re Crane, 23 Ill.2d 398, 178 N.E.2d 349.

364 N.E.2d at 77 (emphasis added). Thereafter, the court in *Walker* detailed the facts underlying that case. We deem those facts of such similarity and significance to the instant matter that we quote the Illinois Supreme Court's discussion at length.

Respondent entered the practice of law in 1935. In 1938 he was elected to the first of his three terms as county judge. After service in the armed forces during World War II he served one term in the Illinois legislature. Following that he was a hearing officer with the Illinois Commerce Commission for eight years. He was elected to the office of State's

Attorney of Jefferson County in 1966, and served in that capacity until 1972. During his tenure as State's Attorney he also engaged in the private practice of law. It was in 1969, when respondent was endeavoring to simultaneously fulfill the duties of State's Attorney and maintain a private practice, that the events which ultimately led to the instant action occurred.

The indictment which forms the basis for the present disciplinary action charged that for the year 1969 respondent had taxable income of $22,602.68 but reported only $13,055. Although respondent was prosecuted by the Federal authorities, his plea accepted by the district court, and a $5,000 fine imposed, the record reflects that attorneys for the office of the regional counsel of the Internal Revenue Service stated in a report after investigating the respondent "that it was felt that these unreported receipts that were reflected on the return lacked a criminal intent." It is clear that respondent's failure to report all his taxable income was the result of a bookkeeping system so shoddy that it has been variously characterized before this court as incomprehensible and nonexistent. . . . Prior to 1969, this had once resulted in respondent overstating his income and receiving a tax refund; in 1969, the opposite occurred. In short, the proper amount of income was recorded for the year 1969, but many notations were in the wrong books and so were not found when the year's income was totalled by his office help for tax purposes. When respondent discovered the error, he filed an amended return, 14 months prior to his indictment. The income reported on this amended return, this time calculated after searching all the ledger books for 1969 income, so closely approximated the correct income figure that the tax to be paid on it was just $292 less than the tax liability eventually assessed against respondent's 1969 income.

There is no question but that respondent's conduct fell short of that degree of care which an attorney should give to the keeping of his income records and cannot be condoned. His apparent lack of fraudulent intent, however, as recognized by the Internal Revenue Service's own attorneys, together with a background in public service which can only be labeled exemplary, mitigate against the suspension recommended by the "majority" report of the Review Board. We, therefore, hold that in light of respondent's conduct and all the aforementioned extenuating circumstances he is deserving of the censure of this court.

*Id.* at 77-78. Thus, in *Walker,* the Illinois Supreme Court examined the circumstances underlying the attorney's conviction and

concluded that extenuating factors mitigated against a sanction more severe than censure. *See also* District of Columbia Bar v. Kleindienst, 345 A.2d 146, 149 (D.C. 1975) (court considered fact that attorney was "caught up in a 'highly charged political atmosphere . . .' " mitigated the criminal behavior involved, *i.e.,* repeated misrepresentations to a United States Senate committee); Louisiana State Bar Ass'n v. Loridans, 338 So.2d 1338, 1347 (La. 1976) (although issue of guilt may not be relitigated, character of misconduct resulting in conviction may be examined for mitigating circumstances); In re La Duca, 299 A.2d 405 (N.J. 1973); Levy v. Association of the Bar of City of New York, 333 N.E.2d 350 (N.Y. 1975); Office of Disciplinary Counsel v. Troback, 383 A.2d 952 (Pa. 1978).

A third consideration has compelled our attention to the facts and circumstances underlying respondent's conviction in the instant case. As we have noted throughout the above factual discussion, respondent has tendered for our consideration the issue of whether the proceedings against him in federal court were conducted fairly, in accord with due process of law, and in a manner entitling them to undiminished weight in a disciplinary proceeding before this court. Early on in these proceedings, in our order issued on September 16, 1986, we observed:

> On the basis of evidence obtained to date as a result of this court's order of July 22, 1986, and in light of the several dissenting opinions of judges of the United States Court of Appeals for the Ninth Circuit, this court has determined that it cannot summarily dismiss respondent's contentions.

*See* State Bar v. Claiborne, Docket No. 17294, order filed September 16, 1986; *see, e.g.,* United States v. Claiborne, 781 F.2d 1334 (9th Cir. 1986) (Pregerson, J., dissenting); United States v. Claiborne, 781 F.2d 1327 (9th Cir. 1986) (Reinhardt, J., dissenting); United States v. Claiborne, 781 F.2d 1325 (9th Cir. 1985) (Ferguson, J., dissenting).

Although it is not the function of this court to sit in review of respondent's federal judgment of conviction, or to relitigate the question of guilt, nonetheless it is clear that "[t]he two judicial systems of courts, the state judicatures and the federal judiciary, have autonomous control over the conduct of their officers. . . ." *See* Theard v. United States, 354 U.S. 278, 281 (1957). Accordingly, the United States Supreme Court, in considering the question of whether disbarment by a state should be followed by disbarment by the federal courts, concluded that it was proper for it to inquire into whether the state procedures resulting in state disbarment suffered from any lack of due process. *See* In Re Ruffalo, 390 U.S. 544, 550, *modified* 392 U.S. 919 (1968);

Selling v. Radford, 243 U.S. 46, 51 (1917). Additionally, in *Selling* the Court stated that it would recognize the judgment of a state court in a bar proceeding unless

> from an intrinsic consideration of the state record, one or all of the following conditions should appear: 1. That the state procedure from want of notice or opportunity to be heard was wanting in due process; 2, that there was such an infirmity of proof as to facts found to have established the want of fair private and professional character as to give rise to a clear conviction on our part that we could not consistently with our duty accept as final the conclusion on that subject; or 3, that some other grave reason existed which should convince us that to allow the natural consequences of the judgment to have their effect would conflict with the duty which rests upon us not to disbar except upon the conviction that, under the principles of right and justice, we were constrained so to do.

*See Selling,* 243 U.S. at 51. *See also* SCR 114(3).

Analogously, where grave allegations are raised respecting the investigative, prosecutorial, and procedural fairness of the proceedings underlying an attorney's conviction, any disciplinary action based solely on that conviction, without an "intrinsic consideration" of the record of those proceedings, would clearly conflict "with the duty which rests upon us" in the performance of our disciplinary function, to proceed in accordance with "principles of right and justice." Selling v. Radford, 243 U.S. at 51. *See generally* Potter v. State Bd. of Med. Exam'rs, 101 Nev. 369, 371, 705 P.2d 132, 134 (1985) (the interest in practicing one's profession cannot be arbitrarily abridged or revoked); Burleigh v. State Bar of Nevada, 98 Nev. 140, 145, 643 P.2d 1201, 1204 (1982) (a state cannot exclude a person from the practice of law without due process of law).

With these considerations in mind, and from our review of the facts, circumstances and conduct underlying respondent's federal conviction, we conclude that respondent has indeed engaged in conduct deserving of discipline. Respondent himself has conceded that he was careless and negligent with regard to his personal obligations as a taxpayer. Unquestionably, that conduct, as in the case of In re Walker, 364 N.E.2d 76, 77 (Ill. 1977), tends to "bring the legal profession into disrepute." In our view, "respondent's conduct fell short of that degree of care which an attorney should give to the keeping of his income tax records and cannot be condoned." *Id.* at 78. Moreover, the disciplinary rules governing the legal profession in this state during the period in question prohibited a lawyer from engaging in conduct prejudi-

cial to the administration of justice and reflecting adversely on his fitness to practice law. *See* ABA Code of Professional Responsibility, DR 1-102(A)(5), (6).[302] We conclude, therefore, that respondent slighted his responsibilities under these provisions by virtue of his negligent and careless attention to his legal obligations as a taxpayer during the years 1979 and 1980.

In so concluding, for perhaps the first time throughout the tortured history of respondent's travails, respondent has been extended the benefit of the doubt. Based upon our extended consideration of the record, we have emerged with an abiding doubt as to respondent's guilt under a criminal standard of proof. Therefore, as to respondent's conviction, we are precisely in the position specified by the United States Supreme Court, having concluded that "there was such an infirmity of proof as to facts found to have established the want of fair private and professional character as to give rise to a clear conviction on our part that we could not consistently with our duty accept as final the conclusion on that subject." *Selling,* 243 U.S. at 51.

Although our conclusion in this regard renders it unnecessary to consider whether the conduct resulting in respondent's conviction involved moral turpitude, we reiterate that our view of the facts is in complete accord with the factual analysis tendered by Senator Hatch. As noted, Senator Hatch carefully reviewed the facts of this case and concluded that they do not sufficiently support a finding that respondent willfully signed his returns intending to defraud, or that he was intentionally dishonest for the purpose of personal gain. Under these circumstances, were it necessary for us to reach the issue, we would entertain grave doubts as to whether respondent's conduct was sufficiently willful and intentional to justify a finding of moral turpitude. *See* In re Cochrane, 92 Nev. at 255, 549 P.2d at 329; *see also* In re Reno, 57 Nev. 314, 330, 64 P.2d 1036, 1041 (1937) (where physician's license to practice was revoked based upon a criminal conviction, this court modified the order of revocation where circumstances created substantial doubt as to whether physician's conduct involved moral turpitude).

As stated, however, the record in the instant case nonetheless demonstrates grounds warranting the imposition of discipline. Therefore, the issue before us is the severity of the disciplinary sanction to be imposed. The underlying facts and circumstances of the conviction, as well as all relevant factors in mitigation of any possible sanction, are appropriately considered in this regard. Sloan v. State Bar, *supra;* In re Cochrane, *supra;* In re

---

[302]These specific provisions, among others, were repealed on March 28, 1986, and replaced by the Model Rules of Professional Conduct. *See* SCR 150.

Kristovich, 556 P.2d 771, 773 (Cal. 1976); In re Walker, 364 N.E.2d 76, 77 (Ill. 1977). Moreover, this court must consider "all the relevant factors and mitigating circumstances on a case-by-case basis." *See* Murray v. State Bar of California, 709 P.2d 480, 485 (Cal. 1985). *See generally* In re Kellar, 88 Nev. 63, 493 P.2d 1039 (1972); In re Parks, 64 Nev. 478, 481, 184 P.2d 355, 356 (1947). There are no fixed standards as to the appropriate penalty in disciplinary actions. Alberton v. State Bar of California, 686 P.2d 1177, 1185 (Cal. 1984), *cert. denied,* 470 U.S. 1007 (1985).

Further, in reaching a just determination in this regard, we must remain mindful of the primary goals of disciplinary action. As we observed in *Cochrane,* the fundamental "objective of disciplinary action . . . is not additional punishment of the attorney but rather to protect the public from persons unfit to serve as attorneys . . . and to maintain public confidence in the bar as a whole." *See Cochrane,* 92 Nev. at 255, 549 P.2d at 329, *citing* In re Ford's Case, 149 A.2d 863, 864 (N.H. 1959).[303] Accordingly, we turn to an examination of those factors relevant to respondent's fitness to serve as an officer of the court and to continue the practice of a profession imbued with the public interest and trust. *See* In re Echeles, 430 F.2d 347 (7th Cir. 1970) (purpose of bar proceedings is not to punish but to determine the fitness of an officer of the court to continue in that capacity and to protect the courts and the public from the official ministration of persons unfit to serve); Standing Com. on Dis. of United States v. Ross, 735 F.2d 1168, 1170 (9th Cir.), *cert. denied,* 469 U.S. 1081 (1984); *see also* Ex Parte Wall, 107 U.S. 265, 273 (1882).

The obvious circumstances to be considered in this regard encompass the alleged conduct underlying the charges against respondent in the criminal proceedings. As we detailed above,

---

[303]Our review of the legal authorities reveals that an overwhelming majority of states has adopted a similar approach in bar disciplinary matters. *See, e.g.,* Ex Parte Wall, 107 U.S. 265 (1882) (bar proceedings are not for purposes of punishment but seek to protect the courts and the public from attorneys unfit to serve); Matter of Riley, 691 P.2d 695, 706 (Ariz. 1984); In re Kristovich, 556 P.2d 771 (Cal. 1976); District of Columbia Bar v. Kleindienst, 345 A.2d 146, 147 (D.C. App. 1975); The Florida Bar v. Saphirstein, 376 So.2d 7 (Fla. 1979); In re Crisel, 461 N.E.2d 994 (Ill. 1984); Louisiana State Bar Ass'n v. Bosworth, 481 So.2d 567 (La. 1986); Matter of Freedman, 277 N.W.2d 635 (Mich. 1979); Matter of Discipline of Kraemer, 361 N.W.2d 402 (Minn. 1985); In re Maier, 664 S.W.2d 1 (Mo. 1984); Matter of Kushner, 502 A.2d 32 (N.J. 1986); Matter of Maragos, 285 N.W.2d 541 (N.D. 1979); In re Scannell, 617 P.2d 256 (Or. 1980); Office of Disciplinary Counsel v. Tumini, 453 A.2d 310 (Pa. 1982); Carter v. Cianci, 482 A.2d 1201 (R.I. 1984); McInnis v. State, 618 S.W.2d 389 (Tex. Civ. App. 1981), *cert. denied,* 456 U.S. 976 (1982); Matter of Stock, 704 P.2d 611 (Wash. 1985).

however, the first four counts of the indictment related to the accusations respecting the solicitation and acceptance of bribes from Joseph Conforte.[304] In view of the substantial evidence that Conforte's accusations were nothing more than the unreliable, highly motivated effusions of a brothel owner and fugitive from justice, we are compelled to discount completely, as did the government in dismissing the Conforte counts, any inference of attorney misconduct that might be associated with them. Thus, we conclude that these unfounded charges support no inference that respondent's continued practice of law would endanger the public.

Next, Count VII of the indictment charged that respondent submitted a false financial disclosure form to the Judicial Ethics Committee in 1978. The jury acquitted respondent of this charge, and we have discovered nothing in the record supporting a conclusion that respondent otherwise violated any rules of professional or judicial conduct relating to the Judicial Ethics Committee disclosure form. Accordingly, we conclude that the record reveals no impairment to the public's interest in a competent bar arising out of the conduct underlying Count VII.

The remaining counts of the indictment against respondent concern his tax returns for the years 1979 and 1980. As Senator Hatch has observed, respondent's conduct in this regard is far more consistent with negligence than with an intent to defraud or

---

[304]Count IV of the indictment charged that respondent willfully signed his income tax return for the year 1978 knowing that it falsely understated his income for that year. The prosecution argued at the first trial that, along with other unreported income, the 1978 return failed to report the alleged $30,000 bribe from Conforte. *See* Rec. Pt. II, Vol. XV at 3561. As previously noted, the prosecution dismissed Count IV of the indictment along with the remaining Conforte counts prior to the second trial. We further note in this regard that attorney R. Paul Sorenson testified at the November hearing respecting respondent's tax returns. Mr. Sorenson holds both a law degree and an accounting degree and is a Certified Public Accountant. Prior to the hearing in Las Vegas on November 24, 1987, Mr. Sorenson advised the Chief Justice that he felt he possessed knowledge that could be of significance at the hearing. After Sorenson briefly outlined his knowledge of the case, the Chief Justice concluded that Sorenson's testimony at the hearing would be appropriate. *See* Nevada Code of Judicial Conduct Canon 3A(4). Indeed, at the hearing, there were no objections to Sorenson's testimony. Sorenson explained that in 1983, respondent had asked him to review respondent's tax returns for the years 1972 through 1980, and that Sorenson prepared amended returns for respondent for the years 1977, 1978, and 1979. Further, Mr. Sorenson stated that *both the 1977 and 1978 returns had overstated respondent's taxable income and respondent had a refund due from the IRS. See* State Bar v. Claiborne, Docket No. 17294, Reporter's Transcript of Hearing of November 24, 1987, at 59-64. Thus, according to Mr. Sorenson, in 1978 respondent had overpaid his taxes. Therefore, in the absence of Conforte's bribery accusations it appears that there was no basis whatsoever for Count IV of the indictment.

intentional dishonesty for the purpose of personal gain. Respondent's negligent inattention to his tax obligations during the years in question, however, does adversely reflect on his fitness to practice law. Accordingly, as we have noted, the conduct underlying these counts establishes grounds for discipline.

Nevertheless, as in the *Cochrane* case, an important consideration is whether "[t]here is . . . a scintilla of evidence before us that [respondent] was derelict in any duties owed to, or performed for, his clients." *In re Cochrane,* 92 Nev. at 255, 549 P.2d at 329. In the present case, respondent's transgressions related solely to his *personal* tax obligations, and there have been no allegations that respondent was ever derelict in his obligations as an attorney or as a federal judge. In fact, the numerous witnesses who addressed this court at the hearing of November 24, 1987, lauded respondent's contributions as a lawyer. For example, Marion Earl, who until his recent death was the senior practicing attorney in Clark County and a highly respected member of the bar, observed:

> I do not excuse his carelessness and his negligence in the matter of his tax returns, but I am strongly convinced that there were no wrongful intentions on his part.
> I have known Harry Claiborne, Judge Harry Claiborne, since he first began his practice of law here in 1947.
> I have never known any attorney who worked harder at his chosen profession than Judge Claiborne.
> I join with my colleagues in feeling that he has been punished enough and has suffered enough.
> And on behalf of myself and my colleagues, I respectfully ask this honorable body to season justice with mercy.[305]

Similarly, attorney George Dickerson, a past president of the State Bar of Nevada and member of its Board of Governors for twelve years stated:

> Nobody in this room could tell you today that Harry Claiborne cannot handle the process in behalf of individuals in our judicial system.
> As a matter of fact, denying him that right may very well be depriving those to whom we owe the duties to provide the best, the very best among us in the criminal process. That's one aspect of this case for your consideration.[306]

Attorney Edward G. Marshall, former District Attorney of Clark County, echoed these sentiments by noting that respondent:

[305]State Bar v. Claiborne, Docket No. 17294, Reporter's Transcript of Hearing of November 24, 1987, at 27-28.

[306]*Id.* at 25.

has always been, in my experience . . . a very skilled adversary. But not only that, he has always been a fair man. He was always anxious and solicitous for the welfare of his own clients. He always played by the rules of the game fairly. I never, at any time, saw anything that would suggest to me that he was morally unfit.[307]

Additionally, Neil Galatz, a past president of the Western Trial Lawyers' Association and a member of the Nevada Trial Lawyers' Association, the Board of Governors of the American Trial Lawyers' Association, and the Board of Directors of the International Academy of Trial Lawyers, stated that "Mr. Claiborne has always, as a lawyer, conducted himself with the utmost honor, outstanding courage and great talent."[308]

State Senator Herbert Jones, a past president of the State Bar of Nevada, expressed the view that "if this community were deprived of the right to have [respondent] assist them with their legal problems, that . . . would be a great loss to this community."[309] All of the statements tendered by the remaining witnesses at the hearing expressed similar views respecting respondent's dedication to the legal profession.[310]

As set forth above, our independent review of respondent's professional background corroborates the representations of the eminent and distinguished members of the public and the bar who stated that respondent's continued practice of law will pose no threat to the public's interest in a competent bar. Moreover, as we have observed, this proceeding is the only instance during respondent's approximate forty-year membership in the Nevada Bar, in which respondent's ethical fitness to practice law has been formally questioned in this court. The conduct underlying respondent's violations of the disciplinary rules is unquestionably

---

[307]*Id.* at 37.

[308]*Id.* at 39.

[309]*Id.* at 42.

[310]The remaining witnesses presented by respondent's counsel included William P. Curran, the President-Elect of the State Bar of Nevada; George Foley, Sr., a distinguished former District Attorney of Clark County; Paul C. Parraguirre, a former President of the State Bar of Nevada; Daniel M. Markoff, the Federal Public Defender; Edward R. J. Kane, a former Chief Deputy District Attorney and Chief Assistant United States Attorney for the District of Nevada; and O. C. Lee, the head of the Las Vegas Metropolitan Police Protective Association and President of the Nevada Conference of Police and Sheriffs. In addition, written statements were placed in the record from Brian Greenspun, a member of the Nevada Bar and editor of the Las Vegas Sun; William K. Woodburn, a past president of the State Bar of Nevada; and Claude Evans, the Executive Secretary-Treasurer of Nevada A.F.L./C.I.O.

isolated and atypical. This fact, in addition to respondent's long and distinguished career in public and private practice, his contributions to the improvement of the administration of justice and his exemplary record of *pro bono* representation, weigh heavily in mitigation of his conduct. *See* Sloan v. State Bar, 102 Nev. 436, 443, 726 P.2d 330, 335 (1986) (suspension of professional license inappropriate when isolated instance of negligent behavior is committed); In re Francovich, 94 Nev. 104, 106, 575 P.2d 931, 932 (1978) (single incident of misconduct, as opposed to a pattern of misconduct, weighs against suspension); In re Parks, 64 Nev. 478, 480, 184 P.2d 355, 356 (1947) (lack of prior disciplinary action considered when imposing discipline).[311]

Further, we observe that the parties to these proceedings have been afforded an equal opportunity to call to our attention facts and circumstances in aggravation or mitigation of the disciplinary sanction to be imposed in this case. As we have previously explained, respondent's counsel tendered the voluminous record of the federal proceedings to the State Bar. The Board was afforded an opportunity to review that record and to call to our attention any further evidence relevant to these disciplinary proceedings. Unquestionably, it was within the Board's authority to conduct such a review or to instruct Bar Counsel to do so. Nonetheless, no aggravating circumstances reflecting upon the

---

[311]Our review of the authorities from other jurisdictions establishes that consideration of such mitigating factors is clearly appropriate in disciplinary proceedings. *See, e.g.,* Perloff v. Disciplinary Bd. of Ala. State Bar, 424 So.2d 1305, 1307 (Ala. 1982) (court reversed board's decision to disbar, considering as mitigating factors attorney's long and distinguished career in private practice and the state legislature, and devotion of time and energy to bar projects which improved the administration of justice); District of Columbia Bar v. Kleindienst, 345 A.2d 146, 148 (D.C. 1975) (attorney's previous, unblemished and laudable record in private practice and public service is considered in determining discipline); Office of Disciplinary Counsel v. Eilberg, 441 A.2d 1193, 1197 (Pa. 1982) (lawyer's significant contributions while a public servant, his good character, high repute, and fitness to practice law, notwithstanding his conviction, mitigate sanction); In re Walker, 364 N.E.2d 76, 78 (Ill. 1977) (exemplary public service background mitigates against sanction of suspension); Louisiana State Bar Ass'n v. Marcal, 430 So.2d 47, 50 (La. 1983) (in refusing to disbar, court noted not only attorney's post-conviction behavior, but his high integrity, dedication to the legal profession, acceptance of unpopular cases, voluntary service to community organizations, groups and individuals, as well as his reputation as a dedicated advocate whose work exemplified his thoroughness and preparation); State ex rel. Okl. Bar Ass'n v. Hensley, 560 P.2d 567, 569 (Okla. 1977) (court considered attorney's previous record concerning professional conduct in rejecting recommendation to disbar attorney); State v. Steger, 433 P.2d 225, 227 (Okla. 1966) (court would be remiss in its duty if it did not carefully and thoughtfully consider an attorney's good character, reputation and exemplary professional standing).

public impact of respondent's continued practice were ever tendered by the State Bar for our consideration. From our own independent, *de novo* review of what we consider to be an adequate record, we conclude that there is ample basis for endorsing the consensus of the eminent members of the bar and the public who spoke in mitigation of respondent's conduct at the November hearing. Accordingly, we conclude that respondent's continued practice of law will pose no threat to the interests of the public in a competent bar.

Nonetheless, our determination respecting the appropriate disciplinary sanction does not end with the conclusion that the public's interest in a competent bar will not be endangered by respondent's continued practice. As Bar Counsel has correctly observed, "the purpose of professional disciplinary proceedings is both to protect the public *and also to maintain public confidence in the bar as a whole.*"[312] In attempting to attain the latter objective, however, we must carefully balance the need to protect the good name of the profession against the retribution already exacted through the criminal justice system or otherwise. *See* Sloan v. State Bar, 102 Nev. 436, 443, 726 P.2d 330, 335 (1986) (demands of justice were served through punishment received through the criminal justice system); In re Ross, 99 Nev. 657, 660, 668 P.2d 1089, 1092 (1983) (court considered fact that attorneys had been subjected to an extensive amount of improper, inflammatory, unfair and concerted public obloquy and extralegal torment in assessing retribution already exacted); In re Cochrane, 92 Nev. 253, 255, 549 P.2d 328, 329-30 (1976) (suspension or disbarment would be inappropriate because it could only be construed as "additional punishment"); Flanders v. State Dep't of Commerce, 87 Nev. 303, 308-9, 486 P.2d 499, 502 (1971) (reversing order which affirmed revocation of license of a real estate broker because no further punishment warranted where the demands of justice had already been served); In re Reno, 57 Nev. 314, 330, 64 P.2d 1036, 1041 (1937) (retribution previously exacted had satisfied the demands of justice); In re Winters, 40 Nev. 335, 337, 163 P. 244, 245 (1917) (good name of the profession must be maintained and those guilty of professional misconduct should suffer consequences, but rights of an attorney must not be sacrificed in an effort to maintain high standing of the bar).

Our consideration of the retribution thus far exacted upon respondent, in mitigation of the extent of discipline to be

---

[312]State Bar v. Claiborne, Docket No. 17294, Reporter's Transcript of Hearing of November 24, 1987, at 86 (emphasis added).

imposed, comports with the decisions of other courts faced with the problem of attorney discipline. For example, the case of In re Del Mauro, 341 A.2d 325 (N.J. 1975), concerned a judge who, for a considerable period of time, received fees for performing marriage ceremonies despite a court directive prohibiting such practice. Because of this misconduct, the judge was suspended from the practice of law for one year. Subsequent to his reinstatement, a federal indictment was returned against him charging him with two counts of filing false tax returns, in violation of 26 U.S.C. § 7206(1), for failing to report the improper fees on his returns. He pleaded guilty to one count and served four months of a two-year jail sentence. In proceedings to determine whether and to what extent additional discipline should be imposed as a result of the federal conviction, the New Jersey Supreme Court concluded, under the circumstances, that a short suspension was an appropriate sanction:

> The question of punishment, as usual, is difficult. Respondent's conduct of course requires discipline. It is true, however, that he has suffered much. He was compelled to resign his judgeship under a cloud of obloquy. Thereafter he was suspended from the practice of law for one year and later required to pay a substantial fine and to undergo a custodial prison sentence. It is impossible, as it would be wrong, not to take account of these successive instances of manifest personal disgrace and hardship with their undoubted effect upon the respondent.

*Id.* at 326.[313]

Similarly, in the instant case, "we believe the principles of fairness, justice and equity, as well as a proper application of strictly legal rules . . ." demand our consideration of the hard-

---

[313]*See also* Matter of Swartz, 630 P.2d 1020, 1026-27 (Ariz. 1981) (where evidence did not establish that attorney violated a legal duty of disclosure because he was either incompetent, incapable or he sought to enrich himself, and disciplinary proceedings had been pending for six years, censure rather than suspension was appropriate sanction); In re Mekler, 406 A.2d 20, 25 (Del. 1979) (court considered fact that attorney sustained substantial penalty in judgment rendered against him in civil litigation arising out of same facts and course of conduct); In re Scott, 455 N.E.2d 81, 85-86 (Ill. 1983) (in light of evidence of attorney's past service as Attorney General and State Treasurer, and the high caliber of his performance as a public official, and excellent reputation for truth, veracity, and integrity both before and after his conviction, court refused to sanction attorney beyond the two year interim suspension already served); Carter v. Cianci, 482 A.2d 1201, 1203 (R.I. 1984) (severe sanction of loss of public office resulting from conviction mitigates against sanction of disbarment or suspension); In re Hansen, 584 P.2d 805, 807 (Utah 1978) (the great amount of time, effort, expense, adverse publicity and criticism, due in part to attorney's status as public official, is factor to be considered in mitigation).

ship, humiliation, personal disgrace, mental suffering and financial costs which respondent has endured as a result of the federal proceedings against him. *See* In re Pray, 64 Nev. 402, 411, 183 P.2d 627, 631 (1947).

In this context, we observe that respondent has suffered under a cloud of obloquy and innuendo for nearly ten years, ever since it was disclosed to the press that he was under investigation by a Las Vegas grand jury. He endured three additional grand jury investigations and the accompanying publicity before he was finally indicted on seven felony counts, four of which subsequently proved to be unfounded. Although the first trial ended in a mistrial and the second trial proceeded only on those counts unrelated to Conforte's allegations, respondent was put to the considerable expense during the first trial of defending against all the charges including those lacking any substantial foundation. We deem it of considerable significance that respondent evidently was subjected to the financial and emotional burdens of defending against the unfounded Conforte allegations largely as a result of what appears to have been a vendetta by a limited number of federal officials.

Moreover, following respondent's conviction in the second trial, he was assessed $10,000 in fines, over $14,000 in costs of prosecution and served seventeen months of a two-year prison term. He has further been burdened with considerable costs relative to the congressional impeachment proceedings. During much of his prison term, respondent was deprived of the opportunity to earn a living in his chosen profession. Even after his release, he voluntarily refrained from the practice of law until this court entered its order of November 25, 1987, allowing him to do so.

In addition, we observe that when respondent assumed the federal bench at the age of sixty-one, he gave up a lucrative private practice and took a substantial reduction in salary. Following his impeachment and the Senate trial, he forfeited his judicial salary, plus the eventual prospect of substantial financial benefits and security respondent could have enjoyed as a federal judge in senior status. *See* 28 U.S.C. § 371 (1984).[314] Even

---

[314]Under the provisions of 28 U.S.C. § 371(a), (b) and (c), respondent would have had the option in the fall of 1988, after serving ten years in office and attaining the age of 70, to retire from his office or "to retain the office but retire from regular active service." A federal judge who chooses to retire from office receives an annual annuity during the remainder of his lifetime "equal to the salary he was receiving at the time he retired." *See* 28 U.S.C. § 371(a). A federal judge who chooses to retain his office but retire from regular active service receives "the salary of the office" during the remainder of his lifetime. *See* 28 U.S.C. § 371(b).

without the precise calculations that a professional actuarial evaluation would provide, we deem the loss of these benefits to be of considerable consequence in the case of a seventy-year old individual who has undoubtedly expended substantial resources in a legal battle spanning almost a decade. Under these circumstances, if this court were to deprive respondent of the opportunity to earn a living at the only profession to which he has dedicated his life, and at this stage of his life, the resulting hardship, in light of the isolated nature of his professional derelictions, would be extreme and disproportionately severe. Such humanitarian concerns have weighed heavily in our determination. *See, e.g.,* In re Parks, 64 Nev. 478, 480-81, 184 P.2d 355, 356 (1947) (court took into account that attorney was sixty-nine, in ill health and partly disabled, and that he may have been the victim of local bar association's attempt to strike at the improper practices of another); In re Winters, 40 Nev. 335, 337, 163 P. 244, 245 (1917) (court considered the serious consequences of disciplinary action that could deprive an attorney of the age of the individual there involved from earning a living for himself and his family in the calling in which he was trained and for which he was presumably best suited); Matter of Tapper, 477 N.Y.S.2d 16, 17 (N.Y. App. Div. 1984) (where attorney was convicted of making a false written statement, court determined that a lengthy suspension would result in severe deprivation in light of attorney's age, illness, and fact that he was sole support for a dependant son and his personal problems had prevented him from practicing for approximately one year).

As we have noted, the statement of Brian Greenspun was included in the record of this court's November hearing. In light of Mr. Greenspun's perspective as an attorney, and as an editor of the Las Vegas Sun, and although we are fully aware of the supportive stance that the Las Vegas Sun has articulated throughout respondent's trials, we consider his observations regarding the public's perception of this matter with some deference. In this regard, Brian Greenspun stated:

> On this issue, I can report an overwhelming belief among the people from whom I have heard that Claiborne has been punished enough.
>
> From the precedential standpoint, it is clear that others who have been convicted of similar offenses spent little, if any, time in prison and were allowed to practice their profession, benefiting not only themselves and their families but their clients as well.
>
> Clearly, not one of them has been impeached on national television in front of millions of Americans. Suffering the ultimate humiliation by being stripped naked of high judicial

office in front of his fellow countrymen, having to serve the fullest extent of a prison sentence, being denied any form of early release or parole, and having to return to a community which once held you in high esteem as a federal judge and a respected defense attorney, has provided Harry Claiborne with a degree of ignominy heretofore unmatched in legal history.

The public sentiment I have heard, and which I report to you today, is that to strip the last vestiges of dignity from Harry Claiborne by refusing to allow him to earn a living in a profession to which he has brought honor throughout his adult life is unnecessary and cruel and is not in keeping with the level of tolerance for human frailty for which Nevadans have become known and envied.[315]

We also take note of the statement of Claude Evans, the Executive Secretary-Treasurer of the A.F.L./C.I.O. in Nevada, which was submitted for our consideration at the November hearing. Mr. Evans observed in part:

We in organized labor feel strongly that Mr. Claiborne deserves the opportunity to continue to earn his living in his chosen profession.

. . .

We feel that he has paid his penalty to society, if, indeed, he owed one, and should not continue to be persecuted and denied the right to continue in his profession.[316]

We have given appropriate consideration to these expressions of the public's sentiment in assessing the impact of our decision upon the public's confidence in the legal profession in this state.

As many of the speakers at the November hearing urged, we have also given appropriate consideration to the punitive impact upon respondent of the congressional proceedings. As attorney George Foley, Sr., observed, respondent "had the terrible punishment of going before this nation on television, and when the United States Senator of his own state went to shake his hand, he was shoved aside by United States Marshals."[317]

It is indeed of no little significance that respondent endured the ignominy of being the first federal judge in over fifty years to be impeached and removed from office. No less significant is the fact that respected United States Senators have expressed the

---

[315]State Bar v. Claiborne, Docket No. 17294, Reporter's Transcript of Hearing of November 24, 1987, at 69-70.

[316]*Id.* at 73-74.

[317]*Id.* at 45.

belief that although the unprecedented procedural rules employed during the Claiborne impeachment trial may have comported with constitutional standards vesting each body of Congress with the authority to determine its own rules, those unprecedented procedures, and perhaps the press of Senate business as Congress rushed to complete its agenda before an election year adjournment, may well have denied respondent the full, fair, and meaningful hearing the Senate historically has accorded to others in respondent's position.

In reaching our determination, we have further carefully considered the substantial indications that adverse special and selective investigative, prosecutorial, trial, and appellate procedures were imposed on respondent throughout the proceedings against him. This overall "appearance of impropriety," as defined in part by Judge Reinhardt, has influenced our decision not only in terms of the weight which we have accorded respondent's federal conviction for the purposes of these disciplinary proceedings, but also in terms of the substantial mental anguish that respondent has thus far endured.

Additionally, we note that a review of similar attorney disciplinary cases in this jurisdiction reveals that respondent may have already suffered more retribution than the combined criminal and disciplinary sanctions previously imposed upon any individual member of the Bar convicted of a similar tax offense. In the *Cochrane* case for example, it does not appear that Cochrane suffered any imprisonment as a result of his income tax conviction, nor did this court impose suspension or disbarment. This court did, however, impose monetary sanctions upon Cochrane in an amount less than $4000. A review of this court's files also reveals an unreported case involving an attorney who was convicted of income tax evasion and fined $10,000, pursuant to a plea of nolo contendere. The attorney did not receive a sentence of imprisonment. Upon the recommendation of the Board of Bar Governors, this court suspended him from the practice of law for six months. *See* Order No. 6214, filed October 12, 1970. He lost no position and was not subjected to any comparable humiliation, stress, or public obloquy, and never served time in prison.

Finally, we have given serious consideration to the eloquent observation of Marion Earl who reminded us that "[t]he quality of mercy is not strained," and respectfully requested that we "season justice with mercy in behalf of Judge Harry Claiborne."[318] In light of the magnitude of the hardship and retribution that respondent has endured, we consider Mr. Earl's eloquent plea particularly meaningful.

---

[318]*Id.* at 28-29.

In the final analysis, after a careful review of the massive record before us and the principles of law applicable to attorney discipline, we have concluded that the imposition of additional sanctions upon respondent would serve no proper purpose and could only be construed as additional punishment. *See* In re Cochrane, *supra*. In our view, the magnitude of the retribution heretofore exacted from respondent has satisfied the demands of justice and has adequately insured against any repetition of the attorney misconduct revealed by our review of the facts. *See* Sloan v. State Bar, 102 Nev. at 443, 726 P.2d at 335; In re Ross, 99 Nev. 657, 668 P.2d 1089 (1983); *see also* Flanders v. State Dep't of Commerce, 87 Nev. 303, 486 P.2d 499 (1971); In re Reno, 57 Nev. 314, 64 P.2d 1036 (1937).

## VI.  CONCLUSION

Harry Eugene Claiborne will forever remain an historical enigma. If our review of the record had enabled us to conclude, in good conscience, that Claiborne had been fairly prosecuted and convicted, we unhesitatingly would have imposed severe sanctions given the position of high judicial office and public trust he enjoyed at the time of his conviction. Accordingly, we do not fault those who, however precipitously, criticize us for having apparently diminished the magnitude of a criminal conviction sustained by "one of our own."[319] Indeed, we have not been unmindful of the fact that countless numbers of citizens will not have or take the opportunity to study and ponder seriously what has occurred beyond the headlines respecting respondent's prosecution, conviction, and removal from office, and our ultimate disposition of the disciplinary proceeding. Thus, we are admittedly troubled by the prospect that this court's motives and actions may be perpetually misunderstood to the detriment of our judicial and legal system in Nevada. We are equally sensitive to the views of some non-Nevadans who, with an existing disdain for gaming and legalized prostitution, may simply conclude that our decision was consistent with their perceptions of the moral atmosphere of our state. We thus understand that there are undoubtedly those within and without the bar, the judiciary, and

---

[319]For example, an editorial in the National Law Journal, December 14, 1987 edition, declared: "The fact that Mr. Claiborne is again a lawyer in good standing is a perfect example of lawyers protecting their own. It never should have happened." *See Claiborne Found Fit to Practice Law In Nevada,* National Law Journal, December 14, 1987. Each of us received a letter from a law student expressing outrage over our decision not to subject Claiborne to further punishment, and decrying our "gutter ethics" as the source of Claiborne's relief.

this state who would exact of Harry Eugene Claiborne "the uttermost farthing." We would join them if we could ignore what the record reveals about his conviction. We would join them if we could cast aside what we must recognize as sound legal precedents. We may have joined them if we could have simply cast stones at him without considering the human frailties that permeate all aspects and all sides of this case. And perhaps we could have joined them if we had disregarded the spirit of our procedural rules and merely followed the recommendation of a disciplinary board ill-equipped to provide an in-depth review of the record.

The most difficult of the issues before us concerns the tension between public perceptions of the integrity of the judiciary and the bar on the one hand, and individual justice to Harry Claiborne on the other. Ultimately, we concluded that if the cherished values of individual dignity and due process of law are to have any real meaning, our course was clear. In that regard, we do not imply that respondent has been denied a form of due process. Our concerns relate to the quality of the due process he received. Although we can readily appreciate the need to remove corrupt judges from office, and certainly the machinery and will exists for so doing, it nevertheless is essential to even-handed justice that he or she to whom the task of assuring that due process prevails in our courtrooms, may also feel secure in the benefits thereof when involved in the process as a criminal defendant.

Similarly, in this nation's highest traditions of deference to human dignity, we have accorded a presumption of innocence to those accused of a crime. From the record, we are forced to question whether that presumption was ever meaningfully enjoyed by respondent. And yet, we emphatically declare that our decision has not been, to any extent, based upon what are popularly referred to as "legal technicalities." Hence, by way of illustration, we have paid not the slightest attention to respondent's allegations that his residence was unlawfully entered by or at the behest of federal agents to secure information useful to the prosecution.[320] When it comes to a judicial officer, proof of guilt, however obtained, would have to be considered in a disciplinary proceeding; maintaining public confidence in the bench and bar would demand no less.

Harry Claiborne, to this date, remains a convicted felon. It has been neither the nature of this proceeding nor our jurisdictional prerogative to alter that status. Any relief to which respondent may be entitled in that regard must be sought through the federal

---

[320]Rec. Pt. I, Vol. VIII, Pleading No. 81; Rec. Pt. I, Vol. IX, Pleading No. 105.

system that produced the conviction. We, of course, have no way of knowing whether Claiborne is innocent or guilty of the charges that eventually caused his downfall. We have therefore brought to bear our combined efforts and resources to analyze fairly and thoroughly the large record in an attempt to responsibly uphold our duty to dispense justice. There will be those who will objectively and patiently track the slow pace of this lengthy opinion and still honestly conclude that we arrived at the wrong destination. There may also be those who will agree that our conclusions are just, but nevertheless feel that respondent should be sacrificed on the altar of ongoing respect for public perceptions of the integrity of the bench and bar.[321] And inevitably there will be those who, in their harsh and precise judgment will prove anew the truth of George Herbert's observation that "the ignorant hath an eagle's wings and an owl's eyes." Neither this court, nor respondent, nor any other earthly source can disabuse those in the latter category; we would prefer that it were otherwise, for it would greatly serve the principles underlying this opinion, as well as future discourse on improving the administration of justice.

In summary, we wish to stress that our disposition of this matter should in no manner be construed to diminish the significance and the consequences which ordinarily are accorded to an attorney's conviction of a serious crime. *See* SCR 111. As we have endeavored to set forth above, however, this was no ordinary conviction. Questionable investigative and prosecutorial motivations, as well as anomalous and arguably unfair practices and procedures, pervade the record of this matter from its inception. Indeed, the very procedures utilized by this court in resolving the issues at hand have been the subject of much recent discussion in the press and among the members of the bar. We are cognizant of the fact that regardless of our ultimate disposition of this case, its controversial nature and the widespread public attention which it has engendered will inevitably result in further public debate. Accordingly, in an attempt to insure that such debate, regardless of its focus, may be informed, based upon fact

---

[321]Such feelings would not be without some justification. It is clear that respondent, as a sitting federal judge, was both intemperate and provocative in his comments to the press concerning the integrity and character of federal agents assigned to the task of bringing criminal elements to justice in Nevada. *See* textual discussion, page 19, *supra,* including the footnoted material therein. Hence, the contention is not totally without reason that respondent invited the treatment he received and that he, rather than the bench and bar, should suffer the consequences of the vendetta provoked by his intemperate public statements. Again, we may have had some sympathy for that view if the record had reflected a true and fair path from the point of agitation through respondent's conviction and impeachment.

rather than anonymous speculation, we have endeavored to set forth in detail the manner in which this matter came before us, the procedures we employed in resolving the factual and legal issues presented and the underlying facts and legal rationale which led to our ultimate conclusion. In so doing we are hopeful that the public and the bar will come to understand that we acted in accordance with well-established and frequently stated principles of law pertinent to professional disciplinary proceedings.

In light of the above, we decline to impose additional punishment upon respondent Claiborne by way of professional discipline, and we hereby dismiss these disciplinary proceedings.[322]

YOUNG and SPRINGER, JJ., concur.

---

[322]Pursuant to the request of respondent's counsel, THE HONORABLE JOHN C. MOWBRAY, Justice, recused himself from consideration of this case. Nev. Const. art. 6, § 4.

FEDERAL BUREAU OF INVESTIGATION

1

Date of transcription 6/17/83

Charlotte Travaglia, 3414 Sylvia, apartment #4, Las Vegas, Nevada, was asked to examine a xerox copy of a "worksheet" that was supposedly prepared for her to be utilized in completing the 1980 federal income tax form for Barry Claiborne.

Upon examing the form Charlotte Travaglia advised the items listed as number one and number two and number three appeared to have been placed on the form by Jerry Watson. She feels this is his handwriting.

As for item number four she also believes this is Watson's handwriting with the exception of the wording "interest earned on" which she stated she placed on the form in her handwriting. The boxes on the form as well as the other diagrams appear to be consistent with the manner in which Watson would "doodle" on forms or take down information. After items number four the words "also #345" were put on the form by her.

Items number five and number six are in her handwriting. She also advised the "tick marks" appearing on the form are also hers as is the asterisk mark preceding the figure $88,500 in item number two.

When asked if she had this form which spells out the income of $88,500 why she did not place that in the income column on the federal income tax form. She stated she cannot answer that question as she does not know why she would not have placed it in the income. She stated she was never told not to declare the $88,500 as income; and she added she was never told to include it.

Based on the questions she wrote out in item number five on the form she believes she must have had other documents or worksheets that she was making reference to. However, she cannot specifically recall this particular worksheet and therefore cannot recall if there were other documents but felt there must have been.

| 6/17/83 | Las Vegas, Nevada | LV 58-138-5.3 2 0 |

SA Richard T. Jesinger/lmb          6/17/83

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

EXHIBIT #1

AFFIDAVIT

I, Richard T. Jesinger, having been first duly sworn, depose and say that:

(1) I am employed by the Federal Bureau of Investigation as a Special Agent on behalf of the United States of America from June 16, 1969, to present.

(2) Attached to this affidavit is a Federal Bureau of Investigation interview report (FD-302) of Charlotte Travaglia, 3414 Sylvia, Apartment Number 4, Las Vegas, Nevada, dated June 17, 1983.

(3) The interview report was recorded by me, and the information contained therein is correct and accurate to the best of my knowledge.

Further, affiant sayeth not.

_____
Richard T. Jesinger

Subscribed and sworn to before me this seventh day of May, 1986.

_____
Notary

Michael B. Growney
NOTARY PUBLIC
State of Nevada, Clark County
My commission expires July 21, 1986

63 835 2015

1980

DEFENDANT'S
EXHIBIT
41
CR 83-57

# Income

① Wages as Federal Judge : $54,499.22

② Income from Private Practice
Before Appointment in      ✗ 88,500.00
1978 Payable And Received
in   1980

③ Interest On Savings Account
At Nevada Savings          1,773.14

Interest earned on
④ Dividends on New York Life
Insurance Policy           4,632.62

also - ✗ 4,345,

⑤ What I use in his business transactions is: Fair Mkt+
price was not considered on the trade—take — the acct
a gain from sale becomes above value was use in
as income. If the was knowledge of that fair market
value use can go for it '80 interview supply to
that "no 3 Income +"

⑤ What about Pioneer 33½?
if monies withdrawn are resold
same as forfeiture

EXHIBIT #2

236

**SCHEDULE D**
**(Form 1040)**
Department of the Treasury
Internal Revenue Service

**Capital Gains and Losses** (Examples of property to be reported o Schedule are gains and losses on stocks, bonds, and similar investments, and gains (bu. losses) on personal assets such as a home or jewelry.)
▶ Attach to Form 1040.   ▶ See Instructions for Schedule D (Form 1040).

**'80**
**15**

Name(s) as shown on Form 1040    HARRY E. CLAIBORNE

Your social security number    431 14 0100

**Part I** — Short-term Capital Gains and Losses—Assets Held One Year or Less

| a. Kind of property and description (Example, 100 shares 7% preferred of "Z" Co.) | b. Date acquired (Mo., day, yr.) | c. Date sold (Mo., day, yr.) | d. Gross sales price (less expenses of sale) | e. Cost or other basis, as adjusted (see instructions page 21) | f. LOSS If column (e) is more than (d) subtract (d) from (e) | g. GAIN If column (d) is more than (e) subtract (e) from (d) |
|---|---|---|---|---|---|---|
| 1 Viceto Rec For. Law Practice left upon Sit of employment in Finited US Court appoint | 1978 | | | | | |
| | | | | | | |

| | | | |
|---|---|---|---|
| 2 Gain from sale or exchange of a principal residence held one year or less, from Form 2119, lines 7 or 11 . . . . . . . . . . . . . . . . . | 2 | | |
| 3 Enter your share of net short-term gain or (loss) from partnerships and fiduciaries . . . . . . . . . . . . . . . . . . . . . . | 3 | | |
| 4 Add lines 1, 2 and 3 in column f and column g. . . . . . . . . . . | 4 | | |
| 5 Combine line 4, column f and line 4, column g and enter the net gain or (loss) . . . . . . . . | 5 | | |
| 6 Short-term capital loss carryover from years beginning after 1969. . . . . . . . . . . . | 6 | ( | ) |
| 7 Net short-term gain or (loss), combine lines 5 and 6 . . . . . . . . | 7 | | |

**Part II** — Long-term Capital Gains and Losses—Assets Held More Than One Year

| a | | | | | | |
|---|---|---|---|---|---|---|
| super house | | 1978 | 1980 | 150,000 | 350,000 | 100,000 |
| | | | | | | |

| | | | |
|---|---|---|---|
| 9 Gain from sale or exchange of a principal residence held more than one year, from Form 2119, lines 7, 11, or 18 . . . . . . . . . . . . . . . . | 9 | | |
| 10 Enter your share of net long-term gain or (loss) from partnerships and fiduciaries . . . . . . . . . . . . . . . . . . . . . . | 10 | | |
| 11 Add lines 8, 9 and 10 in column f and column g. . . . . . . . . . . | 11 | 100,000 | |
| 12 Combine line 11, column f and line 11, column g and enter the net gain or (loss) . . . . . . . | 12 | (100,000) | |
| 13 Capital gain distributions . . . . . . . . . . . . . . . . . ▼ . . . . | 13 | | |
| 14 Enter gain, if applicable, from Form 4797, line 5(a)(1) . . . . . . . . . . . . . . . | 14 | | |
| 15 Enter your share of net long-term gain from small business corporations (Subchapter S) . . . . . | 15 | | |
| 16 Combine lines 12 through 15. . . . . . . . . . . . . . . . . . . | 16 | (100,000) | |
| 17 Long-term capital loss carryover from years beginning after 1969 . . . . . . . . . . . . | 17 | ( | ) |
| 18 Net long-term gain or (loss), combine lines 16 and 17. . . . . . . . . . . . . . . . | 18 | (100,000) | |

Note: If you have capital loss carryovers from years beginning before 1970, do not complete rest of form. See Form 4798 instead. Otherwise, complete this form on reverse.

EXHIBIT #3

Schedule    1D) 1980                                                                                      Page 2

**Part III** Summary of Parts I and II

| | | | |
|---|---|---|---|
| 19 Combine lines 7 and 18, and enter the net gain or (loss) here . . . . . . . . . | **19** | ⟨100,000⟩ | |
| 20 If line 19 shows a gain— | | | |
| a. Enter 60% of line 18 or 60% of line 19, whichever is smaller. Enter zero if there is a loss or no entry on line 18 . . . . . . . . . . . . . . . . . . . | **20a** | | |
| If the amount you enter on this line is other than zero, you may be liable for the alternative minimum tax. See Form 6251. | | | |
| b Subtract line 20a from line 19. Enter here and on Form 1040, line 14 . . . . . . . . . | **20b** | | |
| 21 If line 19 shows a loss— | | | |
| a. Enter one of the following amounts: | | | |
| (i) If line 7 is zero or a net gain, enter 50% of line 19, | | | |
| (ii) If line 18 is zero or a net gain, enter line 19; or, | | | |
| (iii) If line 7 and line 18 are net losses, enter amount on line 7 added to 50% of the amount on line 18 . . . . . . . . . . . . . . . . . . . . | **21a** | ⟨50,000⟩ | |
| b Enter here and enter as a loss on Form 1040, line 14, the smallest of— | | | |
| (i) The amount on line 21a, | | | |
| (ii) $3,000 ($1,500 if married and filing a separate return); or, | | | |
| (iii) Taxable income, as adjusted . . . . . . . . . . . . . . . . . . | **21b** | ⟨3,000⟩ | |

Note: If the loss on line 21a is more than the loss shown on line 21b, complete Part IV to determine post-1969 capital loss carryover from 1980 to 1981.

**Part IV** Computation of Post-1969 Capital Loss Carryovers from 1980 to 1981
(Complete this part if the loss on line 21a is more than the loss shown on line 21b)

Section A.—Short-term Capital Loss Carryover

| | | |
|---|---|---|
| 22 Enter loss shown on line 7; if none, enter zero and skip lines 23 through 27—then go to line 28 . . . | **22** | |
| 23 Enter gain shown on line 18. If that line is blank or shows a loss, enter zero . . . . . . . . . | **23** | |
| 24 Reduce any loss on line 22 to the extent of any gain on line 23 . . . . . . . . . . . . . . | **24** | |
| 25 Enter amount shown on line 21b . . . . . . . . . . . . . . . . . . . . . . . | **25** | |
| 26 Enter smaller of line 24 or 25 . . . . . . . . . . . . . . . . . . . . . . . . | **26** | |
| 27 Subtract line 26 from line 24 . . . . . . . . . . . . . . . . . . . . . . . . | **27** | |

Note: The amount on line 27 is the part of your short-term capital loss carryover from 1980 to 1981 that is from years beginning after 1969.

Section B.—Long-term Capital Loss Carryover

| | | |
|---|---|---|
| 28 Subtract line 26 from line 25. (Note: if you skipped lines 23 through 27, enter amount from line 21b) . | **28** | 2,000 |
| 29 Enter loss from line 18; if none, enter zero and skip lines 30 through 33 . . . . . . . . . . | **29** | 100,000 |
| 30 Enter gain shown on line 7. If that line is blank or shows a loss, enter zero . . . . . . . . . | **30** | 0 |
| 31 Reduce any loss on line 29 to the extent of any gain on line 30 . . . . . . . . . . . . . | **31** | 100,000 |
| 32 Multiply amount on line 28 by 2 . . . . . . . . . . . . . . . . . . . . . . . | **32** | 4,000 |
| 33 Subtract line 32 from line 31 . . . . . . . . . . . . . . . . . . . . . . . . | **33** | 94,000 |

Note: The amount on line 33 is the part of your long-term capital loss carryover from 1980 to 1981 that is from years beginning after 1969

EXHIBIT #3

FINANCIAL DISCLOSURE REPORT

ANNUAL REPORT DUE BY MAY-15 FROM JUDICIAL OFFICERS AND CERTAIN JUDICIAL EMPLOYEES PER 28 USCA App I §101 et seq

| REPORT, LAST NAME, FIRST, MIDDLE INITIAL | COURT OR ORGANIZATION | REPORT DUE DATE |
|---|---|---|
| Harry E. | District of Nevada | 5/15/81 |
| Judge | NEW EMPLOYEE ONLY-DATE OF ENTRY ON DUTY | IF REPORT IS FOR PERIOD OTHER THAN CALENDAR YR USE PERIOD BELOW |

OFFICE ADDRESS

...5 Vegas Blvd. So., Las Vegas, Nevada 89101

This report includes information for my spouse and dependent

...ion for my spouse and dependent children is submitted on separate forms

The following symbols may be used where applicable: (J) jointly owned by person reporting and spouse, (S) spouse, and (DC) dependent child

See instructions, page 5

Note: Please read the instructions accompanying this form. Sign this form on the reverse side. Attach additional sheets if needed, identify each attachment by showing your name and the section being continued. Complete all parts (If NONE, SO INDICATE) Please type or print clearly

I. INVESTMENT INCOME See Page 6 of Instructions.

| SOURCE (and, for Honoraria only, DATE RECEIVED) | TYPE | AMOUNT (hours not spent $) |
|---|---|---|
| Past fees from law practice | fees | 88,500.00 |

II. INVESTMENTS AND TRUSTS: INCOME (II) and VALUE (III)

| Description of Assets including Trust Assets See Page 7 of Instructions. | Type of Income | II. Income (in excess of $100) See Page 8 of Instructions. | | | | | | III. Value See Page 9 of Instructions. Valuation Method | | Value See Page 9 of Instructions. | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | up to 1 | 1- 1.5 | 1.5- 5 | 5- 15 | 15- 50 | 50- 100 | 100+ | Use Alphabet Code | up to 1 | 1- 15 | 15- 50 | 50- 100 | 100+ | 250+ |
| Pers. □ Savings Account, Nevada Savings and Loan, Las Vegas, Nev. | | X | | | | | | | | X | | | | | |
| Mortgage, Carl Lindburg, Las Vegas Nevada | | | | | | | | | | | | | | | X |
| Mortgage, Capitol Mortgage Company, Las Vegas, Nevada | | X | | | | | | | | X | | | | | |
| Dividend, New York Life Insurance | X | | | | | | | | | X | | | | | |
| Account, First National Bank, Las Vegas, Nevada | | | | | | | | | | | | | | | X |
| Real estate, 810 Pinehurst, Las Vegas, Nevada | | | | | | | | | | | | | | | X |
| Dwelling, 1908 Plaza de la Cruz, Las Vegas, Nevada | | | | | | | | | | | | | | | X |
| Real estate, two lots, Washington County, Utah | | | | | | | | | X | | | | | | |
| Real estate, Riverside County, California | | | | | | | | | X | | | | | | |
| Two lots, Pahrump Valley, Nye County, Nevada | | | | | | | | | X | | | | | | |
| Mercedes Benz Automobile | | | | | | | | | | X | | | | | |
| Dodge Ramcharger Truck | | | | | | | | | X | | | | | | |
| Dodge Pickup Truck | | | | | | | | | X | | | | | | |
| 370,000 shares stock in Grandissimo, Inc., Las Vegas, Nev | | | | | | | | | X | | | | | | |

....NT RECEIVED MAY 1 6 1981

Edward Allen Tarr

Chairman, Judicial Ethics Committee

EXHIBIT #4

BIF'S *See Page 3 of Instructions.*

A. Gifts of transportation, lodging, food, or entertainment.

| SOURCE | DESCRIPTION |
|--------|-------------|
| None ☐ | |

B. Other Gifts *See Page 11 of Instructions.*

None ☐                                                      VALUE

**V. REIMBURSEMENTS** *See Page 11 of Instructions.*

| SOURCE | DESCRIPTION |
|--------|-------------|
| None ☐ | |

**VI. LIABILITIES** *See Page 11 of Instructions.*

| DESCRIPTION *(include identity of Payee or Creditor)* | 10+ to 15 | 15+ to 50 | 50+ to 100 | 100+ to 250 | 250+ |
|---|---|---|---|---|---|
| *None* ☐ Promissory note payable to Stanwell Mortgage Co., Concord, Calif. | | | | X | |
| Promissory note payable to Realty Holdings, Inc. Las Vegas, Nevada | | X | | | |
| Promissory note payable to First Western Savings, Las Vegas, Nevada | | | | X | |

*Amount in thousands of dollars*

**VII. TRANSACTIONS** *See Page 11 & 13 of Instructions.*

| DESCRIPTION      DATE | SALE | PURCHASE | EXCHANGE | 1+ to 5 | 5+ to 15 | 15+ to 50 | 50+ to 100 | 100+ to 250 | 250+ |
|---|---|---|---|---|---|---|---|---|---|
| *None* ☐ June 19, 1980 purchased dwelling at 810 Pinehurst, Las Vegas, Nevada | | X | | | | | | | X |
| October 14, 1980, sold real property located at 500 Rancho Road, Las Vegas, Nevada | X | | | | | | | | X |
| June 26, 1980 purchased dwelling at 1908 Plaza de la Cruz, Las Vegas, Nevada | | X | | | | | | | X |

*Value in thousands of dollars*

**VIII. POSITIONS** *See Page 12 of Instructions.*

| POSITION | NAME OF ORGANIZATION |
|----------|---------------------|
| None ☐ | |

**IX. AGREEMENTS** *See Page 13 of Instructions.*

| DATES | PARTIES | TERMS |
|-------|---------|-------|
| None ☐ | | |

NOTE: Any individual who knowingly and willfully falsifies, or who knowingly and willfully fails to file this report may be subject to civil & criminal sanctions (28 U.S.C.A. App. 1, §304 & 18 U.S.C. §1001)

SIGNATURE ☐   I certify that all information given above is accurate, true, and complete to the best of my knowledge and belief, and that any information not reported was withheld because it met applicable statutory conditions permitting non disclosure

DATE _____

MAILING THIS FORM   Judicial Officers and Employees mail original and one copy of this form to.    Deliver one copy to the Clerk of the Court on which you sit or serve. Judicial Ethics Committee   Judicial Employees not associated with a specific court, United States Courthouse   such as employees of the Administrative Office and 3rd & Constitution Ave., N.W.   the Federal Judicial Center need not file a copy with any Clerk. Washington, DC 20001

**EXHIBIT #4**

GUNDERSON, C. J., concurring:

I applaud our brother Steffen's conscientious and scholarly effort to provide for history an organized and documented recitation of the sequence of facts involved in the years-long pursuit of Judge Claiborne, the prosecutions of Judge Claiborne and various others, and the eventual conviction and impeachment of Judge Claiborne himself.

Nonetheless, this court cannot hope to prove—by hundreds of citations to the many thousands of pages contained in the record before us—that we have arrived at the final, complete, and ultimate "truth" concerning the Claiborne saga. Nor can we hope to validate, to the satisfaction of everyone, that we are "correct" in deciding that the 71-year-old respondent has at long last suffered enough. I would hope, however, that through Justice Steffen's careful and measured exposition of the historical background, it will be demonstrated, to open-minded folk at least, that there are principled bases—both in fact and in law—for our conclusion that he should not be punished further.

There is a venerable allegorical tale about three sightless mendicants who sensed an elephant passing by them, and who each reached out a hand and touched a different part of his anatomy. One beggar, who contacted the pachyderm's leg, pronounced it confidently to be a tree. Another, who encountered the beast's side, felt himself without question to be facing a wall. And the third, who grasped the animal's trunk, believed beyond any doubt that he had taken hold of a great snake. Each stated his own view with certitude, and wondered what evil demons had possessed his fellows and impelled them to announce their obviously false and groundless claims. A heated dispute ensued between the beggars. All accused the others of being fools and liars; no agreement was ever reached.

As experienced by many, discussions of the Claiborne case almost certainly will be destined for a similar fate. The pursuit, the trials, the conviction, and the impeachment of Judge Claiborne has generated an elephantine body of data, from which diverse inferences and conclusions can be drawn—perhaps even by someone who carefully evaluates the data. And, although most of those data are available in the huge record lodged with this court's clerk here in Carson City, the public neither has any practical access to the record, nor the time and training to sift and weigh its contents. One might argue that, in the interest of our country, the press as the public's surrogate should undertake to analyze the record carefully on behalf of the citizenry. Certainly, as Justice Steffen's efforts demonstrate, its contents reveal a tale— indeed, several tales—worth telling.

I am informed by this court's staff, however, that except for the few token passing glances, no one from outside the court—journalist, lawyer, or lay person—has sought to look at the record at all. There are those who justify their unwillingness to address or assess the facts by professing to believe—notwithstanding the fact that Judge Claiborne was wrongly pursued for years on a series of baseless charges—that the only fact now of importance is that the government ultimately managed to convict him, on very tenuous evidence, of filing false tax returns. Well, let anyone who so desires start and end his or her personal thought processes with that one fact. If the pachyderm's tail—the conviction—is all such persons wish to consider, so be it! I will concede such persons the right to their opinions—although, as Bernard Baruch once opined, I tend to think no one is entitled to be wrong or ignorant about the facts.

In regard to such persons' notions of what the law should be, I can only respond—based on the authorities cited in our brother Steffen's opinion—that under the established law of this state, and of many other jurisdictions for that matter, our court clearly has had a more expansive and more difficult duty to fulfill than merely to notice that Judge Claiborne was ultimately convicted of a federal offense. And it does seem to me, frankly—after so many laws and rules have been ignored and altered throughout the federal system in the long process of achieving Judge Claiborne's conviction and impeachment—that the man should at least be entitled now to have this court adhere with fidelity to our prior precedents: precedents which clearly dictate that we should evaluate all mitigating factors in the course of deciding whether or not, as a further and collateral consequence of his conviction, to strip away this elderly man's only remaining means of earning a livelihood.

If each member of this court were to set forth all of his thoughts about this case, I think we would probably quadruple the length of Justice Steffen's opinion. I, for example, am just as astounded as the Reno Gazette-Journal has been over the bargain government agents struck with a multiply-convicted brothel owner, and I hereby adopt that newspaper's comments by reference. *See* Reno Gazette-Journal, June 29, 1984, *Conforte Reels in Some Mighty Big Suckers,* at 21A. I consider the editorial just cited to be as relevant today as when it was written, because the Gazette-Journal set forth a very cogent picture of how and why the prosecution of Judge Claiborne was initiated and pursued. In the crucial area covered by the editorial, I could not present my thoughts nearly so lucidly, although I would attempt to be less strident. The Gazette-Journal stated:

> The Justice Department and the FBI were so incensed at Judge Claiborne that the need for revenge blinded them to everything but one burning desire. The federal government could not rest after Claiborne denounced its Strike Force lawyers as "rotten bastards" and "crooks and liars." It could not bear Claiborne's other insinuations without retaliating.
>
> So it dug and dug, and when Conforte put out his bait, the government swallowed it right up to the fishing pole.

I have discovered nothing in the record that does not support the Gazette-Journal's further observation that agents of the government were "too busy with retaliation to bother with facts." However, I would not—as the Gazette-Journal seems to—condemn all representatives of the Justice Department and the FBI. I believe that the vendetta the newspaper described was pursued by only a limited number of agents, one of whom (Yablonsky) has since exited both his office and Nevada under a cloud of charges that related to misuse of his office and to apparent expropriation of a large sum of money belonging to a bank. As to other dubious prosecutorial behavior that has been revealed—for just one example, the persecution of respected Nevada IRS Director Gerald Swanson—I join Justice Steffen in hoping the same did not result from a knowing vendetta by the Justice Department or FBI, but from the indiscretions of a small group of people. I believe the management of the Gazette-Journal must understand the reason that better men, higher in government, tolerated the abuses was because the targeted judge had traversed the important principle of political science that the Gazette-Journal implicitly recognized in its editorial. That is, if members of a group are criticized and embarrassed, cohesion tends to develop among all of its members, and this tends to be particularly true when the criticism is harsh and directed toward the group as a whole.

In any case, in our brother Steffen's effort to apply the law to the evidence in the record, he has alluded to the foregoing and to most of the other significant facts and ideas that have occurred to me while studying this record. Also, to the extent they have relevance to the case before us, Justice Steffen has touched upon the more important considerations which repel certain unfair allegations anonymous "sources" have tendered to the media concerning procedural aspects of the handling of this case—allegations that never have been raised as issues by Bar Counsel—but which the "sources," by distorting facts, have attempted to convince the media should be deemed burning concerns nonetheless.

As tempted as I am to do so, I will therefore not enlarge extensively upon Justice Steffen's work in order to repel spurious non-issues which have been raised to the press by "bar sources" but never by Bar Counsel. Issues not preserved for our consideration, either by objection or by motion of counsel, are not normally considered by this court.[1] Thus, the attacks launched through the media by anonymous "bar sources," which concern notions never tendered to this court as issues by Bar Counsel, either contemporaneously or at all, should be considered no proper part of the case before us.

Before concluding, I want to mention that I have now served nearly 18 years on this court, which is vested with the solemn task of providing a final resolution for the most hotly debated issues which arise in our courts. Members of this court now must gird themselves to decide more than four cases per judicial day. This does not leave unlimited time to reflect. This court is no longer the relaxed, contemplative environment law students envision when they think of O. W. Holmes, Jr., and Learned Hand, and, to anyone who suggests our decisions are sometimes flawed by the imperatives of haste, I must acknowledge my fear that this is true. I do not believe such a thing occurred in the instant case, however.

In the time I have served here, I have participated in the determination of over 12,000 cases, involving some 30-thousand or so litigants plus their attorneys. For every successful litigant, there is a loser. In the nature of things, at least half or more of them must go away dissatisfied with our judgments—sometimes desperately so. And, in cases with a high public profile, such as this one, the number of the general public who will be disappointed, disgruntled, or incensed necessarily increases quite markedly. In my time, few matters have possessed as much potential for sharply dividing public opinion as the case before us. Unfortunately, in matters as controversial as this one, citizens who find their wishes have not prevailed tend to vent their frustrations in personal, *ad hominem* attacks against this court.

---

[1] *See* Trustees, Carpenters v. Better Building Co., 101 Nev. 742, 743, 710 P.2d 1379, 1381 (1985) (in absence of objection, point not considered on appeal); Whalen v. State of Nevada, 100 Nev. 192, 194, 679 P.2d 248, 250 (1984) (objection to allegedly incompetent evidence is necessary, or court will accept same as admissible); Old Aztec Mine, Inc. v. Brown, 97 Nev. 49, 52, 623 P.2d 981, 983 (1981) (point not contemporaneously urged is deemed waived); Diversified Capital v. City of N. Las Vegas, 95 Nev. 15, 19 n.4, 590 P.2d 146, 148 n.4 (1979) (appellant without standing to assert master's failure to make a record, since no request made); Auto Fair, Inc. v. Spiegelman, 92 Nev. 656, 659, 557 P.2d 273, 275 (1976) (absent objection to testimony, point not later considered by this court).

As one example of this kind of reaction, I wish to note that, apparently on the basis of anonymous sources, who could have nothing substantial to back up their claims, it has repeatedly been printed as a fact that I am a "close friend" of Judge Claiborne. Without belaboring the point, I believe such an appellation totally mischaracterizes my past associations with the respondent herein. The Recorder, a San Francisco legal newspaper which has reported on this matter with more objectivity than some, quoted legal ethicist Charles W. Wolfram, a Cornell University law professor, as characterizing my acquaintance with Judge Claiborne as "not shocking at all and almost to be expected in such a small legal community—especially when both Gunderson and Claiborne are two of its best known figures." The Recorder, Apr. 4, 1988, at 18. In any case, Bar Counsel knew that I believed I should not disqualify myself, and he never saw fit to raise the question by tendering any motion for my disqualification, in the manner provided by law.

In my view, I was not disqualified to sit either because of my fictive "closeness" to Judge Claiborne, or because I had testified under subpoena as a fact witness in his first trial, about matters which later neither remained at issue nor were subject to any question. Obviously, I could have taken the easy way out by disqualifying myself. But under Nevada law, I had a positive obligation not to disqualify myself as to matters concerning which I did not believe myself disqualified. Now, of course, a judge's own views on the subject of his disqualification are not the final authority. Under Nevada statutes, counsel for either side may question the judge's assessment of such an issue by formal motion. If Bar Counsel had done so, of course, I would have been afforded a chance to present my views in a public hearing, held openly pursuant to NRS 1.225(4). No motion for disqualification has ever been filed.[2]

Again, another media outlet has printed speculations— altogether without basis and contrary to fact—that this court has

---

[2]In this regard, I refer particularly to the case of Ham v. District Court, 93 Nev. 409, 566 P.2d 420 (1977), in which the Supreme Court of Nevada issued a writ of prohibition to prevent a judge from disqualifying himself voluntarily in a case when, in so doing, he had stated he felt there was no cause for him to do so. In other words, this court held that a judge is not free to disqualify himself voluntarily, without good cause, thereby shirking over to another judge his own obligations in a contentious or difficult matter. If he does not deem himself disqualified, the judge has a duty under Nevada law to continue presiding, unless and until he is removed by other authority.

The aforedescribed concept, which has been called the "duty to sit doctrine," is not peculiar to Nevada law. It is also recognized by federal courts and, in fact, Judge Walter Hoffman referred to the doctrine in denying requests for his disqualification. *See, e.g.*, Rec. Pt. I, Vol. VI, Pleading No. 56.

been "dragging its feet" in regard to producing an opinion in this matter. Quite to the contrary, as I believe Justice Steffen's opinion makes obvious, we have given a maximum effort and priority to trying to satisfy the demands of history for a full and documented analysis of the pertinent facts and the relevant law. The problem in formulating an opinion in this matter has not been that supporting data are sparse, as it has been hypothesized, but that they are so many.

And to take a final example, another media outlet has gone so far as to suggest to its readers—without any facts to justify the notion, of course—that the members of this court perhaps think of Harry Claiborne as a "hero." Well, I do not regard Judge Claiborne as a hero; nor do I know anyone on this court who does. Certainly, Judge Claiborne acted precipitously by the manner in which he retaliated verbally against his tormentors; he was at least negligent in handling his personal affairs; he thereby left himself vulnerable—and he has paid a terrible price for these lapses.

Yet, while I certainly would not seek to tender Judge Claiborne to the world as a hero, I will suggest that if the man had been a quitter—had he capitulated, "rolled over" as the saying goes in courthouse circles—so that the background facts of his pursuit and prosecution remained forever obscured, it could have been extremely unfortunate for the American bench and bar. Indeed, it could have been most unfortunate for America. One of the greatest bulwarks for freedom in this country is our independent, life-tenured federal judiciary. It is vitally important, therefore, for the notion never to gain credence that a United States District Court judge can easily be targeted, discredited and destroyed. Whenever such an effort to discredit and destroy a federal judge is undertaken, I think it is essential that any suspect facts concerning the undertaking shall be made known. Hence, through Judge Claiborne's stubbornness—I will not say whether his resistance should be called courage—I suggest that he has impelled, and is impelling, an important examination of the processes by which his indictment, conviction and impeachment were achieved.

While I suppose anonymous "sources" may castigate me for even tendering it, I will close by offering the idea that, because the independence of the federal judiciary is so important, it may be fortunate for our country's system of checks and balances that the targeting and pursuit of the United States District Court judge here in question has not ended with his total annihilation. There is no doubt whatever that the pursuit began with a fixed purpose— but without any evidence whatever—that the United States District Court judge should be destroyed. The pursuit was totally goal-oriented toward that end. The notion of tax charges had not

even been dreamed of, when the effort began to find something to justify a prosecution, any prosecution!

And when the pursuit ended, it did not culminate with any clear affirmation of the premise on which it started—namely, that the United States District Court judge was corrupt—but, rather, it ended with a collection of data that, as Senator Orrin Hatch cogently argued, is more consistent with a finding of mere negligence than with any inference of criminal culpability. In these circumstances, I concur in the majority's conclusion that the final denouement of this unfortunate episode in American history should not be the total and complete destruction of the judge as a human being and as a productive citizen.